# EXHIBIT 1

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA and Attested by the**
**COURT OF COMMON PLEAS OF PHILADELPHIA** *Office of Judicial Records*
*10 MAY 2024 11:10 am*
*U. SMITH*

**FELDMAN SHEPHERD**
**WOHLGELERNTER TANNER**
**WEINSTOCK & DODIG LLP**
1845 Walnut Street - 21st Floor
Philadelphia, Pennsylvania 19103

                                        *Plaintiff,*
vs.

**ALLIED WORLD INSURANCE**
**COMPANY**
1690 New Britain Ave., Suite 101
Farmington, CT 06032

                                        *Defendant.*

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**

**CIVIL ACTION NO.**

**MAY TERM, 2024**
**No.**

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association**<br>**Lawyer Referral**<br>**and Information Service**<br>**1101 Market St., 11th Floor**<br>**Philadelphia, Pennsylvania 19107**<br>**(215) 238-6333** | **Asociacion De Licenciados**<br>**De Filadelfia**<br>**Servicio De Referencia E**<br>**Informacion Legal**<br>**1101 Market St., 11th Piso**<br>**Filadelfia, Pennsylvania 19107**<br>**(215) 238-6333** |

**10-284**

Louis A. Bove, Esquire
lbove@bodellbove.com
PA ID No. 53071                              *Attorneys for Plaintiff*
**BODELL BOVE LLC**                          *Feldman Shepherd Wohlgelernter*
1845 Walnut Street, Suite 1100               *Tanner Weinstock & Dodig LLP*
Philadelphia, PA 19103
(215) 864-6600

_____

**FELDMAN SHEPHERD**
**WOHLGELERNTER TANNER**                     **COURT OF COMMON PLEAS**
**WEINSTOCK & DODIG LLP**                    **PHILADELPHIA COUNTY**
1845 Walnut Street - 21st Floor
Philadelphia, Pennsylvania 19103             **CIVIL ACTION NO.**

                                             **MAY TERM, 2024**
                        *Plaintiff,*         **No.**
vs.

**ALLIED WORLD INSURANCE**
**COMPANY**
1690 New Britain Ave., Suite 101
Farmington, CT 06032

                        *Defendant.*
_____

## COMPLAINT

Plaintiff Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP ("Feldman

Shepherd" or "Law Firm" or "Plaintiff"), by and through its undersigned counsel by and for its

Complaint against Defendant Allied World Insurance Company ("Allied World" or

"Defendant"), avers as follows:

### INTRODUCTION

1.     This is an action against an insurer, Allied World, for breach of contract and bad

faith arising out of its handling of a professional liability claim advanced against its insured

under a professional liability insurance policy it sold to that insured.

2.     Among other knowing, intentional, or reckless acts and omissions, Allied World

wrongfully, and without plausible justification:

(a)     Refused to timely acknowledge that a covered professional malpractice claim under the professional liability policy had been advanced against its insured;

(b)     Refused to timely defend its insured;

(c)     Refused to indemnify defense costs its insured was compelled to advance in response to that covered malpractice claim;

(d)     Refused to engage in any meaningful or good faith efforts to resolve the covered malpractice claim—even after expressly acknowledging that it was a covered claim under the policy; and

(e)     Compelled its policyholder to resolve the covered malpractice claim on its own, and then refused to indemnify the reasonable and arm's length settlement reached.

3.      After breaching its insuring obligations under the professional liability policy and violating its obligations of good faith and fair dealing in these and other regards, Allied World compounded its bad faith handling of this covered claim following the settlement by knowingly misrepresenting policy terms and provisions, painting a false and revisionist history of its bad faith handling of the covered claim, and attempting to raise so-called policy defenses which were patently meritless and, in any event, never timely reserved in writing.

4.      On account of this unlawful breach and bad faith conduct, Plaintiff now seeks to recover from Allied World all consequential damages on account of the breach, all statutory bad faith damages as provided under 42 Pa.C.S. § 8371, and such other and further relief as set forth herein.

**PARTIES**

5.      Feldman Shepherd is a limited liability partnership, organized under the laws of the Commonwealth of Pennsylvania.

2

6. Allied World is an insurance company which regularly conducts insurance business in the Commonwealth of Pennsylvania and engaged in such business in connection with the specific claims advanced herein. Allied World has a place of business for notice at the above captioned address.

7. At all times relevant hereto, Allied World acted by and through its employees, servants, and actual or ostensible agents including, without limitation, Wiley Rein LLP ("Wiley Rein"), Kimberly Cereijo, Joseph W. Gross, and Jaclyn L. Adorno.

## JURISDICTION AND VENUE

8. This Court has jurisdiction because, *inter alia*, the Defendant systematically conducts business within the Commonwealth of Pennsylvania and this County, and the particular cause of action sued upon herein arose from Defendant's particular activities, transactions, acts and omissions in the Commonwealth of Pennsylvania and the First Judicial District.

9. Venue in this matter is proper pursuant to Pa.R.Civ.P. 2179(a) and (b)(1).

## FACTS COMMON TO ALL COUNTS

### A. THE ALLIED WORLD POLICY

10. Allied World marketed, sold, and delivered a certain professional liability insurance policy, identified more specifically as Allied World *LPL Assure* Lawyers Professional Liability Insurance Policy 0310-8385 (the "Allied World Policy"), to Feldman Shepherd at its Philadelphia, Pennsylvania offices. A true and correct copy of the Allied World Policy is attached hereto as **Exhibit "A"**.

11. The Allied World Policy provides broad professional liability coverage to the Law Firm for any actual or alleged act, error, or omission in the performance of or failure to

3

perform legal services, whether or not performed for fee or other consideration, under the

following insuring agreement:

**INSURING AGREEMENT**

The **Insurer** will pay on behalf of an **Insured**, all amounts in excess of the Retention
shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages**
and **Claim Expenses** because of a **Claim** first made during the **Policy Period** or any
applicable Extended Reporting Period and reported in accordance with the terms of this
Policy, for a **Wrongful Act**.

Allied World Policy at Coverage Form LPL 00003 00 (12/2020) ("Coverage Form"), Item I.[1]

12.    The insuring agreement obligates Allied World to defend the Law Firm against

such claims:

The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are
covered by this Policy and made against an **Insured** even if any of the allegations of the
**Claim** are groundless, false or fraudulent.

*Id.*, Coverage Form, Item I.

13.    A **Claim** is defined under the Allied World Policy:

**Claim** means:

1.    any written notice or demand for monetary relief or **Legal Services**;

2.    any civil proceeding in a court of law;

3.    any written demand for mediation, arbitration or any other alternative dispute
    resolution proceeding;

4.    any administrative proceeding, other than a **Disciplinary Proceeding**; or

5.    a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for any
**Wrongful Act**.

---

[1] The terms and provisions in bold print are defined terms and provisions as set forth in the Allied World
Policy. Terms and provisions which are not in bold are not defined under the policy and are "construed in
their natural, plain, and ordinary sense." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595,
608, 735 A.2d 100, 108 (1999).

4

Case ID: 240501357

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

*Id.*, Coverage Form, Item III.C.2.

14.     The term **Insured** includes the **Named Insured**, Feldman Shepherd. *Id.*, Coverage Form, Item III.N.1.

15.     Under the Allied World Policy, a **Wrongful Act** includes a **Legal Services Wrongful Act**, *ibid.*, at Item III.JJ, which is defined broadly to include "any actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**," *ibid.*, at Item III.Q.

16.     The term **Legal Services** is likewise defined broadly to include "those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer … where such services were performed in the ordinary course of an **Insured's** activities as a lawyer." *Id.*, Coverage Form, Item III.P.

17.     **Damages** is defined to include, *inter alia*, the monetary portion of any settlement:

**Damages** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest. **Damages** shall include punitive or exemplary damages, or the multiple portion of multiplied damages, where insurable by law.

**Damages** shall not include:

1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;
2.  amounts deemed uninsurable by law;
3.  the return or restitution of legal fees, costs and expenses, no matter how claimed;
4.  amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or
5.  amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

…

*Id.*, Coverage Form, Item III.G., *as amended by* Endt. No. 4, ¶4.

Case ID: 240501357

18.     **Claim Expenses** include "reasonable fees, costs and expenses charged by attorneys retained or approved by the **Insurer** for a **Claim** brought against an **Insured**" as well as the "reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, [and] defense of a **Claim**." *Id.*, Coverage Form, Item III.D.

19.     The **Insurer**, Allied World, not the **Insured**, the Law Firm, has a duty to defend:

> The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy. The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**. However, the **Insurer** shall not select defense counsel without the consent of the **Named Insured**, such consent not to be unreasonably withheld.

*Id.*, Coverage Form, Item V.C.1 *as amended by* Endt. No. 2.

20.     The **Policy Period** of the Allied World Policy is July 24, 2023 to July 24, 2024. *Id.* at Declarations, Item 2.

21.     The **Limits of Liability** for each and every **Claim** under the Insuring Agreement is Five Million Dollars ($5,000,000), subject to a $50,000 retention.  *Id.* at Declarations, Item 3.I and Item 4(a).

22.     There is no **Retroactive Date** applicable to the liability coverage provided; hence, the policy provides full "prior acts" coverage.  *Id.* at Declarations, Item 7.

23.     There is no allocation provision relative to Allied World's defense and indemnity obligations under the Allied World Policy.

**B.      THE PROFESSIONAL LIABILITY CLAIM**

24.     On December 22, 2020, Brandon Peterson, then 18 years old and an engineering student at Penn State, was struck and killed while standing on the shoulder of a roadway next to

Case ID: 240501357

his disabled vehicle by an eighteen-wheel tractor-trailer, owned and operated by Murrow's

Transfer, Inc. ("Murrow's Transfer") and its driver, Logan J. Denny.

25.     On January 5, 2021, Feldman Shepherd's principal, Alan Feldman, Esquire, along

with his partner, Edward S. Goldis, in the ordinary course of their activities as lawyers, met with

decedent's parents, Brook and Sheila Peterson, and discussed the potential claim the Petersons

may have for the wrongful death of their son.

26.     During that meeting the Petersons decided to retain the Law Firm to represent

their interests in connection with that claim, and they negotiated and ultimately agreed upon the

terms of that engagement in the form of a contingent fee agreement—which provided for a

37.5% fee based on the net recovery; that is, the total amount received from the verdict or

settlement of any claims after deduction of costs and other advances by the firm related to the

litigation.  A true and correct copy of the January 5, 2021 contingent fee agreement is attached

hereto as **Exhibit "B"**.

27.     As later alleged by Mrs. Peterson, at and before the time she entered into the

contingency fee agreement, and as an inducement to do so, Mr. Feldman offered his professional

opinion that her son's case was an eight-(8) figure case, and was led to believe that "Feldman

Shepherd was capable of delivering the kind of result warranted by her son's death, which would

also hopefully protect other mothers and families from having to suffer the unthinkable torture

that she and her family continue to endure on a daily basis."

28.     Hence, according to Mrs. Peterson, it was "under these conditions that [Peterson]

retained Feldman Shepherd and continued to use their services, because she believed they would

fulfil their promise to fight for justice."

7

Case ID: 240501357

29.     On June 3, 2022, Feldman Shepherd commenced a civil action in the Court of Common Pleas of Allegheny County styled *Sheila Peterson, as administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right v. Murrow's Transfer, Inc. et al.*, (the "*Peterson* Lawsuit") by the filing of a Writ of Summons.

30.     Following the exchange of multiple documents, multiple inspections, and the retention of experts, the Law Firm filed a Complaint on behalf of the Estate and Mrs. Peterson in the Court of Common Pleas on Allegheny County on December 22, 2022, which was subsequently removed by the defendants to the United States District Court, Western District of Pennsylvania (the "District Court") at No. 2:23-cv-00136-CCW on January 27, 2023.  A true and correct copy of the Complaint filed in the *Peterson* Lawsuit is attached hereto as **Exhibit "C"**.

31.     The defendants in the *Peterson* Lawsuit denied that they had any liability for the accident and averred that the decedent's own conduct was a bar to recovery.  A true and correct copy of the Answer with Affirmative Defenses to the Complaint filed in the *Peterson* Lawsuit is attached hereto as **Exhibit "D"**.

32.     During the course of the litigation, the Law Firm confirmed that the liability insurance coverage available to Murrow's Transfer and the driver, Logan J. Denny, was limited to $2 Million per accident.

33.     During the course of litigation, the Law Firm also secured an assets evaluation report on Murrow's Transfer.  A true and correct copy of the November 1, 2022 Orlowski and Associates asset evaluation report is attached hereto as **Exhibit "E"**.

34.     The Law Firm also advanced a claim for underinsured motorist ("UIM") benefits to the decedent's automobile insurance carrier, State Farm Mutual Automobile Insurance

8

Company ("State Farm"), which retained the law firm of Robb Leonard Mulvihill to defend State Farm's interests.

35.     The Law Firm further confirmed that the UIM benefits available under the State Farm policy were limited to $600,000.

36.     On January 9, 2023, the Law Firm made a demand upon State Farm for the full amount of the UIM limits. A true and correct copy of the Law Firm's January 9, 2023 correspondence to State Farm's counsel is attached hereto at **Exhibit "F"**.

37.     On March 9, 2023, counsel for State Farm tendered the $600,000 UIM policy limits. A true and correct copy of the State Farm tender of UIM limits is attached hereto as **Exhibit "G"**.

38.     On March 10, 2023, in advance of a Court directed mediation, the Law Firm with the authority of its client, made a time limited demand to settle the claims against Murrow's Transfer and Logan J. Denny for their liability policy limits and an affidavit attesting that no further insurance coverage was available. A true and correct copy of March 10, 2023 time limited policy limit demand is attached hereto as **Exhibit "H"**.

39.     On April 5, 2023, counsel for Murrow's Transfer and Logan J. Denny accepted the time limited policy limit demand, and agreed to pay the full liability insurance limit of $2 Million to settle the *Peterson* Lawsuit. On April 10, 2023, Murrow's Transfer provided an affidavit of no further insurance, a true and correct copy of which is attached hereto at **Exhibit "I"**.

40.     Hence, the Law Firm secured a recovery, on behalf of the Estate and Mrs. Peterson, for the full amount of all available insurance coverage.

9

41.     On May 26, 2023, the Law Firm filed a Notice of Settlement in the *Peterson* Lawsuit.

42.     On August 11, 2023, the Law Firm filed a Petition to Settle Wrongful Death and Survival Action in the *Peterson* Lawsuit.

43.     Mrs. Peterson expressed opposition to the $2 Million settlement reached with Murrow's Transfer, and questioned why Feldman Shepherd would be entitled to a fee on the UIM recovery, and more generally why the January 5, 2021 Contingent Fee Agreement negotiated by Mr. Feldman called for a 37.5% rather than a 33.3% attorney fee.

44.     Having raised these concerns, the Law Firm advised Mrs. Peterson to seek the advice of counsel.

45.     On August 20, 2023, Mrs. Peterson discharged Feldman Shepherd, and retained new counsel (the "Goldleaf Law Firm"), on August 21, 2023.

46.     On August 21, 2023, the Goldleaf Law Firm, now representing Mrs. Peterson's interests against the Law Firm in the *Peterson* Lawsuit, submitted an affidavit by Mrs. Peterson to the District Court to support her request for an extension of time to respond to the Petition to Settle Wrongful Death and Survival Action.  A true and correct copy of the Motion for Extension of Time filed in the *Peterson* Lawsuit is attached hereto as **Exhibit "J"**.  A true and correct copy of Mrs. Peterson's affidavit in support of that Motion is separately attached hereto as **Exhibit "K"** for ease of reference.

47.     Mrs. Peterson, in her sworn affidavit, alleged the following acts, errors and omissions in Feldman Shepherd's professional handling of her case:

1.     I was previously represented by the firm of Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP, who are attorneys operating as a domestic limited liability partnership [hereinafter, "Feldman Shepherd"], regarding the death of my son, Brandon Peterson, as to claims filed in the above matter and otherwise.

10

2.   Feldman Shepherd, without my knowledge, consent or approval, has stated that a settlement with the defendants in this matter has been reached.

3.   Feldman Shepherd represented to this Court and others, including the public at large, without authority, that my case was settled.

4.   I never gave Feldman Shepherd any authority whatsoever to settle my case.

5.   I have never executed any sort of release or other agreement setting forth any terms of settlement, nor have I otherwise given such authority to Feldman Shepherd or to anyone else to do the same.

6.   I do not agree with the unauthorized settlement effort by Feldman Shepherd, and I desire to move forward with my case.

7.   I have expressed my concerns to Feldman Shepherd, including that I did not consent to settlement, and my concerns have not been addressed.

8.   I have discharged Feldman Shepherd as my counsel and have retained new counsel to represent my interests and those of the Estate in this matter.

See August 21, 2023 Peterson affidavit (Ex. "K").

48.     No reference is made by Mrs. Peterson in her affidavit to any fee dispute and, in fact, her affidavit plainly reflects her understanding that she had retained Feldman Shepherd to represent her "as to claims filed in the above matter [the *Peterson* Lawsuit] and otherwise", thus inclusive of the UIM claim Feldman Shepherd advanced against State Farm.  Instead, Mrs. Peterson challenged whether the Law Firm secured appropriate and informed authority before settling the *Peterson* Lawsuit.  *Id.*

49.     Motion practice ensued over a demand directed to Feldman Shepherd to turn over its case file to the Goldleaf Law Firm, and the law firm Fox Rothschild entered on behalf of Feldman Shepherd to brief that issue and the alleged legal malpractice claims advanced by Mrs. Peterson.

Case ID: 240501357

50.     On September 28, 2023, the District Court entered an Order compelling Feldman

Shepherd to produce its "complete case file" on or before October 3, 2023, and directed Goldleaf

Law Firm to file its opposition to the Motion to Settle by October 17, 2023.

51.     In the brief filed in opposition to the settlement, Mrs. Peterson claimed that

Feldman Shepherd had made certain improper representations to induce her to authorize a policy

limit demand (to the effect that the District Court Judge "would force the Petersons to make a

demand and the same was therefore a necessary step in progressing the case to trial"), and

claimed she was never informed "of the upcoming mediation, … the concept up [sic] mediation,

or the opportunities and purposes of attending mediation."  A true and correct copy of the

Verified Brief In Opposition to Motion for Settlement is attached at **Exhibit "L"**.

52.     Peterson also asserted that "the facts known or at least believed based upon the

representations of her attorneys and others only galvanized Sheila Peterson's fundamental belief

that her day in court was coming and she would prevail for her son," referring to Feldman

Shepherd 's representations and those of another law firm which had prosecuted claims against

Murrow's Transfer.  She further represented to the District Court:

> Feldman Shepherd never reviewed the evidence provided, or indeed any other
> evidence, with Sheila Peterson. They never disclosed or discussed the upcoming
> mediation with her. Finally, Feldman Shepherd never disclosed to Sheila Peterson that
> they had co-counsel who concurrently had a multi-vehicle accident case involving the
> very same defendant, and whether that separate representation would have any potential
> impact upon her case, how it was handled, or the representation.

*Id.* at 5, n.6.

53.     In sum, Mrs. Peterson alleged, "Feldman Shepherd painted the demand being

made as a necessary and even forced step to get to trial, and had they explained that outcome,

Sheila Peterson never would have knowingly consented to the alleged settlement. Mrs. Peterson

is of course a layperson, but she understands the fundamental premise that everybody will get

their day in court, especially when it is her choice as the Administratrix of her son's Estate." *Id.* at 5.

54.     Mrs. Peterson's brief also raises—as a secondary, contingent argument—that "there is simply a dispute of fact regarding what the [Contingent Fee Agreement] signed by the Peterson's said at the time it was signed."   On this point, Mrs. Peterson maintains, *inter alia*, that Feldman Shepherd breached its professional obligation to supply her with a copy of the Contingent Fee Agreement and that, in any event, she did not agree to a fee on the UIM claim notwithstanding her admission in her prior affidavit that Feldman Shepherd was retained "as to claims filed in the above matter [the Peterson Lawsuit] and otherwise." *Id.* at 10-11.

55.     On October 31, 2023, the District Court entered an Order compelling an evidentiary hearing on Peterson's claims but declined to allow the parties to engage in fact discovery beyond three (3) interrogatories per party, two (2) requests for production of documents by Peterson, and four (4) requests for production of documents by Feldman Shepherd (and limiting two of those requests to specific items), together with the exchange of liability expert reports—but not depositions of the experts.

56.     On December 13, 2023, Mrs. Peterson advanced a professional liability expert report by James Law addressing, specifically, the legal malpractice claims advanced against Feldman Shepherd; that is, whether Peterson was provided with "'reasonably adequate' information to make an informed decision as to settlement and to negate any otherwise stated objective to proceed to trial."   A true and correct copy of the December 13, 2023 James Law Report is appended hereto as **Exhibit "M"**.

57.     Attorney James offered his opinion that Feldman Shepherd's communications with its client concerning the propriety of a policy limit demand had "the effect of obfuscating

Case ID: 240501357

the Petersons', but specifically Mrs. Peterson's, 'options and alternatives'," at odds with Rule of Professional Conduct ("RPC") 1.4, as well as "Peterson's ability 'to make informed decisions regarding the representation'," (i.e., "informed consent") which impacted her ability to provide an informed decision concerning authority for the settlement under RPC 1.2.

58.     In this regard, among other items addressed by Attorney James, was the allegation that Feldman Shepherd's communications concerning the policy limit demand and ultimate settlement "post-date by 129 days an assets-evaluation report conducted by Orlowski and Associates, on a 'rush basis,' informing Feldman Shepherd that—*based on available information we feel that if the subject concern [Murrow's Transfer] has failed to maintain adequate insurance, they would have additional assets*", explicitly maintaining that additional monies were available beyond the insurance proceeds, had the case proceeded to trial and verdict. *Id.*

59.     Nowhere in Attorney James' 14 page report was there mention of any "fee dispute" or any substantive challenge to the terms of the written Contingent Fee Agreement bearing Mr. and Mrs. Peterson's signature.

60.     A motion to preclude Attorney James' report on *Daubert* grounds was subsequently denied by the District Court which concluded Attorney James "reviewed and relied on other documents, communications, pleadings, as well as the Professional Rules of Conduct, in forming his opinion" and met the requirements of Federal Rule of Evidence 702 and the *Daubert* considerations of "qualification, reliability and fit" which would "assist the trier of fact" in determining whether Feldman Shepherd provided Ms. Peterson with sufficient or adequate information, whether Ms. Peterson did or did not understand the purpose or consequences of sending a policy limits demand, and whether Ms. Peterson authorized the settlement.

14

61.     Hence, the District Court concluded that it would determine at a hearing whether "Feldman Shepherd did or did not provide Ms. Peterson with sufficient or adequate information, and whether Ms. Peterson did or did not understand the purpose or consequences of sending a policy limits demand" as "relevant to the issue of whether Ms. Peterson expressly authorized the settlement…"

62.     Concerned that the substantive rulings—which would be made without the benefit of robust fact and expert discovery contemplated by the Rules of Civil Procedure—on the question of whether Feldman Shepherd adhered to the appropriate standard of care in its discharge of its professional obligations to its clients, Feldman Shepherd, with the express deference of Allied World, as addressed *infra*, actively engaged in arm's length negotiations with Goldleaf Law Firm to resolve the matter short of the hearing, at one point, again with the authorization by Allied World, as addressed *infra*, agreeing to mediate the professional liability claim.

63.     On January 29, 2024, the Petersons and Feldman Shepherd, following arm's length negotiations, reached a settlement of the professional liability claim for the sum of $565,326.15. A true and correct copy of the Settlement Agreement is appended hereto at **Exhibit "N"**.

## C.     ALLIED WORLD'S BAD FAITH HANDLING OF THE PROFESSIONAL LIABILITY CLAIM AND WRONGFUL DENIAL OF COVERAGE

### 1.     Allied World Refuses to Acknowledge a Covered Claim Had Been Asserted Against its Insured, and Breaches its Duty to Defend

64.     On October 3, 2023, following the District Court's Order to turn over its case file, Feldman Shepherd tendered the professional liability claim to Allied World under the Allied World Policy. In that submission, Feldman Shepherd identified the civil action by docket (i.e.,

15

the *Peterson* Lawsuit) and explained that Mrs. Peterson had alleged, through adverse counsel, that Feldman Shepherd had entered into an unauthorized settlement of the *Peterson* Lawsuit. Feldman Shepherd also explained that Peterson had disputed the terms of the Contingent Fee Agreement negotiated by Feldman Shepherd as to the UIM benefits recovery, but later as to the actual percentage contingent fee per the handwritten edits to that agreement. A true and correct copy of the October 3, 2023 tender is appended hereto at **Exhibit "O"**.

65. The October 3, 2023 tender was also directed to the Law Firm's two excess professional liability insurers, Greenwich Insurance Company and QBE Insurance Corporation.

66. Under prevailing Pennsylvania law, the <u>insurer</u> (not the insured) is required to evaluate notice by its insured of a potential claim and make a determination, at the outset, of whether a covered claim has been advanced. *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 610, 2 A.3d 526, 541-42 (2010).

67. As of October 3, 2023, Allied World had actual knowledge that a **Claim**, as defined by the Allied World Policy, had been advanced by Mrs. Peterson in a civil proceeding, regardless of how the tender was characterized by its policyholder.

68. Specifically, as of October 3, 2023, Allied World had actual notice that Mrs. Peterson had filed an affidavit in a civil proceeding in a court of law alleging the Law Firm had engaged in **Wrongful Acts** (<u>i.e.</u>, an "unauthorized settlement" without her consent) and was seeking relief as a consequence of those alleged **Wrongful Acts**.

69. This **Claim** was made during the effective dates of the Allied World Policy and reported to Allied World during the effective dates of the Allied World Policy.

70. Despite a **Claim** having been made and reported during the effective dates of the Allied World Policy for an alleged **Wrongful Act**, Allied World refused to acknowledge the

16

same as a **Claim** under the Allied World Policy and instead surreptitiously relied upon the characterization of the same by its policyholder as a "potential" claim, purposefully ignoring the wording of the Allied World Policy and its immediate obligations under the insuring agreement to defend that **Claim**.

71.     Allied World did not select or appoint defense counsel to represent the Law Firm in connection with the **Claim**.

72.     Allied World did not defend the Law Firm in connection with the **Claim**.

73.     Allied World's refusal to timely acknowledge a covered **Claim** and provide a defense to the Law Firm under the Allied World Policy on October 3, 2023 were without reasonable basis.

74.     Allied World knew or recklessly disregarded its lack of a reasonable basis in denying that a covered **Claim** had been tendered as of October 3, 2023.

75.     On October 12, 2023, the Law Firm advised Allied World that it had retained the law firm of Fox Rothschild to represent it in connection with the professional liability claim.

76.     Allied World did not object to the retention of Fox Rothschild to represent the Law Firm in connection with the professional liability claim.

77.     Allied World did not object to the hourly rates charged by the Fox Rothschild firm to represent the Law Firm in connection with the professional liability claim.

78.     Allied World did not disclaim or otherwise reserve rights under the Allied World Policy nor did it advance any formal coverage position, inclusive of any reservation of rights, under the Allied World Policy.

79.     Instead, Allied World, whilst leaving its policyholder to defend itself against the professional liability **Claim** advanced in the *Peterson* Lawsuit, delayed until December 21, 2023

17

Case ID: 240501357

to advise its **Insured** of any coverage position in writing, and then purported to treat this obvious

**Claim** for a **Wrongful Act** as a "Notice of a Potential Claim" commenting "it does not appear as

though a **Claim** has been made at this time." A true and correct copy of the covering email and

December 21, 2023 correspondence is appended at **Exhibit "P"**.

80. Allied World knew that to be false when written.

81. By December 21, 2023, Allied World knew, or recklessly disregarded, among

other things, that:

(a) Mrs. Peterson had claimed in formal pleadings filed with the District Court that Feldman Shepherd had made material misrepresentations or, at a minimum, omissions, concerning the mediation of her claims and the impact of a policy limit demand in the *Peterson* Lawsuit;

(b) Mrs. Peterson maintained that the trucking concern, which was the subject of the alleged unauthorized settlement, had potential assets available should her case be tried, and that Feldman Shepherd had, essentially, undersold the Estate's claim by insisting and agreeing on a policy limit settlement without client authorization;

(c) The District Court had entered an Order compelling an evidentiary hearing addressing the merits of Peterson's malpractice claims, and that its policyholder had been denied the opportunity to engage in robust discovery of those claims; and

(d) Mrs. Peterson had already advanced an adverse expert liability report, exclusively addressing the Law Firm's alleged professional liability and misconduct.

82. Yet, Allied World continued its baseless refusal to defend Feldman Shepherd as

of December 21, 2023 on grounds that this civil proceeding was not a **Claim**. See December 21,

2023 Email and Correspondence (Ex. P).

83. By doing so, Allied World breached its defense obligations under the Allied

World Policy leaving the Law Firm to defend itself and, in any event, knowingly waived any

right to select defense counsel or challenge defense counsel's customary rates.

18

2.    **Allied World Wrongfully Refuses to Participate in the
Settlement of the Legal Malpractice Claim**

84.    Allied World waited until January 16, 2024 to acknowledge a **Claim** had been
made against Feldman Shepherd for a **Wrongful Act** and that coverage, inclusive of a defense
and indemnity obligation, was triggered under the Allied World Policy.  This was more than
three (3) months after Allied World had actual notice of a **Claim** against its **Insured** for a
**Wrongful Act** and had left its policyholder, in breach of its duty to defend, to fend for itself in
response to the professional liability claims being advanced against it.

85.    In that communication, which Allied World declined to reduce to a writing at the
time, Allied World agreed to pay "post tender" **Claim Expenses** incurred by Feldman
Shepherd's lawyers, Fox Rothschild, without exception or audit, but unilaterally indicated it
would "audit" that firm's invoices going forward implicitly if not explicitly agreeing to the
selection of Fox Rothschild as defense counsel for the covered **Claim**.

86.    Under prevailing Pennsylvania law, an insurer is obligated to pay pre-tender
defense counsel absent a showing of actual prejudice. *Rite Aid Corp. v. Liberty Mut. Fire Ins.
Co.*, No. 1: CV-03-1801, 2006 U.S. Dist. LEXIS 57094 (M.D. Pa. Aug. 14, 2006); *Safeguard
Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 961 F.2d 209 (3d Cir. 1992).

87.    Allied World had actual or constructive knowledge that pre-tender defense costs
were payable under the Allied World Policy absent a showing of demonstrable prejudice.

88.    Allied World never claimed any prejudice arising from Fox Rothschild's pre-
tender defense activities, nor could it establish such prejudice.

89.    Allied World's refusal to indemnify pre-tender defense costs the Law Firm
incurred was inconsistent with prevailing law and without reasonable basis.

19

Case ID: 240501357

90.     Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to indemnify pre-tender defense costs the Law Firm incurred.

91.     Allied World offered no support for the proposition that it had the right to "audit" defense counsel bills, after breaching its prior obligation to defend and waiving its right to select defense counsel.

92.     Allied World expressed an interest in mediation of the malpractice claim, but cautioned that any "resolution of a fee dispute" would not be indemnified under the Allied World Policy.

93.     Allied World offered no policy support for the proposition that a so-called fee dispute would not be indemnified if it arose out of an alleged **Wrongful Act**.

94.     In fact, there is nothing in the Allied World Policy which suggests that a so-called "fee dispute" precludes coverage for a covered **Claim**.

95.     Allied World was aware of the terms of the Allied World Policy, yet made this misrepresentation of pertinent policy terms and provisions deliberately, recklessly, and without reasonable basis.

96.     The following day, January 17, 2024, Allied World acknowledged (this time in writing) that Mrs. Peterson was willing to mediate the malpractice claims, and advised Fox Rothschild "[i]f mediation can be successful, the goal would be a global resolution."  Notably, however, Allied World continued to obfuscate over the existence of a **Claim**, suggesting in that same writing "if the mediation is not successful, we at least will have insight into what is coming."  A true and correct copy of Allied World's January 17, 2024 consent to mediate is appended at **Exhibit "Q"**.

Case ID: 240501357

97.     "[W]hat is coming", as Allied World put it, had already occurred—Feldman Shepherd was the subject of a professional liability claim advanced in a civil proceeding where its former client had advanced an expert liability report opining that Feldman Shepherd had breached its professional obligations in the performance of or failure to perform Legal Services.

98.     This commentary, directed in writing by Allied World to its insured, was designed to imply that the Allied Policy did not cover this **Claim**, and to have a chilling effect on the Law Firm's pursuit of coverage for a settlement.  It was a continuation of a pattern and practice by Allied World of recklessly misrepresenting pertinent facts and policy provisions relating to coverages at issue in violation of, *inter alia*, 40 Pa. Stat. Ann. §1171.5(a)(10)(i), as well as Allied World's obligation to defend and address settlement of this covered **Claim** in good faith.

99.     On January 20, 2024, the Petersons advanced a demand of $1,653,168 to settle the malpractice claim, which was immediately communicated to Allied World.  A true and correct copy of the January 20, 2024 demand communicated to Allied World is appended hereto at **Exhibit "R"**.

100.    The $1,653,168 demand was predicated upon the $5,250,000 mid-point of the economic loss valuation in the underlying wrongful death claim had it been tried, as opposed to the subject of an alleged unauthorized settlement.  From this figure, the Petersons deducted the insurance proceeds recovered of $2,600,000, the Law Firm's out of pocket costs of $70,000 and anticipated $100,000 in costs to try the case, and then applied the one-third claimed contingency fee from the net to arrive at this demand.  *Id*.

101.    The settlement demand was premised upon the lost opportunity—as a consequence of Feldman Shepherd's alleged professional malpractice—to try the wrongful death case and collect against Murrow's Transfer on the verdict.  *Id*.

21

102.    Allied World knew this when it received the demand on January 20, 2024.

103.    Following notice to Allied World, the Law Firm countered the demand with a proposal to litigate the pending malpractice claim in a separate proceeding (where, among other things, the Law Firm would have an opportunity to engage in unfettered fact and expert discovery constrained only by the Rules of Civil Procedure), and an agreement by Feldman Shepherd to reduce its fee on the UIM recovery from 37.5% to 22.5%. A true and correct copy of the January 24, 2024 counteroffer is appended hereto at **Exhibit "S"**.

104.    The Petersons ultimately countered with a demand to resolve the malpractice claim against the Law Firm on January 29, 2024 stating:

> We feel the sum attributable to Feldman Shepherd's malpractice far exceeds the $500,560.01 payable to Mrs. Peterson, however, in the context of this confidential settlement effort, we believe the following allocation applies:
>
> Sum attributable to fee dispute: $20,873.35 (37.5% - 33.33% = 4.17% of $500,560.01)
>
> Sum attributable to malpractice claim: $479,686.66 ($500,560.01 - $20,873.35).

105.    Although it would have been plainly apparent to Allied World had it properly evaluated the **Claim** over the prior four (4) months, by this time the Law Firm's defense counsel had already detailed the risks of permitting the malpractice claim to be addressed in the evidentiary proceeding ordered by the District Court, explaining:

> First, the Court denied Feldman Shepherd's motion in limine to limit the scope of the evidentiary hearing. In its Order denying the motion, the Court stated "whether Feldman Shepherd did or did not provide Ms. Peterson with sufficient or adequate information, and whether Ms. Peterson did or did not understand the purpose or consequences of sending a policy limits demand are relevant to the issue of whether Mrs. Peterson expressly authorized the settlement." That determination, while incorrect in my view, means the Court will receive testimony and evidence regarding the quality and sufficiency of Feldman Shepherd's representation and communications with the Petersons. It also means that the Court may make findings about Feldman Shepherd's communications with the Petersons and the sufficiency of those communication that could collaterally estop Feldman Shepherd from relitigating those same issues in a subsequent malpractice action by the Petersons.

Case ID: 240501357

> Second, in any malpractice claim, Feldman Shepherd will have the burden of proving the non-collectability of any judgment in the underlying action. See *Kituskie v. Corbman*, 714 A.2d 1027 (Pa. 1998) (holding that defendant/lawyer in a legal malpractice action should plead and prove the affirmative defense that the underlying case was not collectible by a preponderance of the evidence).
>
> Third, in addition to their allegation that Feldman Shepherd settled the underlying case without their consent or authority, the Petersons are alleging that Feldman Shepherd modified the contingent fee agreement after it was signed by the Petersons by changing the percentage of the contingent fee without the Petersons' knowledge or approval; that Feldman Shepherd did not adequately investigate the assets of the Defendants; that Feldman Shepherd publicly disclosed the fact of the settlement without the Petersons' knowledge or consent; and that Feldman Shepherd sent authorizations to various government agencies concerning the settlement without the Petersons' knowledge or consent, among other allegations. Again, we believe these allegations are baseless. But the reality is there will be significant costs incurred to defend the Petersons' malpractice action.

106.    The urgency of resolving the professional liability claim was readily apparent to Allied World at this point, as the District Court had already denied the joint request to adjourn the evidentiary hearing, which was set to proceed just a few days later.

107.    Recognizing the unenviable position its policyholder was placed in—having to try a professional liability claim in a civil evidentiary proceeding without the benefit of meaningful pre-trial discovery—Allied World took full advantage of the situation, placing its own financial interests over its policyholder's reputational and financial interests, in a textbook example of bad faith.

108.    After addressing this matter "internally" but still not having advanced a writing to its **Insured** acknowledging its coverage obligations, Allied World proclaimed that it was only willing to pay "$50,000" toward a resolution of what it had previously expressly conceded, albeit telephonically only, was a covered **Claim**. Notably, Allied World then elected to defer completely to Feldman Shepherd's own judgment on whether to settle:

> As explained during our call, at this juncture, Allied World is prepared to contribute $50,000 toward the proposed global resolution of this dispute. In addition, Allied World

23

Case ID: 240501357

will pay all reasonable and necessary defense costs that the Firm has incurred in the defense of this matter, in excess of the Policy's $50,000 Retention.

Allied World **defers** to the Firm and its counsel as to whether to move forward with this resolution. In the event that the matter does not resolve, and the claimant proceeds with the pursuit of a legal malpractice claim, Allied World will continue to provide the Firm with a defense, subject to a reservation of rights. (emphasis supplied)

A true and correct copy of Allied World's January 29, 2024 11:02 AM EST email to Feldman Shepherd is appended hereto at **Exhibit "T"**.

109. The basis of the so-called "reservation of rights" referenced in Allied World's January 29, 2024 missive had never been articulated, as the only formal "coverage position" Allied World had advanced was one in which it wrongly maintained that a **Claim** had not been asserted under cover of December 21, 2023 (Ex. P). The notion that "Allied World *will continue* to provide the Firm with a defense" was patently false, as Allied World at that point in time had not indemnified *any* **Claim Expenses**. And the arbitrary offer of $50,000, untethered to any realistic or good faith evaluation of the covered exposure, defied decades of prevailing Pennsylvania law.[2]

---

[2] As Allied World knew at the time, yet recklessly disregarded, an insurer's obligation to evaluate settlement opportunities has been described as one of "due care" and "utmost good faith". See generally *Cowden v. Aetna Cas. & Sur. Co.*, 389 Pa. 459, 470 (1957) (describing duty of "utmost good faith"); *Shearer v. Reed*, 286 Pa. Super. 188, 194, 428 A.2d 635, 638 (1981) (Brosky, J. concurring); *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 410 Pa. 55, 59, 188 A.2d 320 (1963) (stating that an insurer is derelict in its duty when it, *inter alia*, unreasonably refuses an offer of settlement). Where an insurer, as here, acts in bad faith, by unreasonably refusing to settle a claim, "it breaches its contractual duty to act in good faith and its fiduciary duty to its insured." *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 408 (2001). Hence, an "insurer is required to treat the claim against the insured as if it were only against itself", it may "not expose the insured to the risk of pecuniary loss", and it "cannot hazard the well-being of the insured". *Gedeon*, 410 Pa. at 61, 188 A.2d at 323 (Egan, J. concurring). In sum:

> [A] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company. This expertise must be applied, in a given case, to a consideration of all the factors bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated

24

110.     Confronted by its own insurer which had steadfastly refused to perform any of its

obligations under the professional liability policy it sold, or otherwise comply with its good faith

obligations under the controlling law, the Law Firm's principal implored Allied World to reverse

course and discharge its insuring obligations faithfully and in good faith:

> I have not had any response to my email sent at 11:20 AM. Since then, we have had
> another unfavorable ruling from the Court, and we are increasingly concerned that the
> Court's decisions at the evidentiary hearing this week will effectively find us responsible
> for legal malpractice. We have an opportunity to settle all claims against us for about
> $500K. As I explained in my email earlier today, the fee reduction portion of the claim is,
> at most, $130K and perhaps much less. The balance of at least $370K, and in the view
> of the Petersons virtually all of the settlement amount, is clearly and unequivocally for
> asserted claims of legal malpractice. Allied World's offer to contribute only $50K to
> resolve the legal malpractice claims is unreasonable and inconsistent with your
> obligations to my firm under the insurance contract.
>
> Your refusal to cover all or even most of the legal malpractice claims against us puts my
> firm in a difficult position. Because of our concern about the outcome of the hearing
> scheduled for this Thursday and Friday, and Allied World's refusal to participate with a
> fair contribution to the proposed settlement, please be advised of our intention to go
> forward with a settlement of all claims for the amount of $500K, which will initially be
> funded by my firm. The settlement agreement will reflect a fair and equitable allocation
> of this amount between our modest fee reduction and the bulk of the settlement, which is
> plainly for resolution of the legal malpractice claims. We will thereafter seek
> reimbursement from Allied World of the full amount of our payment to resolve the legal
> malpractice claims.

A true and correct copy of Alan Feldman's January 29, 2024 communications with Allied

World are collectively appended hereto at **Exhibit "U"**.

---

range of a verdict, should it be adverse; the strengths and weaknesses of all of the
evidence to be presented on either side so far as known; the history of the particular
geographic area in cases of similar nature; and the relative appearance,
persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at
trial.

*Shearer v. Reed*, 286 Pa. Super. 188, 193-94, 428 A.2d 635, 638 (1981) (emphasis and citations omitted)
(citing *Rova Farms Resort, Inc. v. Investors Insurance Company of America*, 65 N.J. 474, 489-90, 323
A.2d 495, 503-04 (1974)).  Allied World demonstrably did not engage in any analysis of the covered
exposure to the **Insured**, let alone the utmost good faith evaluation mandated by Pennsylvania law.

Case ID: 240501357

111.     Rather than acknowledging its failure to comply with its insuring obligations and duty of utmost care to its **Insured** relative to this settlement opportunity, and curing those breaches, Allied World chose to double down on its bad faith conduct by reversing its prior agreement to "defer" to Feldman Shepherd's judgment as to the propriety and reasonableness of the settlement, and then by threatening its **Insured** with the "consent to settle" provision in the Allied World Policy—a provision Allied World knew was wholly unenforceable under Pennsylvania law in these circumstances.

112.     Remarkably, the "consent to settle" provision in the Allied World Policy was the first policy provision Allied World ever cited—following its abject refusal to acknowledge that a **Claim** even existed a month prior.

113.     Allied World's citation to the consent to settle provision was purposefully designed to intimidate its **Insured** as Allied World knew and recklessly or intentionally disregarded that it could not rely upon the same to escape an indemnity obligation for the reasonable arm's length settlement offer presented. *Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 635 Pa. 1, 30, 131 A.3d 445, 462 (2015) (holding an indemnity obligation attaches where an insured accepts a fair and reasonable settlement offer following an insurer's refusal to fund while maintaining its reservation of rights, notwithstanding the consent to settle or voluntary payments provision in a liability policy).

114.     Allied World was unable to muster any reasoned basis for its refusal to fund a reasonable settlement of the covered malpractice claim.  Expert reports, court orders, declarations, and multiple pleadings specifically addressed Feldman Shepherd's alleged breach of its professional obligations relating to the settlement, and all but abandoned any viable "fee

Case ID: 240501357

dispute" claim.  The adverse claimant herself allocated *her demand* principally to the malpractice claim.

115.    No one involved in this matter, including Allied World, rationally believed a so-called "fee dispute" was a settlement driver.

116.    Not surprisingly, when confronted with the question of why Allied World evaluated the covered **Claim** at $50,000, it had no answer.  When asked if Allied World had an objection to the settlement (and, if so, the nature of that objection), it had no response.  When asked whether Allied World had an objection to the amount of the settlement (and if so, the basis of that position), it had no response.  When asked how it arrived at a $50,000 contribution level toward the settlement, Allied World had no answer.  When asked why Allied World was not in fact covering the covered **Claim**, it had no answer.  A true and correct copy of Law Firm's February 5, 2024 email confirming Allied World's positions is appended hereto at **Exhibit "V"**.

117.    Allied World ultimately refused to fund any portion of the settlement of the malpractice claim against its **Insured**.

118.    By doing so, Allied World purposefully breached its indemnity obligations under the Allied World Policy in bad faith, leaving the Law Firm to fund the reasonable and justifiable settlement of an acknowledged covered **Claim** under the Allied World Policy.

119.    Feldman Shepherd reached an agreement to settle the covered **Claim** for the sum of $565,326.15 on January 29, 2024.

120.    The settlement was subsequently reduced to a formal settlement agreement (Ex. N)**.**

121.    The Law Firm is now legally obligated to fund the $565,326.15 settlement of the malpractice claims against it.

Case ID: 240501357

122. Allied World has refused to contribute any sum toward the settlement of the covered **Claim**.

### 3. Allied World's Untimely Bad Faith Denial of Coverage

123. On January 31, 2024—the very first purported coverage letter advanced by Allied World in writing respecting the *covered* **Claim**—Allied World provided no answer as to the basis for the arbitrary $50,000 valuation (which it had since reneged upon), and no substantive objection to the reasonableness of the settlement amount. A true and correct copy of Allied World's January 31, 2024 correspondence is appended hereto at **Exhibit "W"**.

124. Allied World's January 31, 2024 correspondence (Ex. W) included various admissions, misrepresentations, and misstatements in these and other regards:

(a) Allied World admitted that as of January 16, 2024 "Allied World has accepted the *Peterson* Matter as a **Claim**.";

(b) Allied World misrepresented that it had "agreed to provide a defense to the Firm, subject to a complete reservation of rights" as no such reservation of rights was ever communicated to Feldman Shepherd in writing following Allied World's reversal of its prior "no **Claim**" position;

(c) Allied World falsely represented that it had "agreed to provide a defense to the Firm", yet admittedly had failed to indemnify any **Claim Expenses**;

(d) Allied World surreptitiously cited to Endorsement 2 to the Allied World Policy, which purports to give Allied World the right to select counsel, even though it waived that right months before, and could not in any event enforce that provision given its prior breach of its duty to defend following the October 3, 2023 tender;

(e) Allied World again cited the voluntary payments/consent to settle provision of the policy even though it knew that provision could not be enforced under prevailing law and had previously—and expressly—deferred to the Law Firm regarding settlement of the professional liability claims;

(f) Allied World conceded that it had completed no investigation whatsoever of the **Claim** as tendered on October 3, 2023, relying instead on the insured's description of a "potential" claim and narrative, in a purported attempt to justify its prior wrongful denial of coverage on December 21, 2023—all the while knowing that the manner in which its policyholder chose to characterize that

Case ID: 240501357

**Claim** (as being a "potential claim") was of no moment under Pennsylvania law; and

(g)     For the first time, ever, Allied World challenged Fox Rothschild's fees—despite having previously abandoned its policyholder by wrongfully denying its defense obligation back in October of 2023—and now claimed that it needed to "reach an agreement with respect to Fox Rothschild's hourly rates", *even though by the time this letter was penned the malpractice claim had already settled.*

125.     In sum, as of January 31, 2024, *after* the **Insured** was compelled to defend itself and *after* it accepted a reasonable settlement demand of the covered **Claim**, Allied World had never reserved any rights respecting that covered **Claim**, could offer no basis for its refusal to fund the settlement (or the patently arbitrary amount it later reneged on paying), and instead elected to challenge **Claim Expenses** it previously refused to pay and still had not paid.

126.     On February 14, 2024, well after the malpractice claim had been defended and resolved, Wiley Rein, acting in the capacity as a claims adjuster for Allied World, disclaimed coverage under the Allied World Policy for the **Claim**.  A true and correct copy of Wiley Rein's February 14, 2024 correspondence is appended hereto at **Exhibit "X"**.

127.     Allied World lacked any reasonable basis for denying coverage under the Allied World Policy for what it previously confirmed was a covered **Claim**, and knew or recklessly disregarded its lack of a reasonable basis in doing so.

128.     Wiley Rein confirmed that its principal's initial failure to conduct any investigation of the underlying malpractice claim led to Allied World's decision not to treat this matter as a **Claim**, and advanced the untenable position that Allied World can legitimately avoid making a proper coverage determination from the outset, as mandated by *Jerry's Sport*, by placing blinders on, and conducting no independent investigation.[3]   *Id.*

---

[3] It bears repeating that had Allied World conducted any investigation of this matter on October 3, 2023, it would have known that Mrs. Peterson had filed an affidavit in the District Court proceeding maintaining that Feldman Shepherd had allegedly engaged in **Legal Services Wrongful Acts** as defined

Case ID: 240501357

129.     Wiley Rein admits that on January 16, 2024, "during a telephone call", its principal, Allied World, agreed to accept the matter as a covered **Claim** "based on the additional information provided, and in light of the Firm's request" – again confirming that Allied World had not engaged in any independent investigation of the matter since the October 3, 2023 tender, and had otherwise failed to discharge its obligations, under the policy and prevailing law, to promptly evaluate that tender for coverage when first reported. *Id.*

130.     Having ultimately admitted a covered **Claim**—for which Allied World had no conceivable basis to deny a defense or indemnity obligation under the policy—Wiley Rein pivoted to newly raised coverage defenses based on (1) the false notion that the claim was merely a "fee dispute", and (2) any settlement must have been "unreasonable".

131.     Wiley Rein first falsely asserts that Allied World "specifically advised the Firm that the Policy does not afford coverage for fee disputes and confirmed that any reduction of the Firm's fees would not qualify as covered **Damages** under the Policy" when, in fact, Allied World failed to confirm any coverage position in writing at the time, and waited until weeks *after the settlement was reached* to raise this position in writing with its **Insured**. *Id.*

132.     If Allied World believed the tender merely addressed a "fee dispute", then Allied World was required to raise that supposed coverage defense in writing at that time.

133.     There is no mention that the "Policy does not afford coverage for fee disputes and confirmed that any reduction of the Firm's fees would not qualify as covered Damages under the

---

by the Allied World Policy; that is, what she attested was an "unauthorized settlement" of her lawsuit. Feldman Shepherd itself referenced that charge of misconduct in its October 3, 2023 tender.  See October 3, 2023 Tender (Ex. O) at 2 ("… new counsel for Sheila Peterson entered their appearance and submitted an Affidavit from Ms. Peterson in which she contended, for the first time, that she had not authorized a settlement with the trucking defendants.").

Case ID: 240501357

Policy" in the December 21, 2023 correspondence (Ex. P), and the definition of **Damages** is not even referenced in that correspondence.

134.    Allied World's post-settlement January 31, 2024 correspondence (Ex. W) does not advance any reservation on these grounds, and again does not even reference the definition of **Damages**.

135.    Allied World cannot, after the fact, disclaim coverage on grounds never disclosed to the **Insured** in writing, after expressly agreeing, in writing, that the **Claim** was covered, and its effort to do so was unjustifiable, reckless, designed to further its own financial interests at the expense of its insured, and in bad faith.

136.    Moreover, the entire premise that a "fee dispute claim" is not covered under the Allied World Policy by virtue of the previously non-disclosed definition of **Damages** is wholly unsupportable and knowingly false.

137.    The exception in the definition of **Damages**, first raised by Allied World weeks *after* the settlement, in fact reads:

> **Damages** shall not include:
> …
> 3.    the <u>return</u> or <u>restitution</u> of legal fees, costs and expenses, no matter how claimed;

Allied World Policy (Ex. A), Item III.G., *as amended by* Endt. No. 4, ¶4 (emphasis supplied).

138.    Wiley Rein misrepresents that exception not once, but twice, in its February 14, 2024 correspondence (when it was first raised), claiming "Allied World has no obligation to pay amounts in connection with any return *or reduction of the Firm's fees*."  In fact, the exception applies to the "return or restitution" of legal fees, neither of which were raised in connection with the malpractice claims advanced against the Law Firm.

31

139.    No one claimed that Feldman Shepherd received monies at all, or that the Law

Firm was obliged to return any funds it received.

140.    Hence, Allied World elected to re-write its policy to state that the exception

pertains to a "reduction" in fees, which nowhere appears in its policy.

141.    That repeated, false representation as to the policy's terms and conditions was in

violation of, *inter alia*, 40 Pa. Stat. Ann. §1171.5(a)(10)(i), and knowingly advanced in bad faith.

142.    In any event, no one believed this **Claim** was limited to some "fee dispute".

Everyone, including the District Court Judge, recognized that Feldman Shepherd's actual or

alleged acts, errors or omissions, in the performance of or failure to perform **Legal Services**,

were at issue and would be determined in this civil proceeding:

(a)    Peterson had advanced a professional liability claim against Feldman Shepherd at the moment she filed a sworn affidavit in a civil proceeding on August 21, 2023, as explained to Allied World in the policyholder's tender;

(b)    The professional liability claim was supported by an expert liability report advanced in that civil proceeding on December 13, 2023, prior to Allied World's refusal to treat this matter as a covered **Claim**;

(c)    The adverse expert liability report specifically addressed a legal malpractice claim against Feldman Shepherd based on alleged violations of the Rules of Professional Conduct and, ultimately, an alleged unauthorized settlement which foreclosed Peterson's ability to try the case against Murrow's Transfer and obtain a recovery beyond Murrow's Transfer's insurance limit from its additional assets; and

(d)    The District Court concluded that it would decide at the hearing whether "Feldman Shepherd did or did not provide Ms. Peterson with sufficient or adequate information, and whether Ms. Peterson did or did not understand the purpose or consequences of sending a policy limits demand" as "relevant to the issue of whether Ms. Peterson expressly authorized the settlement…"

143.    Having no policy provision or plausible facts to support a disclaimer for a prior

admitted covered **Claim**, Wiley Rein, on behalf of its principal, next cherry picked from

advocacy filings on behalf of the **Insured** in defense of the malpractice claims to ostensibly

32

support its unilateral view that a settlement, immediately prior to the evidentiary hearing where Feldman Shepherd's alleged malpractice would be judged, was somehow "unreasonable".

144. Feldman Shepherd's filings were properly crafted to raise *defenses* to the malpractice claim, and served to potentially *minimize* Allied World's exposure for the covered **Claim**.

145. Potentially defensible legal malpractice claims are covered under the Allied World Policy.

146. Utilizing defense advocacy submissions out of context to support a contrived "reasonableness" challenge to a settlement—which Allied World expressly deferred to its insured's own best judgment to reach—was patently disingenuous and advanced in bad faith.

147. Allied World, through its acting claims adjuster, alternatively maintained that Feldman Shepherd alone should personally bear the financial consequences of a covered **Claim** despite having paid substantial premiums to Allied World to avoid that very risk.

148. Allied World had the temerity to posit that when a law firm is accused of malpractice, it (rather than its liability insurer) should pay any settlement arising out of that claim from its fee for services. Any other result, Allied World proclaims, would be "unjust," thus branding this proper settlement of a covered **Claim** as "unreasonable." Wiley Rein's February 14, 2024 (Ex. X) at 9.

149. Eschewing an indemnity obligation on grounds that the insured's fees for services should be forfeited prior to the insurer's duty to indemnify has no support in the Allied World Policy and was knowingly advanced by Allied World's acting claims adjusters in bad faith.

150. The so-called "fee dispute", as Allied World maintains was in part the substance of the Covered **Claim**, concerned whether the contingent fee as agreed was at 33⅓% or, as the

33

instrument reflects, 37.5%, of the settlement net of costs and expenses. A settlement of $2,600,000 net of approximately $70,000 in costs and expenses yields a differential of $106,260 based on the alleged competing views of the contingent fee percentage.

151. The professional liability claim was settled at arm's length for $565,326.15.

152. Hence, even accepting Allied World's strained view that a maximum deduction from the settlement figure on account of a so-called "fee dispute" is appropriate (and it clearly is not), the balance of the settlement—which could *only* be attributed to the professional liability claim—is $459,066.15.

153. In sum, Allied World offered nothing to support the notion that the admitted covered **Claim** had absolutely no settlement value, yet it bases its disclaimer on that very proposition as it has refused to indemnify any portion of the settlement.

154. Allied World cannot rationally justify a funding obligation of $50,000. And it most certainly cannot rationally justify a funding obligation of Zero, having reneged on that prior funding obligation.

155. Allied World's refusal to indemnify a reasonable and arm's length settlement of an admitted covered **Claim** was in breach of its insuring obligations under the Allied World Policy.

156. Allied World's refusal to indemnify a reasonable and arm's length settlement of an admitted covered **Claim** lacked any reasonable basis.

157. Allied World's refusal to indemnify a reasonable and arm's length settlement of an admitted covered **Claim** was both knowing and reckless, and designed to favor its own financial interests over that of its policyholder.

34

Case ID: 240501357

<u>COUNT I</u>
**Breach of Contract**
**Duty to Defend**

158.    Plaintiff incorporates by reference the foregoing averments of this complaint as if the same were set forth more fully herein at length.

159.    Under the Allied World Policy, Allied World had a duty to defend the Law Firm against a **Claim** for any actual or alleged act, error, or omission in the performance of or failure to perform legal services, whether or not performed for fee or other consideration, and even if any of the allegations of the **Claim** are groundless, false or fraudulent, where such **Claim** is first made against the Law Firm and reported by the Law Firm during the effective dates of that policy.

160.    On October 3, 2023, a covered **Claim**, first made during the effective dates of the Allied World Policy, was reported by the Law Firm to Allied World under the Allied World Policy.

161.    Allied World wrongfully and without justification breached its duty to defend the Law Firm under the Allied World Policy.

162.    As a consequence of that material breach, the Law Firm was compelled to defend itself against a **Claim** to which a duty to defend had attached under the Allied Policy, and which should have been defended by Allied World under the terms of the Allied World Policy.

163.    As a consequence of that material breach, Allied World is estopped from challenging or otherwise disputing the reasonable and necessary defense costs incurred by the Law Firm to defend the covered **Claim**.

Case ID: 240501357

164.    As a consequence of that material breach, Allied World has waived any basis to challenge or otherwise dispute the reasonable and necessary defense costs incurred by the Law Firm to defend the covered **Claim**.

165.    To date, Allied World has refused to indemnify the reasonable and appropriate defense costs incurred by the Law Firm on account of the covered **Claim**.

166.    Allied World is liable to the Law Firm for those sums the Law Firm incurred in the defense of the covered Claim, and all other consequential damages resulting from Allied World's material breach of the Allied World Policy, together with interest on those sums.

167.    All conditions precedent to Allied World's defense obligation for the covered **Claim** asserted against the Law Firm were satisfied or otherwise waived by Allied World.

**WHEREFORE**, Plaintiff, Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP, demands judgment it its favor and against Allied World Insurance Company:

(a)     For all sums Plaintiff has incurred in defending the claims against it in the Peterson Lawsuit, together with interest on those sums;

(b)     For all consequential damages on account of Allied World Insurance Company's breach of its insuring obligations under Allied World LPL Assure Lawyers Professional Liability Insurance Policy 0310-8385, including but not limited to costs and attorney's fees incurred in this action, together with interest on those sums; and

(c)     For such other and further relief as requested in this Complaint and as otherwise may be determined by this Court to be just and proper under the circumstances.

Case ID: 240501357

**COUNT II**
**Breach of Contract**
**Duty to Indemnify**

168.     Plaintiff incorporates by reference the foregoing averments of this complaint as if the same were set forth more fully herein at length.

169.     Under the Allied World Policy, Allied World had a duty to indemnify those sums the Law Firm is legally obligated to pay on account of a **Claim** for any actual or alleged act, error, or omission in the performance of or failure to perform legal services, whether or not performed for fee or other consideration, where such **Claim** is first made and reported during the effective dates of that policy.

170.     Allied World wrongfully and without justification refused to acknowledge a covered **Claim** had been asserted against the Law Firm until January 16, 2024.

171.     Allied World did not reserve any rights relative to its insuring obligations under the Allied World Policy respecting the covered **Claim**.

172.     Even after acknowledging a covered **Claim** under the Allied World Policy, Allied World refused to meaningfully and in good faith participate in efforts to resolve the covered **Claim** against the Law Firm, as was its obligation to do under that policy and prevailing law.

173.     On January 20, 2024, the Petersons advanced a demand of $1,653,168 to settle the malpractice claim against the Law Firm, which was immediately communicated to Allied World.

174.     The $1,653,168 demand was predicated upon the $5,250,000 mid-point of the economic loss valuation in the underlying wrongful death claim had it been tried, as opposed to the subject of an alleged unauthorized settlement.  From this figure, the Petersons deducted the insurance proceeds recovered of $2,600,000, the Law Firm's out of pocket costs of $70,000 and

37

anticipated $100,000 in costs to try the case, and then applied the one-third claimed contingency fee from the net to arrive at this demand.

175.    The settlement demand was premised upon the lost opportunity—as a consequence of Feldman Shepherd's alleged professional malpractice—to try the wrongful death case and collect against Murrow's Transfer on the verdict.

176.    Allied World knew this when it received the demand on January 20, 2024.

177.    Allied World made no effort to respond to that demand on behalf of its policyholder in material breach of its duty of good faith and handling of a covered **Claim** against its insured.

178.    The Petersons ultimately made a further demand to resolve the malpractice claim against the Law Firm on January 29, 2024 for $500,560.01, stating:

> We feel the sum attributable to Feldman Shepherd's malpractice far exceeds the $500,560.01 payable to Mrs. Peterson, however, in the context of this confidential settlement effort, we believe the following allocation applies:
>
> Sum attributable to fee dispute: $20,873.35 (37.5% - 33.33% = 4.17% of $500,560.01)
>
> Sum attributable to malpractice claim: $479,686.66 ($500,560.01 - $20,873.35).

179.    Allied World again refused to meaningfully or in good faith respond to that demand on behalf of its policyholder.

180.    Instead, Allied World proclaimed that it was only willing to pay "$50,000" and would defer completely to Feldman Shepherd's own judgment on whether to settle.

181.    The proposal to fund just 10% of an admitted covered **Claim** was facially unreasonable and untethered to any consideration of this covered exposure under the Allied World Policy.

182.    Feldman Shepherd reached an agreement to settle the covered Claim for the sum of $565,326.15 on January 29, 2024.

Case ID: 240501357

183.     Allied World ultimately refused to fund any portion of the settlement of the malpractice claim against its **Insured**.

184.     By doing so, Allied World purposefully breached its indemnity obligations under the Allied World Policy in bad faith, leaving the Law Firm to fund the reasonable, justifiable and arm's length settlement of an acknowledged covered **Claim** under the Allied World Policy.

185.     As a consequence of that material breach, the Law Firm is legally obligated to pay the sum of $565,326.15 to settle the malpractice claims against it and secure a release of those claims.

186.     As a consequence of that material breach, Allied World has waived any basis to challenge the reasonable and arm's length settlement, or otherwise raise the "consent to settle" provision of the Allied World Policy as a bar or limitation to its indemnity obligation for the settlement.

187.     As a consequence of that material breach, Allied World is estopped from challenging the reasonable and arm's length settlement, or otherwise raising the "consent to settle" provision of the Allied World Policy as a bar or limitation to its indemnity obligation for the settlement.

188.     As a consequence of Allied World's failure to inform the insured, in writing, of any coverage defense or rights reserved under the Allied World Policy, Allied World has waived any coverage defense it purports to have relative to its duty to indemnify the settlement.

189.     As a consequence of Allied World's failure to inform the insured, in writing, of any coverage defense or rights reserved under the Allied World Policy, Allied World is estopped from raising any coverage defense relative to its duty to indemnify the settlement.

Case ID: 240501357

190.    Under prevailing Pennsylvania law, the duty to indemnify follows the duty to defend where a settlement precludes findings bearing on any purported coverage defense.

191.    Hence, having expressly conceded that a covered **Claim** had been advanced relative to its duty to defend, and then having effectively abandoned its insured when the opportunity arose to settle that covered **Claim**, Allied World is strictly liable to indemnify the settlement.

192.    Allied World is liable to the Law Firm in the amount of $565,326.15, plus interest on that sum, and all other consequential damages resulting from Allied World's material breach of the Allied World Policy, together with interest on those sums.

193.    All conditions precedent to Allied World's indemnity obligation for the covered **Claim** asserted against the Law Firm were satisfied or otherwise waived by Allied World.

**WHEREFORE**, Plaintiff, Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP, demands judgment it its favor and against Allied World Insurance Company:

(a)    In the amount of $565,326.15, plus interest;

(b)    For all consequential damages on account of Allied World Insurance Company's breach of its insuring obligations under Allied World LPL Assure Lawyers Professional Liability Insurance Policy 0310-8385, including but not limited to costs and attorney's fees incurred in this action, together with interest on those sums; and

(c)    For such other and further relief as requested in this Complaint and as otherwise may be determined by this Court to be just and proper under the circumstances.

Case ID: 240501357

## COUNT III
### Bad Faith

194.    Plaintiff incorporates by reference the foregoing averments of this complaint as if the same were set forth more fully herein at length.

195.    Allied World's refusal to timely acknowledge a covered **Claim** and provide a defense to the Law Firm under the Allied World Policy on October 3, 2023 was without reasonable basis.

196.    Allied World knew or recklessly disregarded its lack of a reasonable basis in denying that a covered **Claim** had been tendered as of October 3, 2023.

197.    Allied World knew or recklessly disregarded its lack of a reasonable basis in denying a timely defense to the Law Firm for the covered **Claim** following the Law Firm's tender of that claim.

198.    Allied World's refusal to indemnify pre-tender defense costs the Law Firm incurred was inconsistent with prevailing law and without reasonable basis.

199.    Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to indemnify pre-tender defense costs the Law Firm incurred.

200.    Allied World's refusal to indemnify defense costs the Law Firm was compelled to incur following Allied World's refusal to timely acknowledge a covered **Claim** was without reasonable basis.

201.    Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to indemnify defense costs the Law Firm was compelled to incur following Allied World's refusal to timely acknowledge a covered **Claim**.

Case ID: 240501357

202.     Allied World's continued refusal to indemnify defense costs following Allied World's belated acknowledgment of a covered **Claim** on January 16, 2024 was without reasonable basis.

203.     Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to indemnify defense costs the Law Firm was compelled to incur following Allied World's belated acknowledgment of a covered **Claim** on January 16, 2024.

204.     Allied World's refusal to indemnify defense costs the Law Firm has incurred in defending the covered **Claim** was without reasonable basis.

205.     Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to indemnify defense costs the Law Firm has incurred in defending the covered **Claim**.

206.     Allied World had a duty under the Allied World Policy and prevailing law to actively engage in good faith negotiations to resolve its insured's exposure for the covered **Claim**.

207.     Allied World refused to engage in good faith negotiations to resolve its insured's exposure for the covered **Claim**.

208.     Allied World's refusal to engage in good faith negotiations to resolve its insured's exposure for the covered **Claim** was without reasonable basis.

209.     Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to engage in good faith negotiations to resolve its insured's exposure for the covered **Claim**.

210.     Allied World had a duty under the Allied World Policy and prevailing law to respond to the demand to resolve its insured's exposure for the covered **Claim**.

Case ID: 240501357

211.    Allied World refused to meaningfully and in good faith respond to the demand to resolve its insured's exposure for the covered **Claim**.

212.    Allied World's refusal to meaningfully and in good faith respond to the demand to resolve its insured's exposure for the covered **Claim** was without reasonable basis.

213.    Allied World knew or recklessly disregarded its lack of a reasonable basis in refusing to meaningfully and in good faith respond to the demand to resolve its insured's exposure for the covered **Claim.**

214.    Allied World unreasonably refused to commit to indemnify a proposed reasonable and arm's length settlement of the covered **Claim** advanced against its insured.

215.    Allied World knew or recklessly disregarded the fact that its refusal to commit to indemnifying a proposed reasonable and arm's length settlement of the covered **Claim** was without reasonable basis.

216.    As a consequence of Allied World's acts and omissions, the Law Firm was compelled to settle and resolve the covered **Claim**.

217.    Allied World has a duty to indemnify the settlement under the Allied World Policy.

218.    Allied World waived any defense to that indemnity obligation.

219.    Allied World is estopped from raising any policy-based defense to that indemnity obligation.

220.    Allied World has refused to indemnify the settlement of the covered **Claim** under the Allied World Policy.

221.    Allied World's refusal to indemnify the arm's length and reasonable settlement obtained by its insured was without reasonable basis.

Case ID: 240501357

222.    Allied World knew or recklessly disregarded its lack of a reasonable basis in

refusing to indemnify the settlement under the Allied World Policy.

223.    In an action arising under an insurance policy, if the court finds that the insurer

has acted in bad faith toward the insured, the court may take all of the following actions:

(1)    Award interest on the amount of the claim from the date the claim was
made by the insured in an amount equal to the prime rate of interest plus
3%.
(2)    Award punitive damages against the insurer.
(3)    Assess court costs and attorney fees against the insurer.

42 Pa.C.S. §8371.

224.    Allied World is liable to the Law Firm for all sums and remedies afforded under

42 Pa.C.S. §8371 and prevailing law as a result of its bad faith conduct.

**WHEREFORE**, Plaintiff, Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig

LLP, demands judgment it its favor and against Allied World Insurance Company:

(a)    In the amount of $565,326.15, plus interest;

(b)    For all consequential damages on account of Allied World Insurance Company's

breach of its insuring obligations under Allied World LPL Assure Lawyers Professional Liability

Insurance Policy 0310-8385, including but not limited to costs and attorney's fees incurred in

this action, together with interest on those sums;

(c)    An award of interest on the amount of the claim from the date the claim was made

by the insured in an amount equal to the prime rate of interest plus 3% under 42 Pa.C.S. §8371;

(d)    An award of punitive damages;

(e)    An award assessing court costs and attorney fees; and

(f)    For such other and further relief as requested in this Complaint and as otherwise

may be determined by this Court to be just and proper under the circumstances.

44

Case ID: 240501357

Respectfully Submitted,

By: /s/ Louis A. Bové
LOUIS A. BOVÉ, ESQUIRE
PA BAR I.D. NO. 53071
**BODELL BOVE, LLC**
1845 Walnut Street, 11th Fl., Suite 1100
Philadelphia, PA 19103
Tel: (215) 864-6600
Facsimile: (215) 864-6610
lbove@bodellbove.com
*Attorneys for Plaintiff Feldman Shepherd*
*Wohlgelernter Tanner Weinstock & Dodig LLP*

Date: May 10, 2024

45

V E R I F I C A T I O N

I am authorized to make this Verification on behalf of the plaintiff, Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP, and I verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. However, the language used in the within pleading is language chosen by our attorney in order to conform to the Pennsylvania Rules of Civil Procedure. Additionally, to the extent that the contents of the pleading are that of counsel, I have relied upon counsel in taking this Verification. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

Date:  5/10/2024



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# A

RISK MANAGEMENT

# Allied World
# Lawyers Professional Liability

**Dear Policyholder,**

Thank you for choosing Allied World as your Lawyers Professional Liability insurance carrier. In addition to the coverage provided in the attached policy, AWAC Services Company, a member company of Allied World, partners with the law firm of Hinshaw & Culbertson LLP to provide the following value added risk management services *at no additional charge.*

Allied World Lawyers Professional Liability policyholders can access the interactive risk management website at:

awac.lawyeringlaw.com

Enter your policy number and create your password.

## CONTACTS

If you have any questions on these risk management services, please contact:
riskmanagement@awacservices.com

**Thank you for choosing Allied World.**

## RISK MANAGEMENT CONSULTATIONS

- *Up to two hours free per year, per firm* of live risk management hotline support with an experienced senior attorney from the law firm of Hinshaw & Culbertson LLP

- Helpline partners have years of experience specializing in professional liability and legal ethics

- All helpline consultations form an attorney-client privileged relationship

For a risk management consultation, call **866-639-2309** and identify yourself as a lawyer insured by Allied World. You can also request a consultation by going to the Risk Management Consultation link on **awac.lawyeringlaw.com.**

## CONTINUING LEGAL EDUCATION (CLE)

- *Up to five hours free* CLE for each insured attorney

- You may access the free CLE courses by going to **awac.lawyeringlaw.com**

## EDUCATIONAL PORTAL

Designed to be a forum for risk management education, our online portal contains monthly advisories on topical issues. **To create your unique access to the portal,** go to https://alliedworldrisk.management/policy_holders/sign_in and enter your Allied World policy number, inception and expiration date.

## RISK MANAGEMENT WEBSITE

This interactive website contains the following information, documents, and forms:

- Articles on topics related to legal malpractice

- Sample engagement agreements, non-engagement & disengagement letters, litigation hold letters and more

- Checklists to assist in client screening, opening new files, conflicts checks, and suing clients for fees

- Summaries of recent and archived decisions concerning lawyers' professional liability

- Considerations for adopting law firm policies on issues such as records retention, disaster planning, etc.

- Rules of professional conduct & ethics opinions

- Self-audit forms to help evaluate practice management systems

- The Hinshaw & Culbertson LLP *"Lawyers' Lawyer"* Newsletter is published approximately six times per year

- "Client Alerts" notify lawyers of recent decisions involving issues pertaining to practice management, legal ethics and professional liability



# RISK MANAGEMENT

www.alliedworldinsurance.com

This information is provided as a general overview for agents and brokers. Coverage will be underwritten by an insurance subsidiary of Allied World Assurance Company Holdings, GmbH, a Fairfax company ("Allied World"). Such subsidiaries currently carry an A.M. Best rating of "A" (Excellent), a Moody's rating of "A3" (Good) and a Standard & Poor's rating of "A-" (Strong), as applicable. Coverage is offered only through licensed agents and brokers. Actual coverage may vary and is subject to policy terms and conditions. Coverage may not be available in all jurisdictions. Risk management services are provided or arranged through Allied World. Hinshaw is not a member company of Allied World. © 2019 Allied World Assurance Company Holdings, GmbH.
All rights reserved.

0319

Case ID: 240501357



**ALLIED WORLD INSURANCE COMPANY**

**1690 New Britain Ave., Suite 101, Farmington, CT 06032 Tel. (860) 284-1300 Fax (860) 284-1301**

A Non-Participating Insurer

## ALLIED WORLD *LPL ASSURE* LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

**POLICY NUMBER: :** 0310-8385          **RENEWAL OF:** 0310-8385

**THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD, AND REPORTED IN ACCORDANCE WITH SECTION V.E. OF THE POLICY.  THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES WILL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION AMOUNT.   IN NO EVENT WILL THE INSURER BE LIABLE FOR CLAIMS EXPENSES OR DAMAGES IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.**

## DECLARATIONS

**Item 1.   Name and Mailing Address of Named Insured:**
Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103

**Item 2.   Policy Period:**

(a) Inception Date:      July 24, 2023
(b) Expiration Date:     July 24, 2024

**At 12:01 a.m. Standard Time at the Mailing Address Shown Above**

**Item 3.   Limits of Liability:**

**I.      Limits of Liability for Insuring Agreements**

$5,000,000 Limit of Liability for each and every Claim under Insuring Agreement I.

**II.      Limits of Liability for Additional Coverages**

(a)      $25,000 Shared Aggregate Limit of Liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.

(b)      $500,000   Limit of Liability for each and every Claim under Additional Coverage B., Non-Profit Directors & Officers Coverage.

Case ID: 240501357

$500,000  Limit of Liability for all Claims under Additional Coverage B., Non-Profit Directors & Officers Coverage.

(c)  $30,000   Limit of Liability for all personal earnings, under Additional Coverage C.; provided that this Limit of Liability is further limited as follows:

(i)  $500 for personal earnings lost each day

(ii)  $15,000 for personal earnings per Claim

(d)  $20,000  Limit of Liability for all fees, costs and expenses incurred from each and every Disciplinary Proceeding under Additional Coverage D.

$60,000  Limit of Liability for all fees, costs and expenses incurred from all Disciplinary Proceedings under Additional Coverage D.

(e)  $10,000  Limit of Liability for all fees and costs incurred from the Insured receiving a Subpoena arising out of Legal Services under Additional Coverage E.

**III.    Policy Aggregate Limit of Liability**

$5,000,000 Aggregate Limit of Liability for all amounts payable under Insuring Agreement I. and Additional Coverages A. and B.  The Aggregate Limit of Liability does not apply to the Additional Coverages C., D. and E.

**Item 4.   Retentions:**

(a)  $50,000 each and every Claim under Insuring Agreement I.

(b)  $5,000 each and every Material Event; each and every Privacy Wrongful Act; and each and every Data Breach under Additional Coverage A.

(c)  $5,000 each and every Claim under Additional Coverage B.

No Retention shall apply to Additional Coverages C., D. and E.

**Item 5.   Address of Insurer For Notices Under This Policy:**

Claim-Related Notices:
noticeofloss@awac.com

All Other Notices:
1690 New Britain Avenue, Suite 101
Farmington, CT 06032

**Item 6.    Premium:**    ██████

Case ID: 240501357

**Item 7.   Retroactive Date:**          None - Prior Acts Coverage Provided


**Item 8.   Prior Knowledge Date:**   July 24, 2017


**Item 9.   Endorsements Attached at Issuance:**
1. LPL 00032 37 (02/2021) Pennsylvania Amendatory
2. LPL 00060 00 (11/2013) Amend Selection of Defense Counsel
3. LPL 00062 00 (11/2013) Specific Entities Excluded from Coverage
4. LPL 00132 00 (12/2020) Amendatory Endorsement


In Witness Whereof, the **Insurer** has caused this Policy to be executed and attested. This Policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.


President                                              Asst. Secretary


_____

**AUTHORIZED REPRESENTATIVE**

Case ID: 240501357

**ENDORSEMENT NO. 1**

**PENNSYLVANIA STATE AMENDATORY**

This Endorsement, effective at 12:01 a.m. on July 24, 2023, forms part of

      Policy No.     0310-8385
      Issued to      Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP
      Issued by     Allied World Insurance Company

To be attached to and form a part of all Lawyers Professional Liability Policies written in the State of Pennsylvania.

In consideration of the premium charged, it is understood and agreed that:

1.     Section V. CONDITIONS, Subsection F. EXTENDED REPORTING PERIOD OPTIONS, clause 5. CONDITIONS APPLICABLE TO ALL EXPRNDED REPORTING PERIOD OPTIONS, is amended by deleting paragraph (a) therefrom.

2.     Section V. CONDITIONS, Subsection J. CANCELLATION; NO OBLIGATION TO RENEW, is amended to read as follows:

     **J.**     **CANCELLATION; NO OBLIGATION TO RENEW**

        1.     This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declarations, or upon any earlier cancellation.

        2.     This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect.  If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure. Any unearned premium shall be returned to the **Named Insured** no later than thirty (30) days after the effective date of cancellation by the **Named Insured**.

        3.     This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least sixty (60) days prior to the effective date of such cancellation, for the following reasons:

            (a)     a condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the **Policy Period**;

            (b)     loss of reinsurance or a substantial decrease in reinsurance, which loss or decrease shall, at the time of cancellation, be certified to the Insurance Commissioner of Pennsylvania as directly affecting in-force policies;

            (c)     the Policy was obtained through fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by the **Insurer**;

            (d)     material failure to comply with the policy terms, conditions or contractual duties;

            (e)     any other reason that the Insurance Commissioner of Pennsylvania may

Case ID: 240501357

approve.

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

4.   This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least fifteen (15) days prior to the effective date of such cancellation, for the following reasons:

   (a)   the **Insured** has made a material misrepresentation which affects the insurability of the risk; or

   (b)   the **Insured** failed to pay a premium when due.

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

5.   If the Policy is canceled by the **Insurer**, the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis.  Any unearned premium shall be returned to the **Named Insured** no later than ten (10) days after the effective date of cancellation by the **Insurer**.  Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

6.   The **Insurer** will not be required to renew this Policy upon its expiration.  If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail by first-class or certified mail written notice, to the **Named Insured**, at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

7.   If the **Insurer** increases the premium upon renewal, the **Insurer** will deliver or mail to the **Named Insured**, at its last known address, written notice to that effect at least thirty (30) days before the Expiration Date set forth in Item 2. of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case ID: 240501357

**ENDORSEMENT NO. 2**

**AMEND SELECTION OF DEFENSE COUNSEL**

This Endorsement, effective at 12:01 a.m. on July 24, 2023, forms part of

| | |
|---|---|
| Policy No. | 0310-8385 |
| Issued to | Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP |
| Issued by | Allied World Insurance Company |

In consideration of the premium charged, it is hereby agreed that Section V. CONDITIONS, Subsection C.1. is amended to read as follows:

1.  The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy.  The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**.  However, the **Insurer** shall not select defense counsel without the consent of the **Named Insured**, such consent not to be unreasonably withheld.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case ID: 240501357

**ENDORSEMENT NO. 3**

**SPECIFIC ENTITIES EXCLUDED FROM COVERAGE**

This Endorsement, effective at 12:01 a.m. on July 24, 2023, forms part of

      Policy No.     0310-8385
      Issued to      Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP
      Issued by     Allied World Insurance Company

In consideration of the premium charged, it is hereby agreed:

No entity listed below is an **Insured** under this Policy.  Accordingly, this Policy does not cover any **Claim** or **Disciplinary Proceeding** brought by or against, or arising out of the acts, errors, omissions or **Wrongful Acts** of the following entities, or any related or affiliated entities:

| |
|---|
| Full Armor Sports, Inc; Powerhouse Entertainment Group, Robertson, LLC |

All other terms, conditions and limitations of this Policy shall remain unchanged.

                                         _____
                                                Authorized Representative

Case ID: 240501357

**ENDORSEMENT NO. 4**

**AMENDATORY ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on July 24, 2023, forms part of

| | |
|---|---|
| Policy No. | 0310-8385 |
| Issued to | Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP |
| Issued by | Allied World Insurance Company |

In consideration of the premium charged, it is hereby agreed that:

1.  Item 3.II.(c) of the Declarations is deleted in its entirety and replaced as follows:

    (c)   $50,000   Limit of Liability for all personal earnings, under Additional Coverage C.; provided that this Limit of Liability is further limited as follows:

        (i)   $500 for personal earnings lost each day

        (ii)   $30,000 for personal earnings per Claim

2.  Item 3.II.(d) of the Declarations is deleted in its entirety and replaced as follows:

    (d)   $20,000   Limit of Liability for all fees, costs and expenses incurred from each and every Disciplinary Proceeding under Additional Coverage D.

        $100,000   Limit of Liability for all fees, costs and expenses incurred from all Disciplinary Proceedings under Additional Coverage D.

3.  Section 3.II.(e) of the Declarations is deleted in its entirety and replaced as follows:

    (e)   $25,000   Limit of Liability for all fees and costs incurred from the Insured receiving a Subpoena arising out of Legal Services under Additional Coverage E.

4.  Section III. DEFINITIONS, Subsection G. "**Damages**" is deleted in its entirety and replaced as follows:

    G.   **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest. **Damages** shall include punitive or exemplary damages, or the multiple portion of multiplied damages, where insurable by law.

        **Damages** shall not include:

        1.   criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

        2.   amounts deemed uninsurable by law;

        3.   the return or restitution of legal fees, costs and expenses, no matter how claimed;

        4.   amounts paid or incurred by an **Insured** to comply with a judgment or settlement

1

Case ID: 240501357

for any form of equitable or non-monetary relief; or

5.    amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

In determining the insurability of punitive or exemplary damages, or the multiple portion of multiplied damages, the laws of the state or jurisdiction most favorable to the **Insured** shall apply, provided such state or jurisdiction is:

(a)    where such punitive or exemplary damages, or the multiple portion of multiplied damages were awarded;

(b)    where any act, error or omission underlying the **Claim** took place;

(c)    where either the **Named Insured** or the **Insurer** is incorporated, has its principal place of business, or resides; or

(d)    where this Policy was issued and became effective.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

2

Case ID: 240501357



**ALLIED WORLD INSURANCE COMPANY**
**1690 New Britain Ave., Suite 101, Farmington, CT 06032 Tel. (860) 284-1300 Fax (860) 284-1301**

## ALLIED WORLD *LPL ASSURE*
## LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

**I.      INSURING AGREEMENT**

The **Insurer** will pay on behalf of an **Insured**, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** first made during the **Policy Period** or any applicable Extended Reporting Period and reported in accordance with the terms of this Policy, for a **Wrongful Act**.

It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:

1.      during the **Policy Period**; or

2.      on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

    (a)      the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**;

    (b)      prior to the date listed in Item 8. of the Declarations, no **Insured** had any basis: (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

    (c)      there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

**II.     ADDITIONAL COVERAGES**

    A.      Supplemental Privacy Coverage

        1.      Crisis Management Coverage

        The **Insurer** shall reimburse the **Named Insured**, in excess of the applicable Retention, for **Crisis Management Expenses** incurred by the **Named Insured** in connection with **Material Events** which first take place or are reasonably anticipated to first take place during the **Policy Period**.

Case ID: 240501357

2. Notification and Credit Monitoring Costs Coverage

The **Insurer** shall reimburse the **Named Insured**, in excess of the applicable Retention, for **Notification Costs** incurred by the **Named Insured** arising from a **Network Security and Privacy Wrongful Act**, which takes place during the **Policy Period**. **Notification Costs** are not eligible for coverage under this Additional Coverage A.2. in the event such costs are covered as **Damages** under Insuring Agreement I.

3. Data Forensics Coverage

The **Insurer** shall reimburse the **Named Insured** in excess of the applicable Retention, for **Data Forensic Expenses** incurred by the **Named Insured** in connection with a **Data Breach** which first occurs during the **Policy Period** and which the **Insured** reasonably believes might result in a **Claim** for a **Network Security and Privacy Wrongful Act**.

Such costs are not eligible for coverage under this Additional Coverage A.3. in the event such costs are covered as **Damages** under Insuring Agreement I.

As a condition precedent to coverage under Additional Coverages A.1., A.2., and A.3.:

(a) The actual or anticipated **Material Event**, the **Network Security and Privacy Wrongful Act**, and/or **Data Breach** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the expiration of the **Policy Period**; and

(b) The **Crisis Management Expenses**, **Notification Costs**, and/or **Data Forensic Expenses** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the **Named Insured** first incurs such **Crisis Management Expenses**, **Notification Costs**, and/or **Data Forensic Expenses**.

B. Non-Profit Director and Officer Coverage

The **Insurer** will reimburse an individual **Insured** lawyer, subject to the applicable Retention, all amounts that such **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** first made during the **Policy Period** or any applicable Extended Reporting Period for a **Non-Profit Director or Officer Wrongful Act**.

The coverage provided under this Additional Coverage B. is specifically excess of, and shall not contribute with, any other insurance plan or program of insurance or self-insurance carried by the **Non-Profit Organization**, or any contribution and indemnification to which the individual **Insured** lawyer is entitled to from such **Non-Profit Organization**.

The most the **Insurer** shall pay for all **Claims** for which coverage is provided under this Additional Coverage B. shall be an amount equal to the lesser of:

(a) The per **Claim** Limit of Liability under the **Non-Profit Organization's** Directors and Officers Liability Insurance; or

Case ID: 240501357

(b)      The Limit of Liability set forth in Item 3.I. of the Declarations;

up to a maximum amount of $500,000 per **Claim** and in the aggregate for all such **Claims**.  Any payment made under this Additional Coverage B. shall be part of, and not in addition to, the applicable Limit of Liability set forth in Item 3.I. of the Declarations.

As a condition precedent to coverage under this Additional Coverage B.:

(a)      any **Non-Profit Director or Officer Wrongful Act** upon which a **Claim** is based occurred:

1.   during to the **Policy Period**; or

2.   on or after the **Retroactive Date** and prior to the **Policy Period**, provided that the following conditions are met:

a.      the **Insured** did not notify any prior insurer of such **Non-Profit Director or Officer Wrongful Act** or **Related Act or Omission**; and

b.      prior to the date listed in Item 8. of the Declarations, no **Insured** had any basis to foresee that any fact, circumstance, situation, transaction, event or **Non-Profit Director or Officer Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**;

(b)      The individual **Insured** lawyer serving as a director, officer or committee member of the **Non-Profit Organization** must do so with the express consent, or at the request of, the **Named Insured**;

(c)      The **Non-Profit Organization** will have, in full force and effect during the **Policy Period** or any Extended Reporting Period, Directors and Officers Liability Insurance with Limits of Liability of at least $500,000 per claim and in the aggregate for all claims; and

(d)      No more than ten percent (10%) of the **Named Insured's** annual gross revenues are derived directly or indirectly from **Legal Services** performed by any **Insured** for the **Non-Profit Organization**.

C.      Lost Earnings Coverage

The **Insurer** shall reimburse each **Insured**, for reasonable expenses incurred and personal earnings actually lost each day or part of a day such **Insured**, at the **Insurer's** express request, attends a hearing, deposition, mediation, settlement conference, arbitration or trial arising from a **Claim** first made during the **Policy Period** and reported to the **Insurer** in accordance with Section V.E. of the Policy.  Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III. of the Declarations and shall not be subject to any Retention.

This coverage shall not apply in the event of a **Disciplinary Proceeding**.

Case ID: 240501357

D.      Disciplinary Proceedings Coverage

The **Insurer** will pay on behalf of an **Insured** reasonable fees, costs and expenses incurred to defend or respond to a **Disciplinary Proceeding** initiated against the **Insured** and reported to the **Insurer** during the **Policy Period**.  Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III. of the Declarations and shall not be subject to any Retention.

There is no coverage for criminal or civil fines, penalties (statutory or otherwise), fees or sanctions assessed against an **Insured**, or for expenses, salaries, wages, benefits, or overhead of an **Insured** arising from a **Disciplinary Proceeding**.

E.      Subpoena Coverage

The **Insurer** will pay on behalf of an **Insured Subpoena Expenses** incurred in responding to a **Subpoena**.

As a condition precedent to coverage under this Additional Coverage E.:

(a)     The **Subpoena** must arise out of an **Insured's** performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

(b)     The **Subpoena** must be reported to the **Insurer** as soon as practicable, but in no event later than the expiration of the **Policy Period**;

(c)     The **Subpoena** must arise out of a lawsuit to which the **Insured** is not a party; and

(d)     The **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit, nor has the **Insured** provided such advice or testimony in the past.

The **Insurer** shall retain an attorney for the **Insured** to provide advice regarding the production of documents, to prepare the **Insured** for sworn testimony, and to represent the **Insured** at the **Insured's** deposition.

Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III. of the Declarations and shall not be subject to any Retention.

Any notice the **Insured** gives the **Insurer** of such **Subpoena** shall be deemed notification of a potential **Claim** under Section V.E.3. of this Policy.

## III.    DEFINITIONS

A.      **APPLICATION** means: (a) the application, including any competitor's application, submitted to the **Insurer**, or any affiliate thereof, for this Policy or any other policy; (b) any attachments and other materials provided with any such application or incorporated into any such application; and (c) any other materials and information submitted by the **Insured** to the **Insurer** in connection with the underwriting of this Policy.

Case ID: 240501357

B.    **BODILY INJURY** means injury to the body, sickness or disease sustained by any person, including death resulting from such injuries; including any mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person, whether or not resulting from injury to the body, sickness, disease or death of any person.

C.    **CLAIM** means:

    1.    any written notice or demand for monetary relief or **Legal Services**;

    2.    any civil proceeding in a court of law;

    3.    any written demand for mediation, arbitration or any other alternative dispute resolution proceeding;

    4.    any administrative proceeding, other than a **Disciplinary Proceeding**; or

    5.    a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for any **Wrongful Act**.

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

D.    **CLAIM EXPENSES** means:

    1.    reasonable fees, costs and expenses charged by attorneys retained or approved by the **Insurer** for a **Claim** brought against an **Insured**;

    2.    reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Insurer** to apply for or furnish such bond.

**Claim Expenses** shall not include:

    (a)    salaries, loss of earnings, reimbursement for the **Insured's** time or attendance required in any investigation or defense;

    (b)    other remuneration by or to any **Insured**.

The determination by the **Insurer** as to the reasonableness of **Claim Expenses** shall be conclusive on all **Insureds**.

Case ID: 240501357

E.   **CONFIDENTIAL INFORMATION** means any confidential information of a client or third party which is obtained by the **Insured** for the purpose of providing **Legal Services**, including but not limited to:

1.   any information subject to the attorney-client privilege;

2.   a natural person's name, e-mail address, social security number, medical or healthcare data, other protected health information, driver's license number, state identification number, credit card number, debit card number, address, unpublished telephone number, account number, account histories, personally identifiable photos, personally identifiable videos, Internet browsing history, biometric or geolocation information, or passwords; or

3.   any other non-public personal information as defined in any local, state, federal, and foreign identity theft and privacy protection laws, legislation, statutes, or regulations that require commercial entities that collect **Confidential Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Confidential Information** has potentially been compromised.

F.   **CRISIS MANAGEMENT EXPENSES** means the following reasonable and necessary amounts when incurred during, or within ninety (90) days prior to a **Material Event** for which the **Named Insured** becomes legally liable for those services performed by a public relations firm, crisis management firm or law firm selected by the **Named Insured** and approved in advance in writing by the **Insurer**, to minimize potential harm to the **Named Insured** arising from a **Material Event**, including, without limitation, maintaining and restoring public confidence in the **Named Insured**, and providing advice to the **Named Insured** or any of its directors, officers, partners or employees.

**Crisis Management Expenses** shall not include compensation, fees, benefits, overhead, or the charges or expenses of any **Insured**.

G.   **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest and punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed.

For the purpose of determining the insurability of punitive or exemplary damages under this Policy, the laws of the jurisdiction most favorable to the insurability of such damages shall control if that jurisdiction:

i.   is the location of the court that awarded or imposed such damages;

ii.   is where the **Insured** is incorporated or otherwise organized or has a place of business; or

iii.   is where the **Insurer** is incorporated or otherwise organized or has its principal place of business.

**Damages** shall not include:

1.   criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

Case ID: 240501357

2.      the multiplied portion of multiple damages;

3.      amounts deemed uninsurable by law;

4.      the return or restitution of legal fees, costs and expenses, no matter how claimed;

5.      amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or

6.      amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

H.      **DATA BREACH** means the unauthorized misappropriation or disclosure of **Confidential Information** that is in the physical possession of the **Insured** or which is stored on, transmitted or received by, the **Named Insured's Network**.

I.      **DATA FORENSIC EXPENSES** means the reasonable and necessary costs incurred by the **Named Insured** to retain a qualified forensics firm to investigate, examine and analyze the **Named Insured's Network**, to find the cause, source and extent of a **Data Breach**. The forensics firm selected by the **Named Insured** to perform data forensic services in connection with such **Data Breach** must be approved in writing by the **Insurer**, prior to the **Named Insured** incurring any **Data Forensic Expenses**.

J.      **DIGITAL ASSETS** means software and electronic data that is stored on or within the **Named Insured's Network**.  **Digital Assets** shall include the capacity of the **Named Insured's Network** to store and process data and information and electronically disseminate data and information over the Internet.

**Digital Assets** shall not include **Money**, funds, debt, securities, bonds, equity instruments, credit, bills, accounts, valuable papers, trade secrets and intellectual property.

K.      **DISCIPLINARY PROCEEDING** means any proceeding initiated by a regulatory, disciplinary or licensing official, board or agency to investigate charges made against an **Insured** alleging professional misconduct in the performance of or failure to perform **Legal Services**.

L.      **IDENTITY THEFT** means the misappropriation of the **Confidential Information** that is in the **Insured's** care, custody and control, which has resulted in the wrongful or fraudulent use of such **Confidential Information**, including but not limited to, fraudulently emulating the identity of an individual or corporation.

M.      **IMMEDIATE FAMILY** means:

1.      the **Insured**;

2.      the **Insured's** lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the **Named Insured**);

Case ID: 240501357

3.       the **Insured's** parents, adoptive parents, or step-parents;

4.       the **Insured's** siblings or step-siblings;

5.       the **Insured's** children, adoptive children, or step-children.

N.     **INSURED** means:

1.       the **Named Insured**;

2.       any **Predecessor Firm;**

3.       any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

4.       any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

5.       any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**;

6.       any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

7.       any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and

8.       the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

O.     **INSURER** means the company identified in the Declarations.

P.     **LEGAL SERVICES** means those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, lobbyist, administrator, conservator, receiver, executor, guardian, trustee, fiduciary or escrow

Case ID: 240501357

agent, but only where such services were performed in the ordinary course of an **Insured's** activities as a lawyer.  **Legal Services** also includes services rendered by an **Insured** as a: (a) member of a formal accreditation, ethics, peer review or licensing board, standards review board, bar association, or any similar board or committee; (b) expert witness in a legal malpractice proceeding; or (c) author, publisher or presenter of legal research or legal articles and papers, but only if the compensation received by the **Insured** annually from such services is less than $5,000.  **Legal Services** does not include services rendered as a real estate agent or broker, as an insurance agent or broker or as a certified public accountant.

Q.    **LEGAL SERVICES WRONGFUL ACT** means:

    1.    any actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or

    2.    any actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**.

R.    **MALICIOUS CODE** means unauthorized and either corrupting or harmful software code, including but not limited to computer viruses, Trojan horses, worms, logic bombs, spyware or spiderware.

S.    **MATERIAL EVENT** means the publication, in media of widespread distribution, of unfavorable information relating to a **Data Breach** or the **Network Security and Privacy Wrongful Acts** of an **Insured**, which can be reasonably considered to lessen public confidence in the competence, integrity or viability of the **Named Insured** to conduct business.

T.    **MONEY** means currency, coins and bank notes in current use and having a face value, bullion, traveler's checks, registered checks, money orders held for sale to the public, digital currency, virtual currency or cryptocurrency.

U.    **NAMED INSURED** means the entity named in Item 1. of the Declarations.

V.    **NETWORK** means computer hardware, software, firmware, and components thereof, including **Digital Assets** stored thereon, which are connected through two or more computers, including such networks accessible through the Internet, intranets, extranets or virtual private networks.  **Network** shall not include the computer hardware, software, firmware, or components thereof, of any third-party provider of telephone, telecommunications, cable, Internet, or satellite services.

W.    **NETWORK SECURITY** means the use of hardware, software and firmware, including, without limitation, firewalls, filters, routers, intrusion detection software, antivirus software, automated password management applications and other authentication mechanisms, which are designed to control or restrict the access to a **Network**, or parts thereof.

X.    **NETWORK SECURITY AND PRIVACY WRONGFUL ACT** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by an **Insured**, solely in connection with the performance of or failure to perform **Legal Services**, which results in a breach of the **Insured's Network Security**, the consequences of which are:

Case ID: 240501357

1.     the inability of a client or authorized third party to gain access to the **Insured's** website or **Network** in order to transmit or access documents or information;

2.     **Identity Theft**;

3.     the transmission of **Malicious Code**;

4.     the unauthorized release of a client or third party's confidential and proprietary business information which is obtained by the **Insured** for the purpose of providing **Legal Services**; or

5.     the misappropriation or disclosure of **Confidential Information**; or a breach or violation of U.S. federal or state law or regulations or any similar or related laws or regulations of any foreign jurisdiction, arising out of the actual or potentially unauthorized access to or disclosure of **Confidential Information**.

Y.     **NON-PROFIT DIRECTOR OR OFFICER WRONGFUL ACT** means any actual or alleged act, error or omission committed by an individual **Insured** lawyer while serving in his or her capacity as a director, officer or committee member of a **Non-Profit Organization**.

Z.     **NON-PROFIT ORGANIZATION** means a corporation or organization, other than an **Insured** entity, which is exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as the same may be amended from time to time.

AA.     **NOTIFICATION COSTS** means the costs incurred by the **Named Insured** for notification and credit monitoring as a result of a **Network Security and Privacy Wrongful Act**. The **Notification Costs** for the **Network Security and Privacy Wrongful Act** must be approved in writing by the **Insurer** prior to the **Named Insured** incurring such costs.

BB.     **PERSONAL INJURY** means libel, slander, violation of a right of privacy, false arrest, detention, imprisonment, wrongful entry, eviction, malicious prosecution or abuse of process, when insurable under the law pursuant to which this Policy shall be construed.

CC.     **POLICY PERIOD** means the period from the Inception Date shown in Item 2. of the Declarations to the earlier of the Expiration Date shown in Item 2. of the Declarations, or the effective date of cancellation of this Policy.

DD.     **PREDECESSOR FIRM** means any individual or entity engaged in **Legal Services** to whose financial assets and liabilities the **Named Insured** is the majority successor-in-interest.

EE.     **RELATED ACT OR OMISSION** means all acts or omissions based on, arising out of, directly or indirectly resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

FF.     **RETROACTIVE DATE** means the applicable date specified in Item 7. of the Declarations.

Case ID: 240501357

GG.  **SUBPOENA** means a written judicial order issued to any **Insured** to provide testimony or to produce or allow the inspection of documents, records, notes, electronic information, tape recordings, photographs, taped footage or other related materials.

HH.  **SUBPOENA EXPENSES** means the reasonable and necessary fees and expenses incurred by an attorney retained by the **Insurer** on the **Insured's** behalf to assist in responding to a **Subpoena**.

II.  **TOTALLY AND PERMANENTLY DISABLED** means a medically determinable impairment of the mind or body which wholly prevents an **Insured** from providing **Legal Services**, when such impairment is reasonably certain to continue throughout the lifetime of the **Insured** or to result in death.

JJ.  **WRONGFUL ACT** means a **Legal Services Wrongful Act** or a **Network Security and Privacy Wrongful Act**.

## IV.  EXCLUSIONS

A.  This Policy does not cover any **Claim** or **Disciplinary Proceeding**:

1.  based upon, involving or contributed to by any dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute, rule or law, by an **Insured**.

    This Exclusion A.1. shall not apply unless such conduct has been established by an admission, final adjudication or finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

    Whenever coverage under this Policy would be excluded, suspended or lost due to this Exclusion A.1., the **Insurer** agrees that such insurance as would otherwise be afforded under this Policy shall be applicable with respect to any **Insured** who did not acquiesce in or remain passive after having knowledge of such conduct.

2.  brought by or on behalf of, or in the name or right of, any **Insured**; provided, however, that this Exclusion A.2. shall not apply to any **Claim** which arises out of **Legal Services** rendered by one **Insured** to another where an attorney-client relationship exists between such **Insureds**.

3.  for any actual or alleged violation by an **Insured** of the Employment Retirement Income Security Act of 1974, its amendments, or any regulation or orders promulgated pursuant thereto, or of any similar provisions of federal, state or local law or regulation.

4.  alleging, arising out of, based upon or attributable to any actual or alleged act, error or omission of any natural person who is not an **Insured**, if such **Claim** or **Disciplinary Proceeding** is based upon office-sharing arrangements, theories of partnership by estoppel, apparent partnership, apparent agency, ostensible agency, vicarious liability, or any similar theory.

B.  This Policy does not cover any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:

Case ID: 240501357

1.  any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate.

2.  any **Insured's** capacity or status as an officer, director, partner, trustee, manager or employee of any entity not listed as a **Named Insured** on Item 1. of the Declarations; provided, however, that this Exclusion B.2. shall not apply to an otherwise covered **Claim** for any **Non-Profit Director or Officer Wrongful Act**.

3.  any **Insured's** capacity or status as a public official, or an employee of a governmental body, subdivision, or agency unless the **Insured** is privately retained solely to render **Legal Services** to the governmental body, subdivision or agency and the remuneration for the **Legal Services** is paid directly or indirectly to the **Named Insured**.

4.  any actual or alleged **Wrongful Acts** of an **Insured**, whether or not such **Legal Services** are performed with or without compensation, for any business enterprise, whether for profit or not-for-profit, in which any **Insured**, or a member of an **Insured's Immediate Family**, has a "Material Interest."

    For purposes of this Exclusion B.4., a "Material Interest" shall mean the right of an **Insured** or a member of an **Insured's Immediate Family** directly or indirectly to:

    (a)  own 10% or more of an interest in an entity;
    (b)  vote 10% or more of the issued and outstanding voting stock in an incorporated entity;
    (c)  elect 10% or more of the directors of an incorporated entity;
    (d)  receive 10% or more of the profits of an unincorporated entity; or
    (e)  act as general partner of a limited partnership, managing general partner of a general partnership, or comparable positions in any other business enterprise.

    Provided, however, there is no coverage for any **Claim** for **Legal Services** for any entity that, at the time of the **Wrongful Act**, any **Insured**, or any **Immediate Family**, individually or collectively with one or more **Insureds**, manages, controls or has an equity interest which exceeds 10%.

5.  the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so;

6.  liability assumed by an **Insured** under an indemnity, hold harmless or liquidated damages provision or agreement, or similar provisions or agreements;

    provided, however, that this Exclusion B.6. shall not apply if such liability would have attached to the **Insured** by law in the absence of such provision or agreement;

7.  the notarized certification or acknowledgement of signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument; provided, however, that such physical appearance

Case ID: 240501357

shall not be required when remote signatures utilizing audio and/or video are permissible under applicable state law, provided the **Insured** follows all requirements established by such applicable law.

For purposes of this Exclusion B.7., applicable law shall be the law of the state where the **Named Insured** is incorporated or otherwise organized.

8.   **Bodily Injury**, and injury to, or destruction of, any tangible property, including the loss of use resulting therefrom;

provided, however, that the exclusion of **Bodily Injury** does not apply to that portion of a **Claim** for mental injury, mental anguish, mental tension, or emotional distress caused by:

(a)      **Personal Injury**;
(b)      a **Non-Profit Director and Officer Wrongful Act**; or
(c)      a **Network Security and Privacy Wrongful Act**.

9.   the loss or diminution of value of any asset, including funds, **Money** or securities, in the **Insured's** care, custody or control, for any reason whether negligent, fraudulent or otherwise, including the use, expenditure, transfer, failure to transfer, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling, of such assets, funds, **Money** or securities.

10.  unsolicited electronic dissemination of faxes, e-mails, text messages or similar communications to actual or prospective customers of the **Insured** or to any other third party, including but not limited to any violation of the Telephone Consumer Protection Act, any federal or state anti-spam statute, or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion.

C.   This Policy does not cover any **Claim** from a **Network Security and Privacy Wrongful Act**, **Crisis Management Expenses** from a **Material Event**, **Notification Costs** from a **Network Security and Privacy Wrongful Act** or **Data Forensic Expenses** from a **Data Breach** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the following:

1.   failure, interruption or reduction in supply of utility service or infrastructure, including, without limitation, electrical, gas, water, telephone, Internet, cable, satellite, or telecommunications.

2.   war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power.

3.   the transfer or failure to transfer funds, **Money** or securities; the return, reinvestment, reimbursement or replacement of funds, monies or securities or anything of monetary value that an **Insured** holds, receives or transfers, or fails to hold, receive or transfer, including any interest that accrued or failed to accrue.

Case ID: 240501357

4.  any wireless network that is not protected by either Wi-Fi Protected Access ("WPA") or any other security protocol that provides equal or greater protection than WPA.

5.  the use of a laptop computer, portable computer or other portable electronic device which does not employ whole disc encryption.

6.  back-up tapes, optical media, or any other form of portable back-up media which are not encrypted.

7.  expiration or withdrawal of technical support by a software vendor.

8.  any actual or alleged violation of any law or statute protecting any patent, or any rule or regulation promulgated thereunder or of any provision of the common law imposing liability in connection therewith; or the misappropriation, misuse or disclosure of confidential and proprietary business information or trade secrets, other than a **Network Security and Privacy Wrongful Act** as specifically described in Definition X., part 4.

## V.   CONDITIONS

### A.   LIMIT OF LIABILITY

Regardless of the number of **Claims**, **Material Events**, **Network Security and Privacy Wrongful Acts**, **Data Breaches** or other matters giving rise to coverage under this Policy, or the number of persons or entities included within the definition of **Insured**, the **Insurer's** liability is limited as follows:

1.  Limit of Liability for Insuring Agreements

    The Limit of Liability set forth in Item 3.I. of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. for all **Damages** and **Claim Expenses** resulting from each **Claim**.

2.  Limits of Liability for Additional Coverages

    (a)  The Shared Aggregate Limit of Liability, as set forth in Item 3.II.(a) of the Declarations, is the **Insurer's** maximum liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.

    (b)  The Limits of Liability, as set forth in Item 3.II.(b) of the Declarations is the **Insurer's** maximum liability for all **Damages** and **Claim Expenses** resulting from each and every **Claim** and all **Claims** for **Non-Profit Director or Officer Wrongful Acts**.

    (c)  The Limits of Liability, as set forth in Items 3.II.(c) – 3.II.(e) of the Declarations, is the **Insurer's** maximum liability for Additional Coverages C, D and E.

3.  Policy Aggregate Limit of Liability

    The Policy Aggregate Limit of Liability for this Policy, as set forth in Item 3.III.

Case ID: 240501357

of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. and Section II., Additional Coverages A and B.

Any amounts paid under Additional Coverages C, D, and E are in addition to the Policy Aggregate Limit of Liability set forth in Item 3.III. of the Declarations.

4.  Claim Expenses

    **Claim Expenses** are part of and not in addition to the Limit of Liability and shall reduce and may exhaust the Limit of Liability.  The Limit of Liability shall first be applied to **Claim Expenses** with the remainder, if any, being the amount available to pay as **Damages**.

5.  Exhaustion of Limit of Liability

    The **Insurer** shall not be obligated to pay any **Damages**, **Claim Expenses** or any other amounts payable under this Policy or to defend or continue to defend any **Claim** after the Limit of Liability set forth in Item 3.I. or Item 3.III. of the Declarations has been exhausted.  The **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this Policy, to accept such tender and proceed solely at its own cost and expense. If the **Insurer's** Policy Aggregate Limit of Liability as set forth in Item 3.III. of the Declarations is exhausted by the payment of **Damages** or **Claim Expenses**, the entire premium will be deemed fully earned.

B.  **RETENTION**

1.  With respect to the coverage provided under Insuring Agreement I., the **Insurer's** obligation to pay **Damages,** including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(a) of the Declarations, which Retention shall apply to each and every **Claim**.

2.  With respect to the coverage provided under Section II. Additional Coverage A., the **Insurer's** obligation to pay any amounts payable is in excess of the Retention set forth in Item 4.(b) of the Declarations, which Retention shall apply to each and every event giving rise to coverage under Section II.A.

3.  With respect to the coverage provided under Section II. Additional Coverage B., the **Insurer's** obligation to pay **Damages**, including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(c) of the Declarations, which Retention shall apply to each and every **Claim**.

4.  A Retention shall only apply to an Additional Coverage where so indicated on the Declarations.

5.  It is the **Named Insured's** responsibility to pay **Damages**, **Claim Expenses** or any other amounts payable under this Policy up to the amount of the Retention.  The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages**, **Claim Expenses** or

Case ID: 240501357

any other amounts payable under this Policy in excess of such Retention and such Retention shall not be insured under this Policy.

6.    Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount in the event that the **Named Insured** fails to do so in a timely manner.  In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

C.    **DEFENSE AND SETTLEMENT OF CLAIMS**

1.    The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy.  The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**.

2.    The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into a settlement of any **Claim** that the **Insurer** deems appropriate.

If, however, the **Insured** refuses to consent to any settlement recommended by the **Insurer** and acceptable to the claimant, then subject to the Limit of Liability set forth in Item 3.I. of the Declarations, the **Insurer's** liability for **Damages** and **Claim Expenses** relating to that **Claim** shall not exceed:

(a)    the amount for which the **Claim** could have been settled by the **Insurer**, plus all **Claim Expenses** incurred up to the date the **Insured** refused to settle such **Claim**; plus

(b)    fifty (50) percent of any **Damages** and/or **Claim Expenses** in excess of the amount in clause a. above, incurred in connection with such **Claim**. The remaining **Damages** and/or **Claim Expenses** will be carried by the **Insured** at its own risk and will be uninsured.

3.    The **Insurer**, at its sole discretion, shall have the right and option to retain counsel to investigate and defend any potential **Claim** and to pay for costs or expenses incurred as a result of any such investigation or defense provided the **Insured** has satisfied the notice requirements of Section V.E.3.  Any such payments shall be deemed **Claim Expenses** and shall be part of, and not in addition to, the Limit of Liability set forth in Item 3. of the Declarations and subject to the Retention set forth in Item 4. of the Declarations.

4.    If the **Named Insured** has not paid any premiums due or satisfied any applicable Retentions, the **Insurer** has the right, but not the obligation, to settle any **Claims** without the consent of the **Insured**.

D.    **MULTIPLE POLICIES**

If this Policy and any other policy issued by the **Insurer** including any Extended Reporting Period coverage afforded by such policy or policies, provides coverage for the same **Claim** against the **Insured**, the maximum limit of liability under all the policies shall not exceed the highest remaining per **Claim** limit of liability under any one policy.

Case ID: 240501357

E.  **NOTICE OF CLAIMS AND CIRCUMSTANCES**

1.  **NOTICE ADDRESS**

Notice of any actual or potential **Claim** shall be made to the **Insurer** at noticeofloss@awac.com.  All other notices shall be made to the **Insurer** at the address shown in Item 5. of the Declarations.

2.  **NOTICE OF AN ACTUAL CLAIM**

(a)  The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during the **Policy Period**, as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**.

(b)  The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during any Extended Reporting Period, as soon as practicable, but in no event later than the termination of the Extended Reporting Period.

(c)  In the event suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Insurer** every demand, notice, summons or other process received directly by an **Insured's** representative.

3.  **NOTICE OF A POTENTIAL CLAIM**

If, during the **Policy Period**, the **Insured** first becomes aware of a **Wrongful Act** which may reasonably be expected to be the basis of a **Claim** against an **Insured**, and the **Insured**, as soon as practicable, but in no event later than the termination of the **Policy Period**, gives the **Insurer** written notice of the **Wrongful Act** including a description of the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then the **Insurer** will treat any subsequently resulting **Claim** as if it had first been made during the **Policy Period**.

4.  **FRAUDULENT CLAIM**

If any **Insured** shall commit fraud in proffering any **Claim** with regard to amount or otherwise, this Policy shall become void from the inception as to such **Insured**.

5.  **RELATED CLAIMS**

All **Claims** based upon or arising out of the same **Wrongful Act** or **Related Act or Omission** shall be considered a single **Claim** and shall be considered first made at the time the earliest **Claim** arising out of such **Related Act or Omission** was first made.  In any such event, only one Limit of Liability and one Retention shall apply.

F.  **EXTENDED REPORTING PERIOD OPTIONS**

Case ID: 240501357

1.      **AUTOMATIC EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, and if this Policy has been in force for at least six (6) months, or if it has been in force for fewer than six (6) months and the **Insurer** consents, the **Named Insured** shall have the right to a period of sixty (60) days immediately following the effective date of such cancellation or non-renewal, in which to give notice to the **Insurer** of **Claims** first made against the **Insured** during such sixty (60) day period for any **Wrongful Acts** committed prior to the effective date of such cancellation or non-renewal and otherwise covered by this Policy.

2.      **OPTIONAL EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, the **Named Insured** has the right upon notification to the **Insurer** of its intent to purchase an Optional Extended Reporting Period Endorsement, and payment to the **Insurer** of an additional premium as set forth below within sixty (60) days of the cancellation or non-renewal, to extend the period for reporting **Claims** first made against an **Insured** after the termination of the **Policy Period** for any **Wrongful Acts** committed prior to the termination of the **Policy Period** and otherwise covered by this Policy. For purposes of determining the availability of an Extended Reporting Period Endorsement, any change in the premium or terms on renewal shall not constitute a refusal to renew.

The **Named Insured** may select from the following Optional Extended Reporting Period options:

(a)     a one-year Optional Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)     a two-year Optional Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)     a three-year Optional Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)     a five-year Optional Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)     an unlimited Optional Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

3.      **NON-PRACTICING EXTENDED REPORTING PERIOD**

If an individual **Insured** lawyer, other than a contract attorney, which is listed on the **Application** for this Policy and insured hereunder as of the Inception Date of this Policy, retires or otherwise ceases the performance of **Legal Services** in all jurisdictions during the **Policy Period**, then such **Insured** has the right, upon

Case ID: 240501357

notification to the **Insurer**, to purchase a Non-Practicing Extended Reporting Period Endorsement. Unless the **Insured** qualifies for a waiver of premium under Paragraph F.4. below, such **Insured** must make payment to the **Insurer** of an additional premium as set forth below prior to the termination of the **Policy Period**. The Non-Practicing Extended Reporting Period will extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the performance of **Legal Services** and otherwise covered by this Policy. If an individual **Insured** lawyer shall resume the performance of **Legal Services** at any time, for any reason, in any jurisdiction, the Non-Practicing Extended Reporting Period elected by such **Insured** shall no longer be effective.

Coverage for any **Claim** first made during a Non-Practicing Extended Reporting Period shall be excess over and shall not contribute with any other insurance in effect on or after the effective date of the Non-Practicing Extended Reporting Period, which covers the **Insured** for such **Claim**.

The additional premium for a Non-Practicing Extended Reported Period shall be calculated using the per individual **Insured** lawyer rate in effect upon the Inception Date of this Policy, based on the number of lawyers with the **Named Insured** at the Inception Date of this Policy, as stated on the **Application** or most recent Renewal Application, multiplied by the percentage set forth below which corresponds to the number of years elected for the Non-Practicing Extended Reporting Period.

The **Insured** may select from the following Non-Practicing Extended Reporting Period options:

(a)     a one-year Non-Practicing Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)     a two-year Non-Practicing Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)     a three-year Non-Practicing Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)     a five-year Non-Practicing Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)     an unlimited Non-Practicing Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

4.      **WAIVER OF PREMIUM FOR NON-PRACTICING EXTENDED REPORTING PERIOD**

(a)     Waiver Upon Death

If an individual **Insured** lawyer, as described in Section V.F.3. above, dies during the **Policy Period**, such **Insured** shall be provided with a

Case ID: 240501357

Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium, until the executor or administrator of the estate of such individual **Insured** lawyer is discharged, provided always that the death did not result from an intentionally self-inflicted injury, suicide or alcohol or drug abuse. Written notification and written proof of death of the **Insured** must be provided prior to the termination of the **Policy Period**. Such Non- Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of death and otherwise covered by this Policy.

(b)     Waiver Upon Disability

If an individual **Insured** lawyer, as described in Section V.F.3. above, becomes **Totally and Permanently Disabled** during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. It shall be a condition precedent to the Non-Practicing Extended Reporting Period that: (1) the disability did not result from intentionally self-inflicted injuries, or from attempted suicide, or from alcohol abuse or from drug abuse; (2) the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years; (3) the **Insured** or his or her legal guardian provides written notice of the disability to the **Insurer** prior to the termination of the **Policy Period**; and (4) the **Insured** or the **Insured's** legal guardian provides a physician's written certification of the disability, including the date it began. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the date the **Insured** is deemed **Totally and Permanently Disabled** and otherwise covered by this Policy.

(c)     Waiver For Continuous Coverage

If an individual **Insured** lawyer, as described in Section V.F.3. above, retires or otherwise ceases the performance of **Legal Services** during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to elect an unlimited Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. A condition precedent to the Non-Practicing Extended Reporting Period shall be that the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years. The **Insured** must provide written notice of his or her request to elect the Non-Practicing Extended Reporting Period prior to the termination of the **Policy Period**. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the

Case ID: 240501357

**Insured's** date of retirement or cessation of the performance of **Legal Services** and otherwise covered by this Policy.

The Aggregate Limit of Liability applicable to each Extended Reporting Period subject to a Waiver of Premium in Condition F.4. will be the Limit of Liability listed on Item 3. III of the Declarations.  If the **Named Insured** as listed in Item 1. of the Declarations is no longer an **Insured**, the maximum aggregate Limit of Liability provided by this Extended Reporting Period shall not exceed the lesser of the Limit of Liability set forth in Item 3. of the Declarations or $1,000,000, for each and all **Claims**.

5.     **CONDITIONS APPLICABLE TO ALL EXTENDED REPORTING PERIOD OPTIONS**

(a)     The right to any of the Extended Reporting Period Endorsement options is not available to any **Insured** if:

(i)     cancellation or nonrenewal by the **Insurer** is due to either: nonpayment of premium, Retention or other money due to the **Insurer**; or misrepresentation in the **Application**; or the failure to comply with the terms and conditions of this Policy; or

(ii)     an **Insured's** right or license to practice law is suspended, surrendered or revoked; however, this provision 5.(a)(ii) shall not apply to an **Insured** who retires from the performance of **Legal Services** while in good standing.

(b)     The Limit of Liability available for any Extended Reporting Period is part of, and not in addition to, the Limit of Liability shown in Item 3. of the Declarations of the Policy.

(c)     The Retention, as shown on the Declarations, which is applicable to **Claims** first made during any Extended Reporting Period, will apply separately to each and every **Claim**.  The Retention will be waived for **Claims** first made during a Non-Practicing Extended Reporting Period in the event that an individual **Insured** lawyer qualifies for a Non-Practicing Extended Reporting Period based on: (i) the death of such **Insured**; or (ii) such **Insured** becoming **Totally and Permanently Disabled**.

(d)     None of the Extended Reporting Period options are cancelable or renewable.  Any additional premium, if applicable, for the Extended Reporting Period Endorsement is fully earned at the inception of the Extended Reporting Period.

G.     **POLICY TERRITORY**

The coverage afforded by this Policy applies to any **Wrongful Acts** that occur anywhere in the world, and **Claims** brought anywhere in the world.

H.     **ASSISTANCE AND COOPERATION OF THE INSURED**

Case ID: 240501357

All **Insureds** shall cooperate with the **Insurer**, including providing all information requested by the **Insurer** regarding any **Claim** or potential **Claim**, and cooperating fully with the **Insurer** in the defense, investigation and settlement of any **Claim**.  Upon the **Insurer's** request, all **Insureds** shall submit to examination by a representative of the **Insurer**, under oath if required.  In addition, upon the **Insurer's** request, all **Insureds** shall attend hearings, depositions, mediations, settlement conferences, arbitrations and trials, and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, all without charge to the **Insurer**.

The **Insured** shall follow the **Insurer's** direction regarding whether to accept or reject a demand for arbitration of any **Claim** and shall not voluntarily agree to arbitrate a **Claim** without the **Insurer's** written consent.  No **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**.

I.   **SUBROGATION**

The **Insurer** shall be subrogated to all **Insureds'** rights of recovery against any person or organization.  All **Insureds** shall assist the **Insurer** in effecting any rights of indemnity, contribution and apportionment available to any **Insured**, including the execution of such documents as are necessary to enable the **Insurer** to pursue claims in the **Insureds'** names and shall provide all other assistance and cooperation which the **Insurer** may reasonably require.  All **Insureds** shall cooperate with the **Insurer** and do nothing to jeopardize, prejudice or terminate in any way such rights.

The **Insurer** shall not exercise any such rights against any **Insured** except as provided herein.  Notwithstanding the foregoing, however, the **Insurer** reserves the right to exercise any rights of subrogation against any **Insured** with respect to any **Claim** brought about or contributed to by the dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute, of such **Insured**.

J.   **CANCELLATION; NO OBLIGATION TO RENEW**

1.   This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declarations, or upon any earlier cancellation.

2.   This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect.  If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3.   This Policy may be canceled by the **Insurer** by written notice mailed to the **Named Insured** at its last known address at least sixty (60) days before the effective date of such cancellation, if for reasons other than nonpayment of premium.  The **Insurer** may cancel this Policy for nonpayment of premium by written notice mailed to the **Named Insured** at its last known address at least ten (10) days before the effective date of such cancellation.  The notice will state the reason for and the effective date of the cancellation.  If the Policy is canceled by the **Insurer**, the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis.

Case ID: 240501357

4.  Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

5.  The **Insurer** will not be required to renew this Policy upon its expiration.  If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail written notice, to the **Named Insured** at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations.  Such notice shall state the specific reason(s) for non-renewal.

K.  **CHANGE IN RISK**

1.  If, during the **Policy Period**, any of the following events occur:

(a)  the merger into or acquisition of the **Named Insured** by another entity such that the **Named Insured** is not the surviving entity, or the acquisition of substantially all of the assets of the **Named Insured**;

(b)  the dissolution of, or appointment of a receiver, conservator, trustee, liquidator or rehabilitator or similar official for the **Named Insured**;

the **Named Insured** shall report the event to the **Insurer** within thirty (30) days of such event occurring.

Coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed on or after such event.  After any such event, this Policy may not be canceled by the **Insured** and the entire premium for this Policy will be deemed fully earned.

2.  If, during the **Policy Period**, the number of lawyers or professional corporations performing **Legal Services** on behalf of the **Named Insured** increases by 34% or more, the **Named Insured** shall notify the **Insurer** in writing within thirty (30) days.  The **Insurer** shall have the right to modify the terms and conditions of the Policy, including premium, as it determines in its sole discretion is appropriate.

L.  **OTHER INSURANCE**

The insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy.  This Policy shall not be subject to the terms and conditions of any other insurance policy.

M.  **ASSIGNMENT**

Neither this Policy nor any **Insured's** interest under this Policy may be assigned.

N.  **LEGAL ACTION AGAINST THE INSURER**

Case ID: 240501357

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy and the amount of all the **Insured's** obligations to pay have been fully and finally determined either by judgment against all **Insureds** after actual trial, or by written agreement of the **Named Insured**, the claimant and the **Insurer**.

Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a defendant in the action against any **Insured**.

O.    **APPLICATION**

By acceptance of this Policy, all **Insureds** affirm or reaffirm as of the Inception Date of this Policy that:

1.    the statements in the **Application** are true and accurate and are specifically incorporated herein, and are all **Insureds'** agreements, personal representations and warranties;
2.    all such communicated information shall be deemed material to the **Insurer's** issuance of this Policy;
3.    this Policy is issued in reliance upon the truth and accuracy of such representations;
4.    this Policy embodies all agreements existing between the **Insureds** and the **Insurer**, or any of its agents, relating to this insurance; and
5.    if any representation is false or misleading, this Policy shall be void from the inception.

P.    **CHANGES**

No change or modification of this Policy shall be effective except when made by a written endorsement to this Policy signed by an authorized representative of the **Insurer**. No representations by any person shall have any force or effect except as included in such endorsement.

Q.    **WAIVER**

The **Insurer's** failure to insist on strict compliance with any terms, provisions or conditions to coverage of this Policy or the failure to exercise any right or privilege shall not operate or be construed as a waiver thereof or of any subsequent breach thereof or a waiver of any other terms, provisions, conditions, privileges or rights.

R.    **ENTIRE AGREEMENT**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** or any of its agents relating to this insurance.

S.    **HEADINGS**

The descriptions in the headings and sub-headings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

T.    **SANCTIONS**

Case ID: 240501357

The **Insurer** shall not be deemed to provide cover nor be liable to pay any claim or provide any benefit under this Policy to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the **Insurer** to any sanction, prohibition or restriction, including under United Nations resolutions, or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

Case ID: 240501357



*Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
S. SMITH*

# EXHIBIT
# B

6:29        .ıll LTE 🔲

## Contigent Fee Agreem... ⌄   Done

### CONTINGENT FEE AGREEMENT

1.     This Agreement is between FELDMAN, SHEPHERD, WOHLGELERNTER, TANNER, WEINSTOCK & DODIG LLP ("Feldman Shepherd")

AND

BROOK PETERSON & SHEILA PETERSON ("CLIENTS") for prosecution of a claim or claims arising from the wrongful death of Brandon Christopher Peterson occurring on December 22, 2020.

2.     Clients agree that as a fee for services under this Agreement, Feldman Shepherd shall receive 33-1/3% of the total amount received from the verdict or settlement of any claims. Feldman Shepherd may share its fee with referral counsel. Expenses of litigation incurred by Feldman Shepherd shall be reimbursed from the proceeds of recovery after the contingency fee has been calculated. Examples of litigation expenses include filing fees, depositions, expert witness fees, investigation services, copying and other costs associated with preparing Client's case. In the event no money is recovered, Client will not be responsible for any fees or costs.

3.     Client agrees to cooperate with Feldman Shepherd by providing all information known or available to Client that is relevant to the representation.

4.     It is agreed that this Agreement shall be interpreted according to the laws of the Commonwealth of Pennsylvania.

5.     Client acknowledges that he/she has read this Agreement and has received a duplicate copy of this Agreement.

DATE: 1-5-20

DATE: 1-5-20
BROOK PETERSON,

DATE: 1/5/20
SHEILA PETERSON

Attorney

COSTS OF LITIGATION WILL BE
PAID AS FOLLOWS:
     CLIENT: 62½ %
    LAW FIRM: 37½ %

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# C

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

COVER SHEET

| Plaintiff(s) | |
|---|---|
| Sheila K. Peterson, as Administratrix of the Estate of Brandon C. Peterson, deceased and in her own right | |

Case Number :

| GD | - | 22 | 006642 |

Type of pleading :

Complaint

Code and Classification : 001
001-Trespass Motor Vehicle

Filed on behalf of

Plaintiff, Sheila K. Peterson as Administratrix of the Estate of Brandon C. Peterson, deceased

(Name of the filing party)

Vs

Defendant(s)

Murrow's Transfer, Inc. and
MT Fairfield, LLC and
Logan J. Denny

☑ Counsel of Record
☐ Individual, If Pro Se

Name, Address and Telephone Number :

Edward S. Goldis
Feldman Shepherd Wohlgelernter
Tanner Weinstock & Dodig, LLP
1845 Walnut St., 21st Fl.
Philadelphia, PA 19103

Attorney's State ID : 88233

Attorney's Firm ID :

Case ID: 240501357

FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP
By: ALAN M. FELDMAN/DANIEL J. MANN/EDWARD S. GOLDIS
Identification No.: 23210/77639/88233                    Attorneys for Plaintiffs
21st Floor
1845 Walnut Street
Philadelphia, PA 19103
(215) 567-8300

| | |
|---|---|
| SHEILA K. PETERSON, as Administratrix of the Estate of BRANDON C. PETERSON, deceased, and in her own right<br>2095 Kingview Road<br>Scottdale, PA 15683<br><br>       Plaintiff<br><br>   v.<br><br>MURROW'S TRANSFER, INC.<br>1660 Blair Street<br>Thomasville, NC 27360<br>     and<br>MT FAIRFIELD, LLC<br>1660 Blair Street<br>Thomasville, NC 27360<br>     and<br>(continued on next page) | COURT OF COMMON PLEAS ALLEGHENY COUNTY<br><br>No. GD-22-006642<br><br>Jury Trial Demanded |

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral Service
Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 261-5555
https://www.getapittsburghlawyer.com/

Case ID: 240501357

LOGAN J. DENNY
3124 Crossing Way Court
High Point, NC 27262

    Defendants

Case ID: 240501357

## CIVIL ACTION COMPLAINT

Plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, by and through her attorneys, Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP, hereby files the instant Complaint and avers as follows:

## I.    PARTIES

1.    Plaintiff Sheila K. Peterson is an adult individual and citizen of the State of Pennsylvania residing therein at 2095 Kingview Road, Scottdale, PA 15683.

2.    Plaintiff Sheila K. Peterson and her husband, Brook Peterson, are the surviving parents of Brandon C. Peterson. Plaintiff Sheila K. Peterson is the Administratrix of the Estate of Brandon C. Peterson having been so appointed by the Register of Wills for Fayette County, Pennsylvania.

3.    Defendant Murrow's Transfer, Inc. ("Murrow's") is a corporation organized and existing under the laws of the State of North Carolina, with principal place of business located at 1660 Blair Street, Thomasville, NC 27360.

4.    Defendant MT Fairfield, LLC ("MT Fairfield") is a corporation organized and existing under the laws of the State of North Carolina, with principal place of business located at 1660 Blair Street, Thomasville, NC 27360.

5.    At all times relevant hereto, defendants Murrow's Transfer and MT Fairfield (hereinafter collectively described as "Murrow's" and/or the "Murrow's defendants") provided transportation services for the shipment of furniture and other freight throughout the United States, including to the Commonwealth of Pennsylvania and within Allegheny County.

3

Case ID: 240501357

6. According to its website, "Murrow's is family owned and operated and today we have 155 dedicated employees, a custom built 145,200 square foot warehouse, 115 Drivers and 420 Trailers."

7. Defendant Logan J. Denny ("Denny") is a resident of the State of North Carolina, residing therein at 3124 Crossing Way Court, High Point, NC 27262.

8. At all times relevant hereto, defendant Denny was an employee and/or agent of the Murrow's defendants, and was acting within the course and scope of his employment and/or agency.

9. At all times relevant hereto, all defendants regularly and continuously conducted business in the Commonwealth of Pennsylvania, including in Allegheny County.

## II. JURISDICTION AND VENUE

10. Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

11. Jurisdiction and venue are proper in the Commonwealth of Pennsylvania and in Allegheny County in accordance with Pa.R.C.P. 1006(c)(1) and 2179(a), as one or more of the defendants regularly and continuously conducts business in the Commonwealth of Pennsylvania and in the County of Allegheny.

## III. FACTS

12. On December 22, 2020, defendant Denny was operating a 2013 Freightliner Cascadia tractor and Hyundai semi-trailer (the "Murrow's tractor and trailer" and/or "tractor-trailer") owned by the Murrow's defendants.

Case ID: 240501357

13.     At all times relevant hereto, the Murrow's tractor and trailer was not properly inspected, maintained and/or repaired by the defendants, was in a state of disrepair, and was not in a safe condition to operate.

14.     At all times relevant hereto, The Murrow's defendants failed to ensure that the Murrow's tractor and trailer were equipped with available, proper, adequate, appropriate and functional crash warning and avoidance technologies.

15.     At all times relevant hereto, the Murrow's defendants failed to have and enforce proper and appropriate policies for the use of cellular phones and personal GPS devices by drivers in order to prevent driver distraction.  To the extent that the Murrow's defendants did have such policies in effect, defendant Denny did not follow those policies.

16.     At all times relevant hereto, the Murrow's defendants failed to have and enforce proper and appropriate policies to ensure that drivers, including defendant Denny were not operating commercial motor vehicles while fatigued.

17.     At all times relevant hereto, the Murrow's defendants failed to have and enforce proper and appropriate policies to ensure that drivers, including defendant Denny were not operating commercial motor vehicles while over the hours of service limitations.

18.     At all times relevant hereto, defendant Denny was on an assignment to transport and deliver furniture to various companies for the Murrow's defendants, including companies in the Commonwealth of Pennsylvania and within Allegheny County.

19.     On December 22, 2020, defendant Denny delivered furniture to Rustic Acres Furniture in Indiana, PA, and afterward took the Murrow's tractor-trailer to Marty's Diesel Garage for automotive service, including the replacement of an air line and quick release valve repair.

Case ID: 240501357

20.     Once the tractor-trailer was released from automotive service at approximately 2:19 P.M., defendant Denny resumed his assignment and operated the Murrow's tractor and trailer southbound on State Route 119 in East Huntingdon Township, Westmoreland County, Pennsylvania.

21.     Also on December 22, 2020, plaintiff's decedent Brandon Peterson was operating his vehicle southbound on State Route 119 in East Huntingdon Township.

22.     It is believed that Brandon Peterson's vehicle suffered a flat tire. When Brandon Peterson became aware of the issue with his vehicle, he moved his vehicle to the right shoulder of the highway and exited the vehicle to assess the situation.

23.     At all times relevant hereto, Brandon Peterson and his disabled vehicle were easily visible to other drivers travelling on the roadway for a great distance.

24.     As Brandon Peterson stood immediately adjacent to his disabled vehicle that was parked within the shoulder of the roadway, defendant Denny was operating the Murrow's tractor and trailer southbound on State Route 119 north of Brandon Peterson's disabled vehicle.

25.     As defendant Denny approached the location of Brandon Peterson's disabled vehicle, he took his eyes off of the roadway to reportedly look at the GPS system in his vehicle and while distracted failed completely to observe the point and position of Brandon Peterson and his visible disabled vehicle ahead, both of which were in plain view to defendant Denny and other motorists.

26.     Defendant Denny continued to negligently and recklessly operate the Murrow's tractor and trailer southbound on State Route 119 so as to cause the tractor-trailer to enter the shoulder of the roadway and violently collide first with Brandon Peterson's plainly visible disabled

6

vehicle and then with the equally plainly visible Mr. Peterson, causing him to sustain catastrophic and ultimately fatal injuries.

27.     At no time prior to the collision did defendant Denny take any evasive action or attempt to slow or stop the Murrow's tractor and trailer in order to avoid the collision with the plainly visible Brandon Peterson or his plainly visible disabled vehicle.

28.     By his own admission, defendant Denny failed to observe Brandon Peterson's plainly visible disabled vehicle or the plainly visible Mr. Peterson himself until after the occurrence of the crash which killed Mr. Peterson.

29.     Defendant Denny's operation of the Murrow's tractor and trailer in causing this fatal crash was negligent and reckless in that his intentional decision to take his eyes off the roadway for an extended period of time while operating a loaded commercial motor vehicle at highway speeds, his consequent failure to observe Brandon Peterson's stopped and plainly visible disabled vehicle, and his failure to take any evasive action to avoid this fatal crash, demonstrates a total disregard for the safety, health and well-being of other motorists, including plaintiff's decedent Brandon Peterson.

## IV.    CAUSES OF ACTION

### COUNT I – NEGLIGENCE and RECKLESSNESS

### SHEILA K. PETERSON, as Administratrix of the Estate of BRANDON C. PETERSON, deceased, and in her own right v. ALL DEFENDANTS

30.     Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

31.     The fatal injuries sustained by plaintiff's decedent Brandon Peterson and the injuries, damages and losses sustained by plaintiff and plaintiff's decedent were caused by the

Case ID: 240501357

negligence, carelessness, negligence per se and recklessness of defendant Denny, both generally and in the following particular respects:

a. Failing to operate the vehicle with due regard for the safety of others;

b. Failing to maintain a proper and adequate look out;

c. Failing to operate the vehicle with due care and due regard for road conditions;

d. Failing to operate the vehicle at a safe and reasonable speed;

e. Failing to timely brake the vehicle;

f. Failing to maintain control of the vehicle;

g. Operating the vehicle at a speed in excess of the posted speed limit;

h. Operating at an unsafe rate of speed under the circumstances;

i. Failing to properly observe and react to conditions existing at the time of the incident;

j. Failing to brake and timely stop the vehicle;

k. Failing to take other avoidance measures;

l. Failing to remain attentive;

m. Intentionally and deliberately taking his eyes off of the roadway for an extended period of time;

n. Operating a commercial motor vehicle while distracted;

o. Operating a commercial motor vehicle while over the hours of service limit;

p. Operating a commercial motor vehicle while fatigued;

q. Operating a commercial motor vehicle with an unstable load;

r. Acting with conscious disregard for the rights and safety of other motorists;

s. Causing the tractor-trailer to travel into the shoulder of the roadway so as to bring about a fatal collision with plaintiff's decedent and his disabled vehicle;

t. Violating the laws, statutes, regulations, rules and standards of the General Assembly of the Commonwealth of Pennsylvania concerning the operation of motor vehicles and commercial motor vehicles, including the Pennsylvania Motor Vehicle Code;

Case ID: 240501357

u.  Violating the laws, statutes, regulations, rules and standards of the Federal Motor Carrier Safety Administration governing or relating to the operation of motor vehicles and commercial motor vehicles;

v.  Failing to drive at a safe speed and failing to stop, in violation of 75 Pa.C.S.A. §3361;

w.  Driving in careless disregard for the safety of other persons, such as plaintiff's decedent, in violation of 75 Pa. C.S.A §3714;

x.  Driving in a state of low mental arousal and/or fatigue at the time of the incident in violation of 49 C.F.R. §392.3;

y.  Failing to properly maintain a log book;

z.  Operating the commercial motor vehicle with log book violations;

aa. Failing to maintain an accurate log in accordance with 49 C.F.R. §395.8;

bb. Violating the hours of service under 49 C.F.R. §395.3;

cc. Failing to properly inspect the tractor-trailer; and

dd. Failing to comply with policies and procedures concerning the safe operation of commercial motor vehicles.

32.     The fatal injuries sustained by plaintiff's decedent Brandon Peterson and the injuries, damages and losses sustained by plaintiff and plaintiff's decedent were caused by the negligence, carelessness, negligence per se and recklessness of the Murrow's defendants, individually, jointly and/or severally, both generally and in the following particular respects:

a.  Failing to properly inspect, maintain and repair the tractor-trailer;

b.  Placing an unsafe driver and commercial motor vehicle on the roadway;

c.  Failing to equip the tractor-trailer with available, proper, adequate, appropriate and functional crash warning and avoidance technologies;

d.  Negligently and recklessly entrusting the tractor-trailer to defendant Denny;

e.  Failing to investigate the fitness of defendant Denny to operate the tractor-trailer;

f.  Negligently and recklessly retaining and hiring defendant Denny;

g.  Failing to perform an appropriate background check on defendant Denny;

9

Case ID: 240501357

h.  Failing to determine whether defendant Denny was competent to operate tractor-trailers on roads and highways in the United States;

i.  Failing to properly train defendant Denny;

j.  Failing to comply with accepted standards and practices with respect to hiring and retaining drivers;

k.  Failing to ensure that defendant Denny had an appropriate level of skill and/or experience;

l.  Failing to recognize the danger to which others would be exposed by allowing defendant Denny to operate a tractor-trailer on roads and highways in the United States;

m.  Failing to create, adopt, enforce and comply with policies and procedures to assure that drivers hired, retained or otherwise engaged to drive were not a menace to public safety;

n.  Failing to create, adopt, enforce and comply with policies and procedures to assure that drivers hired, retained or otherwise engaged to drive were not distracted or fatigued while operating a commercial motor vehicle;

o.  Failing to create, adopt, enforce and comply with policies and procedures to assure that drivers hired, retained or otherwise engaged to drive were not operating a commercial motor vehicle while over the hours of service limitations;

p.  Violation of applicable statutes, ordinances, regulations, rules and standards related to the operation of motor vehicles including commercial motor vehicles, and the hiring, retention or other engagement of drivers to operate commercial motor vehicles;

q.  Failing to properly maintain a log book;

r.  Operating the commercial motor vehicle with log book violations;

s.  Failing to maintain an accurate log in accordance with 49 C.F.R. §395.8;

t.  Violating the hours of service under 49 C.F.R. §395.3;

u.  Failing to comply with applicable standards and recommended practices issued by the National Highway Traffic Safety Administration, U.S. Dept. of Transportation, Federal Motor Carrier Safety Administration, the Vehicle Equipment Safety Commission, the American National Standards Institute, the Society of Automotive Engineers and other generally recognized standards in violation of 75 Pa. C.S.A. §4103(a)-(b); and

v.  Failing to create, institute, adopt, enforce and comply with policies and procedures concerning the safe operation of commercial motor vehicles.

Case ID: 240501357

33.     The aforementioned acts of the defendants were not only negligent, but were deliberate, intentional and reckless, and were undertaken without due regard for the safety of others on the roadway.

34.     The foregoing conduct of the defendants increased the risk of harm, injuries, death, damages and losses sustained by plaintiff's decedent and plaintiff, and was a substantial contributing factor in causing the death of plaintiff's decedent and the injuries, damages and losses sustained by plaintiff and plaintiff's decedent.

35.     The Murrow's defendants are vicariously liable for the conduct of their employees, agents and servants, including defendant Denny, who were at all times relevant hereto acting in the course and scope of their employment or agency.

**WHEREFORE**, plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, demands judgment in favor of plaintiff and against all defendants for compensatory and punitive damages in an amount in excess of the jurisdictional limit for arbitration, together with interest and costs.

## COUNT II – PUNITIVE DAMAGES

### SHEILA K. PETERSON, as Administratrix of the Estate of BRANDON C. PETERSON, deceased, and in her own right v. ALL DEFENDANTS

36.     Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

37.     Defendants' acts and omissions were outrageous in that the conduct of defendants amounted to a reckless indifference to the safety of others.

38.     All defendants knew or had reason to know that their conduct created a risk of physical harm or death to others.

11

Case ID: 240501357

39. The actions of the defendants as set forth herein constitute willful and wonton misconduct in reckless disregard for the rights and safety of plaintiff and plaintiff's decedent, and warrant the imposition of punitive damages against the defendants.

40. The Murrow's defendants are vicariously liable for the reckless conduct of their employees, agents and servants, including defendant Denny, who were at all times relevant hereto acting in the course and scope of their employment or agency.

**WHEREFORE**, plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, demands judgment in favor of plaintiff and against all defendants for compensatory and punitive damages in an amount in excess of the jurisdictional limit for arbitration, together with interest and costs.

## V. <u>DAMAGES</u>

### A. **Wrongful Death Action – Plaintiff v. All Defendants**

41. Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

42. This action is brought on behalf of all persons entitled to recover damages for the death of Brandon Peterson, deceased, pursuant to the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. §8301.

43. The wrongful death beneficiaries are as follows:

| <u>Name</u> | <u>Relationship</u> | <u>Address</u> |
|---|---|---|
| Sheila K. Peterson | Mother | 2095 Kingview Road Scottdale, PA 15683 |
| Brook Peterson | Father | 2095 Kingview Road Scottdale, PA 15683 |

12

Case ID: 240501357

44.      Brandon Peterson did not bring any claim for the matters set forth in this Complaint during his lifetime.

45.      Plaintiff Sheila K. Peterson, as Administratrix of the Estate of her son, Brandon C. Peterson, deceased, and in her own right, claims all lawful damages for all persons entitled by law to recover such damages, including but not limited to medical expenses, funeral expenses, expenses of administration, loss of expected pecuniary contributions and loss of the decedent's companionship, guidance and tutelage.

**WHEREFORE**, plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, demands judgment in favor of plaintiff and against all defendants for compensatory and punitive damages in an amount in excess of the jurisdictional limit for arbitration, together with interest and costs.

**B.      Survival Action - Plaintiff v. All Defendants**

46.      Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

47.      Plaintiff brings this action on behalf of the Estate of Brandon C. Peterson, deceased, pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. §8302, and claims on behalf of the Estate all damages recoverable by law, including but not limited to the decedent's pain and suffering, loss of earnings and earning capacity and the total limitation and deprivation of the decedent's normal activities, pursuits and pleasures.

**WHEREFORE**, plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, demands judgment in favor of plaintiff and against all defendants for compensatory and punitive damages in an amount in excess of the jurisdictional limit for arbitration, together with interest and costs.

13

Case ID: 240501357

### C.      Punitive Damages - Plaintiff v. All Defendants

48.      Plaintiff hereby incorporates the preceding paragraphs as if the same were fully set forth at length.

49.      The actions of the defendants as set forth herein constitute willful and wonton misconduct in reckless disregard for the rights and safety of plaintiff and plaintiff's decedent, and warrant the imposition of punitive damages against the defendants.

**WHEREFORE**, plaintiff Sheila K. Peterson, Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right, demands judgment in favor of plaintiff and against all defendants for compensatory and punitive damages in an amount in excess of the jurisdictional limit for arbitration, together with interest and costs.

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

ALAN M. FELDMAN
DANIEL J. MANN
EDWARD S. GOLDIS
Attorneys for Plaintiffs

DATE: 12/22/22

14

Case ID: 240501357

# VERIFICATION

I, Sheila Peterson, plaintiff in the foregoing pleading, state that the facts set forth are true and correct to the best of our knowledge, information and belief; and that this statement is made subject to the penalties of 18 Pa.C.S. Section 4904, which relates to unsworn falsification to authorities.

_Sheila Peterson_

SHEILA PETERSON



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 10:46 am
E. SMITH

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHEILA K. PETERSON as         )         Civil Division
Administratrix of the Estate of Brandon   )
C. Peterson, deceased and in her       )
own right,                         )
                                  )
          Plaintiff,          )
                                  )         C.A. No. 2:23-cv-136-CCW
      v.                   )
                                  )
MURROW'S TRANSFER, INC., and    )
LOGAN J. DENNY,            )         **JURY TRIAL DEMANDED**
                                  )
          Defendants.       )

## ANSWER AND AFFIRMATIVE DEFENSES

AND NOW, come the Defendants, Murrow's Transfer, Inc. and Logan J. Denny, by and through their attorneys, Pion, Nerone, Girman, Winslow & Smith, P.C. and James M. Girman, Esquire and file the following Answer and Affirmative Defenses to Plaintiff's Complaint and in support thereof aver as follows:

1.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 1 of Plaintiff's Complaint.

2.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 2 of Plaintiff's Complaint.

3.     Admitted.

4.     Admitted.

5.      Admitted in part and denied in part. It is admitted that Murrow's Transfer, Inc. provides transportation services for the shipment of furniture and other freight throughout the United States, including the Commonwealth of Pennsylvania and within Allegheny County. It is denied that MT Fairfield, LLC provides transportation services.

6.      Admitted.

7.      The averments set forth in paragraph 7 of Plaintiff's Complaint are admitted in part and denied in part. It is admitted that Logan Denny is a resident of the state of North Carolina. It is denied that he resides at 3124 Crossing Way Court, High Point, NC 27262. To the contrary, Mr. Denny resides at 3433 Greenhill Drive, High Point, NC 27265.

8.      The averments set forth in paragraph 8 of Plaintiff's Complaint are admitted in part and denied in part. It is admitted that at the time of this accident Logan Denny was an employee of Murrow's Transfer, Inc. and was acting within the course and scope of his employment and/or agency. It is denied that Logan Denny was an employee of MT Fairfield, LLC.

9.      The averments set forth in paragraph 9 of Plaintiff's Complaint state conclusions of law to which no response is required. To the extent that the averments are factual, Defendant, Murrow's Transfer, Inc., admits that it is an interstate motor carrier that conducts business in Pennsylvania, including Allegheny County.

## II.      JURISDICTION AND VENUE

10.      Defendants incorporate herein by reference thereto paragraphs 1-9 of this Answer as though more fully set forth herein at length.

11.     The averments set forth in paragraph 11 of Plaintiff's Complaint state conclusions of law to which no response is required. To the extent that the averments are factual, Defendant, Murrow's Transfer, Inc., admits that it is an interstate motor carrier that conducts business in the Commonwealth of Pennsylvania and in Allegheny County.

### III.     FACTS

12.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 12 of Plaintiff's Complaint except insofar as the following matter therein averred is denied. It is denied that Logan Denny was operating a tractor trailer unit owned by MT Fairfield, LLC. To the contrary, the tractor trailer unit operated by Logan Denny is owned by Murrow's Transfer, Inc.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

18.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 18 of Plaintiff's Complaint except insofar as the following matter therein averred is denied. It is denied that Logan Denny was on an assignment to transport and deliver furniture on behalf of MT Fairfield, LLC.

19.     The averments set forth in paragraph 19 of Plaintiff's Complaint are admitted except insofar as the following matters therein averred are denied. It is denied that Logan Denny took the tractor trailer to Marty's Diesel Garage for automotive service.

20.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 20 of Plaintiff's Complaint.

21.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 21 of Plaintiff's Complaint.

22.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 22 of Plaintiff's Complaint.

23.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 23 of Plaintiff's Complaint.

24.     After reasonable investigation Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 24 of Plaintiff's Complaint.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

29.     Denied.

## IV.    CAUSES OF ACTION

### COUNT I – NEGLIGENCE and RECKLESSNESS

### Sheila K. Peterson as Administratrix of the Estate of Brandon C. Peterson, deceased and in her own right v. All Defendants

30.    Defendants incorporate herein by reference thereto paragraphs 1-29 of this Answer as though more fully set forth herein at length.

31.    The averments set forth in paragraph 31 of Plaintiff's Complaint including it multiple subparts (a) through (dd) are denied.

32.    The averments set forth in paragraph 32 of Plaintiff's Complaint including its multiple subparts (a) through (v) are denied.

33.    Denied.

34.    Denied.

35.    Denied.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

### JURY TRIAL DEMANDED.

### COUNT II – PUNITIVE DAMAGES

### Sheila K. Peterson, as Administratrix of the Estate of Brandon C. Peterson, deceased, and in her own right v. All Defendants

36.    Defendants incorporate herein by reference thereto paragraphs 1-35 of this Answer as though more fully set forth herein at length.

37.    Denied.

38.    Denied.

39.    Denied.

40.     Denied.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

**JURY TRIAL DEMANDED**.

## V.     DAMAGES

### A.  Wrongful Death Action – Plaintiff v. All Defendants

41.     Defendants incorporate herein by reference thereto paragraphs 1-40 of this Answer as though more fully set forth herein at length.

42.     Denied.

43.     After reasonable investigation Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 43 of Plaintiff's Complaint.

44.     After reasonable investigation Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 44 of Plaintiff's Complaint.

45.     Denied.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

**JURY TRIAL DEMANDED**.

### B. -  Survival Action – Plaintiff v. All Defendants

46.     Defendants incorporate herein by reference thereto paragraphs 1-45 of this Answer as though more fully set forth herein at length.

47.     Denied.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

**JURY TRIAL DEMANDED.**

### C – Punitive Damages – Plaintiff v. All Defendants

48.     Defendants incorporate herein by reference thereto paragraphs 1-47 of this Answer as though more fully set forth herein at length.

49.     Denied.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

**JURY TRIAL DEMANDED**.

### AFFIRMATIVE DEFENSES

50.     Plaintiff's Complaint fails to state a claim against these Defendants for which relief can be granted.

51.     Defendants raise the comparative negligence of Plaintiff's decedent as a complete and/or partial bar to Plaintiff's claims.

52.     To the extent justified by the facts developed during discovery or the evidence introduced at the time of trial Defendants raise Plaintiff decedent's assumption of a known risk as a complete and/or partial bar to Plaintiff's claims.

53.     Defendants raise the terms and provisions of the Pennsylvania Motor Vehicle Financial Responsibility Law as a complete and/or partial bar to Plaintiff's claims.

WHEREFORE, Defendants deny that they are indebted to the Plaintiff in the sum or sums demanded or in any sum whatsoever and request judgment in their favor together with costs.

**JURY TRIAL DEMANDED**.

Respectfully submitted,

PION, NERONE, GIRMAN, WINSLOW & SMITH

BY: _____ /s/ James M. Girman _____
James M. Girman, Esquire
Pa. I.D. #58825
jgirman@pionlaw.com
Brian L. Shepard, Esquire
Pa. I.D. #319322
bshepard@pionlaw.com

Attorneys for Defendants,
Murrow's Transfer, Inc. and
Logan J. Denny.

Case ID: 240501357

## CERTIFICATE OF SERVICE

I, James M. Girman, Esquire, hereby certify that a true and correct copy of the foregoing

**ANSWER and AFFIRMATIVE DEFENSES** was served upon counsel of record by CM-ECF

electronic service, this 9th day of February, 2023, as follows:


Edward S. Goldis, Esquire
Feldman, Shepard
1845 Walnut Street
21st Floor
Philadelphia, PA 19103
egoldis@feldmanshepard.com



PION, NERONE, GIRMAN, WILSOW & SMITH


BY: _____/s/ James M. Girman_____
James M. Girman, Esquire
Pa. I.D. #58825
jgirman@pionlaw.com
Brian L. Shepard, Esquire
Pa. I.D. #319322
bshepard@pionlaw.com

Attorneys for Defendants,
Murrow's Transfer, Inc. and
Logan J. Denny.



# EXHIBIT
# E

Case ID: 240501357

 **ORLOWSKI AND ASSOCIATES**

22757 Woodward Avenue
Suite 220
P.O. Box 20103
Ferndale, Michigan 48220
(248) 398-4960
(248) 398-4963 Fax
mail@orlowskiandassociates.com
www.orlowskiandassociates.com

November 01,2022

Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig
1845 Walnut 250
Philadelphia PA 19103
Att. Jenna Hough
You're File Estate of Brandon Peterson
Our File 110122-01-A

### Assignment

Your office requested that we conduct a snapshot investigation of Murrows Transfer Inc to determine possible attachable assets and evaluate their collect ability. You further requested that handle this on a rush basis.

### Results

Murrows Transfer Inc
1660 Blair
Thomasville NC 27360

### North Carolina Corporation records

The subject corporation is a North Carolina for profit corporation in good standing. There are no financials available for this small closely held corporation. This closely held family corporation was formed in 1947.

### Commercial Credit Check

The subject concern has an excellent payment history We made a search of Dun and Bradstreet, Hoovers ,and Experian commercial credit reporting sources and It was learned that there are no financials available for this small closely held family corporation. They are reported to have 97 employees and they operate a Trucking company over multiple states. They also offer on their site warehousing.

### Bank Accounts

The subject was last reported to bank at Fidelity Bank. We were unable to obtain balances and this information was dated.

### Real Estate

We made a search of online real estate and assessors records and found multiple real estate properties at their business location. We did not collect details, but they included a warehouse building and Garage.

### UCC Filings

We made a search of UCC financing filings under the name of the subject concern and found three .Two of which were Orix credit and IBM on specific equipment. The other was an all-encompassing lien to Fidelity Bank.

### Other Assets

The various equipment furniture supplies, vehicles, trailers associated with this type of business. I would like to note that these assets are likely encumbered by the blanket lien to Fidelity Bank.

Case ID: 240501357

**PAGE TWO**

**Internet Presence**
The subject corporation maintains and active internet and Facebook presence, website, .murrows.com. They provided an illustrated description of the corporation history, nature, scope, and assets.

**Comments and Summary**
There are no financials available for this small closely held family corporations. It would appear that there financing is primarily done through one source Fidelity Bank.  Based on available information we feel that if the subject concern has failed to maintain adequate insurance, they would have additional assets.

We would like to thank you for this opportunity to be of service. If you have any questions or comments, feel free to call.

Very truly yours,

David Orlowski
Licensed Private Detective



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:40 am
E. SMITH

# EXHIBIT
# F



Edward S. Goldis
Partner
*Telephone:* 215.567.8300
*Direct Fax:* 215.599.1341
egoldis@feldmanshepherd.com
Also Member NJ Bar

January 09, 2023

**<u>VIA EMAIL</u>**

Mark A. Martini, Esquire
Robb Leonard Mulvihill
BNY Mellon Center
500 Grant Street, Suite 2300
Pittsburgh, PA  15219

      **RE:**   **Peterson v. Murrow's Transfer, Inc., et al.**
            **Your File No.: 22-27566MAM**

Dear Mr. Martini:

      I am writing in response to your January 4, 2023, status update letter on behalf of State Farm.  I enclose a copy of the Complaint recently filed in the Alleghany County Court of Common Pleas.  As you will note, the only defendants are the trucking company and its driver who are responsible for this crash.  Accordingly, the available coverage is limited to the previously provided $2 million policy.  There has been no settlement offer made to date and the litigation of this matter continues.

      State Farm previously provided declaration pages for several policies and indicated that the available underinsured motorist's coverage for this claim is $600,000.  Upon receipt of this letter, please confirm that our understanding of the available coverage is correct.

      As discovery in this matter is just beginning, we have not yet obtained an economic loss report.  While I understand State Farm has requested an economic loss report, I am sure that we can both agree that the economic loss sustained by a young college student will far exceed the available coverage, setting aside any other available damages.

      Thank you for your attention to this matter and anticipated cooperation.  I look forward to hearing from you.

      Very truly yours,

      *Edward S Goldis*

      Edward S. Goldis

ESG/rh
Enclosure

Case ID: 240501357


Filed and Attested by the
Office of Judicial Records
10 MAY 2024 10:40 am
E. SMITH

# EXHIBIT
# G

# ROBB LEONARD MULVIHILL

### ATTORNEYS AT LAW

March 9, 2023

**Mark A. Martini**
mmartini@rlmlawfirm.com

Edward Goldis, Esquire
Feldman Shepherd
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103

           **RE:**    **Brandon C. Peterson**
                      **Our File No.: 22-27566MAM**

Dear Mr. Goldis:

      Please be advised that State Farm has provided me with authority to tender the $600,000.00 in Underinsured Motorist Coverage. Since this case involves a death, State Farm will require court approval of this settlement. Please confirm that you will proceed to obtain same. If you need anything additional from me, please let me know. Thank you.

                Very truly yours,

                */s/ Mark A. Martini*

                Mark A. Martini

MAM/mjd

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT H



Edward S. Goldis
Partner

*Telephone:* 215.567.8300
*Direct Fax:* 215.599.1341
egoldis@feldmanshepherd.com
Also Member NJ Bar

March 10, 2023

**VIA EMAIL**

James M. Girman, Esquire
Pion Law
420 Fort Duquesne Blvd
1500 One Gateway Center
Pittsburgh, PA 15222

     **RE:   Peterson v. Murrow's Transfer, Inc., et al.**

Dear Jim:

     Now that both parties have had the chance to exchange preliminary information, I write to discuss my client's settlement position regarding the claims against the defendants. It should come as no surprise that we view this case as having a value significantly in excess of your clients' limited insurance coverage of $2 million.

     By way of history (much of which we are certain you are aware of), Logan Denny, a CDL Class A licensed driver qualified by a physician to drive only when wearing his corrective lenses, applied for employment with defendant Murrow's Transfer, Inc. on February 26, 2020. Following a Road Test-Driver Performance Evaluation, Murrow's determined that Mr. Denny was satisfactory for hire to transport and deliver furniture to various companies, but only if he was operating an automatic transmission. As part of Mr. Denny's employment onboarding, Murrow's required Mr. Denny to pass a Trainee Driver Evaluation Report to confirm his understanding of Murrow's policies.

     Following ten months of employment, Murrow's assigned Mr. Denny to deliver furniture to Today's Home in Pittsburgh, PA, Rustic Acres Furniture in Indiana, PA and Chuck's Furniture in Morgantown, WV on Tuesday, December 22, 2020. The tractor and trailer provided to Mr. Denny were both owned by Murrow's. As your office has represented, Murrow's generally performs their own inspections and maintenance on their vehicles. Consistent with this representation, a pre-trip inspection check of the subject tractor and trailer should have occurred prior to Mr. Denny's departure for this assignment. To the extent that inspection (or any other that occurred previously) was in fact performed as required, it should have revealed inoperable and malfunctioning safety equipment.

     At midnight on December 22, 2020, the Vehicle Position History Report you provided shows that Mr. Denny was operating the Murrow's tractor trailer at a speed of 62 mph 4.23 miles



**EXHIBIT**
**A**
Case ID: 240501357

James M. Girman, Esquire
March 10, 2023
Page 2

WSW of Toast, NC, before stopping at 12:16 AM near Lambsburg, VA. Mr. Denny resumed travel at 12:36 AM and while driving the tractor trailer, called Murrow's at 12:37 AM. Mr. Denny again stopped at 2:58 AM near Lochgelly, WV. An hour later, Mr. Denny resumed his assigned travel and, with the exception of a brief stop, reached Today's Home in Pittsburgh, PA at 8:20 AM EST. Mr. Denny resumed his travel to his next assigned delivery location at Rustic Acres. After he departed Rustic Acres, the red air hose line on the tractor trailer reportedly broke and required immediate repair. Mr. Denny contacted Murrow's to alert them of the vehicular issue and the vehicle was subsequently repaired by Marty's Diesel. At 2:22 PM, Mr. Denny resumed his travel toward Chuck's Furniture in Morgantown, WV.

At approximately 3:30PM on December 22, 2020, Brandon Peterson stopped at Sheetz in Mount Pleasant. He was operating his 2005 Dodge Ram 2500. Moments before he pulled into Sheetz, he spoke with his father, Brook Peterson, and told his father that he would be headed home after running an errand. This was the last time Brandon's father would ever speak with him.

Brandon pulled out of the Sheetz location, and shortly afterwards while driving southbound on SR119, his vehicle suffered a flat tire causing him to move his truck to the right shoulder of the highway. After pulling fully onto the shoulder, Brandon exited his truck to assess the situation.

While he was on the shoulder, a vehicle driven by eyewitness Rachel Madara-Yagla approached Brandon's vehicle, travelling in the same direction. Ms. Madara-Yagla saw Brandon from a distance with his vehicle on the right shoulder and had plenty of time to perceive and react in order to pass Brandon and his vehicle in a safe manner. Ms. Madara-Yagla moved her vehicle to the left as she passed Brandon and his disabled truck. When Ms. Madara-Yagla thereafter looked in her rear-view mirror, she saw what turned out to be Mr. Denny operating the Murrow's tractor trailer, which was travelling behind her in the same direction. Mr. Denny inexplicably failed to perceive either Brandon or his disabled vehicle on the shoulder of the roadway and Ms. Madara-Yagala saw the tractor trailer strike Brandon so violently that she observed Brandon's body flying into the air from the forceful impact.

While there is no defense for Mr. Denny's conduct, it should be noted that the police reported no adverse weather conditions and the accident occurred during daylight in perfect driving conditions with absolutely clear and unobstructed visibility. Although two witnesses had no difficulty seeing Brandon and his truck on the shoulder, Mr. Denny claims that he never saw Brandon or Brandon's vehicle at any time prior to the crash. Mr. Denny admitted to the investigating authorities that while he felt the impact, he somehow never saw Brandon or Brandon's truck and continued to drive the tractor trailer further south after the impact. Mr. Denny did not even slow the tractor trailer, let alone stop, until long after he struck and killed Brandon Peterson by dragging Brandon's body down the highway.

By his own admission Mr. Denny was distracted while looking down at his GPS and did not have his eyes on the roadway as he crossed the bridge before striking Brandon Peterson. Mr. Denny's dangerous inattentiveness to the roadway while driving a loaded tractor trailer is evident in reviewing the provided GPS data and cell phone records, which indicate that defendant Denny used his phone on multiple occasions while driving for Murrow's. This complete lack of awareness

FELDMAN
SHEPHERD
WOHLGELERNTER
TANNER
WEINSTOCK
DODIG    LLP

James M. Girman, Esquire
March 10, 2023
Page 3

and inattention to roadway conditions was reckless, and punitive damages will be imposed against him in this case. Under controlling Pennsylvania law, as he is an employee of Murrow's, they are vicariously liable for any punitive damages assessed against Mr. Denny. See Dean Witter Reynolds, Inc. v. Genteel, 499 A.2d 637 (Pa. Super. 1985).

Separate and apart from its vicarious liability for Mr. Denny's conduct, it was Murrow's responsibility to ensure that the tractor trailer's safety systems were functional before putting this vehicle out on the roadway. Murrow's failed to meet this responsibility. You have represented that the WABCO OnGuard collision avoidance system and the after-market Blind Spotter system manufactured by Bendix were not functioning properly on the date of the accident, despite Murrow's representation that they perform their own inspections of their vehicles to confirm that all equipment is operating. Had the safety systems been functioning properly, this crash could have been prevented.

Should this case proceed to trial, the jury will learn much about the young man the Murrow's driver struck and killed. Brandon Peterson was a multi-sport varsity athlete who participated in the basketball, wrestling and football programs at Southmoreland High School, from which he graduated on June 5, 2020 with a 3.58 GPA. He was cherished not only by his family but also by his community. After high school, Brandon wanted to stay close to home and was excited when he was recruited by Penn State to join the Fayette campus' men's basketball team for the 2020–21 season. On December 22, 2020, Brandon Peterson was just four days away from celebrating his nineteenth birthday with his whole promising life still ahead of him.

I am sure that we can agree that given the facts of how this crash occurred and the appalling conduct of the defendants, your clients' exposure far exceeds the $2 million of available insurance coverage. Given that the carrier has had over two years to investigate and evaluate this claim, plaintiff demands that the entire policy applicable to this claim be tendered within 45 days. While you have previously provided us with confirmation of insurance, we also require an affidavit from your client that no other insurance or excess coverage is available for this claim.

If this tender is not made during the next 45 days, it will never be accepted by our clients. Hudson must be aware that a failure to tender the entire amount of available coverage would expose both Murrow's and Logan Denny to a judgment well in excess of the $2 million policy limits; any decision by Hudson to fail to pay the full amount of available coverage could only constitute bad faith.

As you are aware from our previous conversations, if the policy limits of coverage are not tendered within 45 days, any further settlement discussions will require significant financial contributions well in excess of the available insurance coverage from Murrow's. In the event the entire policy is not tendered, we look forward to proceeding to trial, obtaining a significant verdict and, if necessary, executing a judgment against the assets of both Mr. Denny and Murrow's.

We would appreciate it if you would please provide us with the contact information for both Murrow's personal counsel and Mr. Denny's personal counsel. If Mr. Denny does not have

FELDMAN
SHEPHERD
WOHLGELERNTER
TANNER
WEINSTOCK
DODIG      LLP

James M. Girman, Esquire
March 10, 2023
Page 4

personal counsel, I trust that you have advised him of this conflict and have made arrangements for him to have separate representation.

We look forward to your clients' response.

Very truly yours,

Edward S. Goldis

ESG/jh



Case ID: 240501357



# EXHIBIT
# I

Case ID: 240501357

## AFFIDVIT OF C. W. DILLON

STATE OF NORTH CAROLINA    )
                                  )
COUNTY OF                       )

      I, C.W. Dillon, President of Murrow's Transfer, Inc., due hereby depose and state the following based upon my personal information, knowledge and belief:

      1.      The only liability insurance in force and effect on December 22, 2020 for the motor vehicle accident in which Brandon Peterson was involved is a liability policy issued by Hudson Insurance Company to Murrow's Transfer, Inc. Policy number HMU200083-04 that has coverage limits of $1,950,000.00 and a retention of $50,000.00 for total coverage of $2,000,000.00. A copy of the Hudson Insurance Declarations is attached to this Affidavit.

      2.      Murrow's Transfer, Inc. has no other liability or excess coverage available for the above-referenced December 22, 2020 motor vehicle accident, except for the insurance policy referenced above.

      FURTHER, AFFIANT SAYETH NOT.

_____
C.W. Dillon

Sworn to and Subscribed
before me this _11th_ day
of _APRIL_____, 2023

_Rachel W Hunsucker_
Notary Public.
My Commission expires
10.11.2027

NOTARY PUBLIC
RACHEL W HUNSUCKER
RANDOLPH COUNTY, NC



# EXHIBIT J

Case ID: 240501357

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHEILA PETERSON, as Administratrix )     CIVIL ACTION
of the Estate of BRANDON C. PETERSON, )
deceased, and in her own right, )     No. 2:23-cv-00136-CCW
                              )
            Plaintiff, )
v. )
                              )
MURROW'S TRANSFER, INC., and )
LOGAN J. DENNY, )
                              )
               Defendants. )

**MOTION FOR EXTENSION OF TIME**

AND NOW, comes Richard C. Thiele, Esquire, George C. Miller Jr., Esquire, and Goldleaf

Law, PLLC, as counsel for Sheila Peterson, as Administratrix of the Estate of Brandon C. Peterson,

and individually, in the above referenced action, and submits the within Motion for Extension of

Time, and in support thereof states the following:

1. Petitioners are new counsel for the plaintiff in this action.

2. Due to a dispute between previous counsel for the plaintiff, Feldman Shepherd
   Wohlgelernter Tanner Weinstock Dodig LLP, previous counsel advised the plaintiff to seek
   the advice of counsel.

3. Petitioners have attached a screen capture of an email from the plaintiff to previous counsel,
   Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP, discharging them from
   further services, on August 20, 2023.

4. Petitioners were retained on August 21, 2023.

5. Petitioners have also attached an Affidavit of the plaintiff in this matter, setting forth
   significant concerns regarding prior representation, which forms a significant part of the
   basis for the plaintiff's decision to discharge prior counsel.

Case ID: 240501357

6. Unfortunately, due to the plaintiff's concerns as expressed in the attached Affidavit and otherwise, it did take the plaintiff some time to retain counsel to represent her interests.

7. Petitioners desire to obtain the plaintiff's file from previous counsel.

8. Petitioners desire time to respond to the Motion for Settlement (Doc. 28), and otherwise as directed and applicable in this Court's Order of August 15, 2023 (Doc. 30).

9. Under the circumstances, no undue prejudice will result from a short extension in this matter.

WHEREFORE, Petitioners, as counsel for the plaintiff, Sheila K. Peterson, in her capacity as Administratrix of the Estate of Brandon C. Peterson, and individually, do hereby respectfully request that this Court grant the plaintiff an extension of twenty (20) days in which to respond to the Motion for Settlement, of Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP, filed on August 11, 2023.

Respectfully submitted,

/s/ Richard C. Thiele
Richard C. Thiele, Esquire
PA ID #94484

110 E Pittsburgh Street
Greensburg, PA 15601
Phone: (724) 838-8600
Fax:    (724) 838-8601
Email: richard@goldleaflaw.com

Case ID: 240501357

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Entry of Appearance was served upon the following persons by electronic service using the CM/ECF system:

Brian L. Shepard, Esquire
Email: bshepard@pionlaw.com

James M. Girman, Esquire
Email: jgirman@pionlaw.com

Pion, Nerone, Girman, Winslow & Smith, P.C.
1500 One Gateway Center
420 Fort Duquesne Blvd
Pittsburgh, PA 15222
412-281-2288
Fax: 412-281-3388

*Counsel for Murrow's Transfer, Inc.*

Alan M. Feldman, Esquire
Email: afeldman@feldmanshepherd.com

Daniel J. Mann, Esquire
Email: dmann@feldmanshepherd.com

Edward S. Goldis, Esquire
Email: egoldis@feldmanshepherd.com

Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
215-567-8300
Fax: 215-567-8300

*Previous Counsel for Plaintiff*

By: /s/ Richard C. Thiele
Richard C. Thiele, Esquire
PA ID #94484

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHEILA PETERSON, as Administratrix )     CIVIL ACTION
of the Estate of BRANDON C. PETERSON, )
deceased, and in her own right, )     No. 2:23-cv-00136-CCW
                           )
          Plaintiff, )
    v. )
                           )
MURROW'S TRANSFER, INC., and )
LOGAN J. DENNY, )
                           )
         Defendants. )

**AFFIDAVIT**

I, _Sheila Peterson_ , do hereby declare this to be my true and correct affidavit

in the above matter, setting forth the following:

1. I was previously represented by the firm of Feldman Shepherd Wohlgelernter Tanner

   Weinstock Dodig LLP, who are attorneys operating as a domestic limited liability

   partnership [hereinafter, "Feldman Shepherd"], regarding the death of my son, Brandon

   Peterson, as to claims filed in the above matter and otherwise.

2. Feldman Shepherd, without my knowledge, consent or approval, has stated that a

   settlement with the defendants in this matter has been reached.

3. Feldman Shepherd represented to this Court and others, including the public at large,

   without authority, that my case was settled.

4. I never gave Feldman Shepherd any authority whatsoever to settle my case.

5. I have never executed any sort of release or other agreement setting forth any terms of

   settlement, nor have I otherwise given such authority to Feldman Shepherd or to anyone

   else to do the same.

Case ID: 240501357

6. I do not agree with the unauthorized settlement effort by Feldman Shepherd, and I desire to move forward with my case.

7. I have expressed my concerns to Feldman Shepherd, including that I did not consent to settlement, and my concerns have not been addressed.

8. I have discharged Feldman Shepherd as my counsel and have retained new counsel to represent my interests and those of the Estate in this matter.

I verify that the statements made in the foregoing Affidavit are true and correct to the best of my knowledge. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Date: 8/21/2023

Sheila Peterson, as Administratrix of the Estate of Brandon Peterson, and individually

7:54        .ııl LTE 🔋

        AA

 **S P**

# Notice of termination of all services     ☆

From sheilakpeterson@yahoo.com
To Daniel J. Mann & 1 more
Aug 20 at 4:40 PM ⌄

Please be informed, Feldman Shepherd and all affiliated counsel are hereby terminated, effective immediately.

Sincerely,
Sheila and Brook Peterson , Sheila Peterson administrator of Brandon Peterson Estate
Sent from Yahoo Mail for iPhone

---

🗑    ✉    ⬆    ⪻    •••
Delete   Archive   Move   Reply All   More

Case ID: 240501357

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHEILA PETERSON, as Administratrix | ) | CIVIL ACTION |
| of the Estate of BRANDON C. PETERSON, | ) | |
| deceased, and in her own right, | ) | No. 2:23-cv-00136-CCW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MURROW'S TRANSFER, INC., and | ) | |
| LOGAN J. DENNY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

AND NOW, following consideration of a Motion for Extension of Time, together with attachments thereto, relating to this Court's Order of August 15, 2023 (Doc. 30), and the pending Motion for Settlement (Doc. 28), it is hereby ORDERED that the said Motion for Extension of Time is GRANTED, and newly-retained counsel for the plaintiff shall, on or before September 11, 2023, file a response to the Motion for Settlement (Doc. 28).

Dated: _____        BY THE COURT:

_____ , J.
CHRISTY CRISWELL WIEGAND



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# K

Case ID: 240501357

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHEILA PETERSON, as Administratrix | ) | CIVIL ACTION |
| of the Estate of BRANDON C. PETERSON, | ) | |
| deceased, and in her own right, | ) | No. 2:23-cv-00136-CCW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MURROW'S TRANSFER, INC., and | ) | |
| LOGAN J. DENNY, | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT**

I, _Sheila Peterson_, do hereby declare this to be my true and correct affidavit in the above matter, setting forth the following:

1. I was previously represented by the firm of Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP, who are attorneys operating as a domestic limited liability partnership [hereinafter, "Feldman Shepherd"], regarding the death of my son, Brandon Peterson, as to claims filed in the above matter and otherwise.

2. Feldman Shepherd, without my knowledge, consent or approval, has stated that a settlement with the defendants in this matter has been reached.

3. Feldman Shepherd represented to this Court and others, including the public at large, without authority, that my case was settled.

4. I never gave Feldman Shepherd any authority whatsoever to settle my case.

5. I have never executed any sort of release or other agreement setting forth any terms of settlement, nor have I otherwise given such authority to Feldman Shepherd or to anyone else to do the same.

6. I do not agree with the unauthorized settlement effort by Feldman Shepherd, and I desire to move forward with my case.

7. I have expressed my concerns to Feldman Shepherd, including that I did not consent to settlement, and my concerns have not been addressed.

8. I have discharged Feldman Shepherd as my counsel and have retained new counsel to represent my interests and those of the Estate in this matter.


I verify that the statements made in the foregoing Affidavit are true and correct to the best of my knowledge. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.


Date: 8/21/2023

Sheila Peterson, as Administratrix of the Estate of Brandon Peterson, and individually



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:40 am
G. SMITH

# EXHIBIT
# L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHEILA K. PETERSON, as Administratrix | ) | CIVIL ACTION |
| of the Estate of BRANDON C. PETERSON, | ) | |
| deceased, and in her own right, | ) | No. 2:23-cv-00136-CCW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MURROW'S TRANSFER, INC., and | ) | |
| LOGAN J. DENNY, | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED BRIEF IN OPPOSITION TO MOTION FOR SETTLEMENT**

AND NOW, comes Sheila Peterson, as Administratrix of the Estate of Brandon C. Peterson, and individually, in the above referenced action, by and through her counsel, Richard C. Thiele, Esquire, George C. Miller Jr., Esquire, and Goldleaf Law, PLLC, and submits the within Verified Brief in Opposition to the Motion for Settlement (ECF No. 28) of Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP [hereinafter "Feldman Shepherd"], and also in opposition to the Brief in Support of Motion for Settlement (ECF No. 40) of Defendants, Murrow's Transfer, Inc. and Logan J. Denny, and in support thereof states the following.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action was commenced by Writ of Summons on June 3, 2022, in the Allegheny County Court of Common Pleas. A Complaint in civil action was then filed on December 22, 2022. This action was removed to the Federal District Court for the Western District of Pennsylvania on January 27, 2023. (ECF No. 1). This case stems from the tragic death of a teenaged young man, Brandon C. Peterson, who was struck and killed by an eighteen-wheel tractor-trailer, owned and operated by Defendants, Murrow's Transfer, Inc. and Logan J. Denny, that veered over the white line on the side of the road, striking and killing the victim, Brandon, on December 22, 2020.

1

Case ID: 240501357

The only person who is a Plaintiff in this case is Sheila Peterson, who is Brandon's mother, and the sole Administratrix of the Estate of Brandon C. Peterson ("Plaintiff" or "Mrs. Peterson"), and Brook Peterson is Brandon's father, a nonparty to the action [collectively, the "Petersons"]. At the time of his death, Brandon Peterson was a freshman engineering student at Penn State, a recent Southmoreland High School Honors Student Graduate, a multiple sports letterman athlete, of only eighteen years of age. It is alleged that Brandon's death resulted, in part, because the defendant driver of the eighteen-wheeler tractor-trailer was looking at his GPS rather than the road, despite clear visibility and significant opportunity to avoid the fatal accident. Following their son's tragic death, as a mother, and as the Administratrix of her son's estate, it has been and remains Sheila Peterson's pursuit to seek justice on behalf of her son.

Soon after Brandon's death, Mrs. Peterson sought attorneys with demonstrated experience and, she thought, a commitment to seek justice and hold all accountable parties firmly responsible for the death of her child. Mrs. Peterson made it abundantly clear to her counsel that her case is not about the money, it is about justice. It was, and remains, her goal that the defendant driver, and the trucking company, be held liable to the fullest extent, including a maximum sum of money that would cause defendants to prevent any future innocent people from being victimized. In addition, Mrs. Peterson desires criminal charges against the driver for his reckless conduct.

Sheila Peterson, selected the law firm of Feldman Shepherd, entering into a 33 1/3% percentage contingent contractual fee agreement.[1] In doing so, she relied on Feldman Shepherd's promises to seek justice in every way possible, and Attorney Alan Feldman expressly informed Sheila Peterson, before traveling from Philadelphia on the phone, and at the time of executing the

---

[1] A copy of this agreement was not supplied to the Petersons until much later. The later-supplied copy is attached hereto as Exhibit A, although that copy bears an increase in the fee that the Petersons were not aware of and never agreed to accept.

2

Case ID: 240501357

fee agreement that her son's case was an eight- (8) figure case (ten million, plus), which led Sheila Peterson to believe that Feldman Shepherd was capable of delivering the kind of result warranted by her son's death, which would also hopefully protect other mothers and families from having to suffer the unthinkable torture that she and her family continue to endure on a daily basis. It was under these conditions that Plaintiff retained Feldman Shepherd and continued to use their services, because she believed they would fulfil their promise to fight for justice.

After retention, Feldman Shepherd had minimal contact with Plaintiff. Although Brook Peterson is not a party or the legal representative of his son's estate, he recalled minimal contacts, approximately four or five phone calls from Feldman Shepherd. Feldman Shepherd expressly stated that there were some required steps to be taken in order to get their case to trial, even declaring repeatedly to the Petersons that the Judge would force them to make a demand for policy limits. These express statements, along with the prior statements by Feldman Shepherd, led Sheila Peterson to firmly believe that all actions taken by Feldman Shepherd were necessary steps in progressing the case towards trial, to hold the defendants accountable. On or about March 6, 2023, Feldman Shepherd had a phone conference with the Petersons. During that phone call, Feldman Shepard informed the Petersons that the Judge[2] would force the Petersons to make a demand and the same was therefore a necessary step in progressing the case to trial.[3] While mediation was ordered on the case and set to occur less than two weeks in the future, the Petersons also have no recollection that they were informed of the upcoming mediation, nor were they even apprised of the concept up mediation, or the opportunities and purposes of attending mediation.

---

[2] Being this Honorable Court.

[3] To wit: "If we just proceeded to go through the discovery phase and to trial without a policy limits demand, it is very likely that the Judge would essentially force us to accept the policy limits at a later point in time in the case." From the Peterson's perspective, Feldman Shepherd painted this action as matter of course, or routine, for this Court to "force" plaintiffs to make certain demands, and that this was nothing more than a necessary step prior to proceeding to trial. This is reflected in in the letter of March 10, 2023.

3

Case ID: 240501357

On March 10, 2023, again mere days before mediation was to occur, Feldman Shepherd sent correspondence to both the Petersons and to counsel for the defendants, expressing a "policy limits" demand.[4] On March 15, 2023, Feldman Shepherd did follow up with a text message, indicating that a demand letter had been sent to the Petersons and to the defense attorney. Sheila Peterson understood from the March 6, 2023 phone call with Feldman, based on the explanation of how Plaintiff was required and would even be forced to take the steps in the case, but Sheila Peterson felt that this meant the case was finally moving forward.[5] Mrs. Peterson thought she was beginning to take long-awaited action she had been waiting for, and the text on March 15, 2023 about a demand being sent only brought further relief to her, because she believed that the case was progressing after years of limited correspondence with or explanation from her attorneys.

While Sheila Peterson was being told by her own attorneys that they must take certain steps, which she understood to be formalities in moving to trial, and otherwise that this Court would literally force her to make a demand. Of course, Mrs. Peterson's mindset always was that the case to hold the Defendants maximally responsible was tremendously strong. She had an underlying core belief they would prevail at trial and get justice that was bolstered not only by her own attorneys at Feldman Shepherd but other attorneys with other firms whom Mrs. Peterson

---

[4] Plaintiff and Mr. Peterson dispute receipt of this letter due to issues with Mrs. Peterson's email, and the letter was also never received by mail, but they have reviewed the letters as part of this dispute. A copy of the letter to the Petersons is attached hereto as Exhibit B.

[5] As the chronology of documents demonstrates, Sheila Peterson retained Feldman Shepherd on January 5, 2020, but the action was not filed, via a writ of summons, until June 2022, then via complaint in December 2022. In other words, from Mrs. Peterson's perspective, minimal action had been taken for over two years, when Feldman Shepherd then informed Mrs. Peterson that certain steps were needed to move the case forward.

Case ID: 240501357

learned had yet another case concurrently against the same defendant trucking company. [6] The facts known or at least believed based upon the representations of her attorneys and others only galvanized Sheila Peterson's fundamental belief that her day in court was coming and she would prevail for her son.[7]

Considering her views on this case, Mrs. Peterson never understood or agreed that her case was to be resolved as alleged by her former counsel. She never understood any conversation or correspondence to mean the provision of insurance coverage would prevent the case from moving forward, nor that under any circumstances would the responsible defendants no longer be parties to the case, and she never dreamed that the pursuit of justice for her son would be over in this manner. Feldman Shepherd painted the demand being made as a necessary and even forced step to get to trial, and had they explained that outcome, Sheila Peterson never would have knowingly consented to the alleged settlement. Mrs. Peterson is of course a layperson, but she understands the fundamental premise that everybody will get their day in court, especially when it is her choice as the Administratrix of her son's Estate.

Feldman Shepherd also did not request, prior to reaching the alleged settlement, that Mrs. Peterson give any affirmation of her alleged agreement. Had that been done together with a clear

---

[6] Prior to the filing of her case, Mrs. Peterson was contacted in December of 2021 by a lawyer from another firm who informed her that he was progressing against the same defendant trucking company, among others, in a multi vehicle accident case. A copy of excerpts from their text messages are attached as Exhibit C. This attorney wished to provide alleged evidence that he stated would assist in her case. The attorney provided spreadsheets with evidence against Murrow's trucking company to Feldman Shepherd. When Mrs. Peterson reached out to that same attorney later for assistance with this very issue, he advised that he had since become co-counsel with Feldman Shepherd in another case and could not help her. He then forwarded that communication to Feldman Shepherd. A copy of that text exchange and email is attached as Exhibit D. Feldman Shepherd never reviewed the evidence provided, or indeed any other evidence, with Sheila Peterson. They never disclosed or discussed the upcoming mediation with her. Finally, Feldman Shepherd never disclosed to Sheila Peterson that they had co-counsel who concurrently had a multi-vehicle accident case involving the very same defendant, and whether that separate representation would have any potential impact upon her case, how it was handled, or the representation.

[7] There were other facts, for example, that an eyewitness who previously passed Brandon's track on the roadway was able to easily avoid hitting Brandon, just prior to the accident. There was nothing in Mrs. Peterson's mind that suggested this was not a case for trial.

Case ID: 240501357

explanation as to the actual result, it would have been extremely clear to Feldman Shepherd that Plaintiff had no intention of doing anything but going to trial with the defendants. The first effort to fully and clearly communicate the impact of the alleged settlement came when Feldman Shepherd delivered the release to Mrs. Peterson. After she indicated that she would not execute the release, Feldman Shepherd began requesting via text message that Plaintiff give her affirmative written consent to the alleged settlement. Mrs. Peterson did communicate her grave concerns and contrary beliefs to Feldman Shepherd, as evidenced by an email attached hereto as Exhibit E.

On April 10, 2023, Feldman Shepherd sent a text message to Brook Peterson, advising that the demand for policy limits had been accepted and also noting the UIM carrier had agreed to tender the policy limits. A copy is attached hereto as Exhibit F. On or about April 25, 2023, Feldman Shepherd again reached out to Brook Peterson, this time noting that they did not have much time to speak but that, for the first time, "we really need to make sure that you guys (Sheila) understands the process." A copy of that text is attached as Exhibit G.

On or about May 24 2023, Feldman Shepherd indicated that various documents including a settlement and release would be sent to Brook Peterson, via text message. A copy of that text message is attached hereto as Exhibit H. Upon review of the settlement and release, several issues in contention were made immediately clear to Plaintiff: (1) Feldman Shepherd had allegedly settled the entire case and wanted Plaintiff to release the defendants from all further liability, without trial; (2) Feldman Shepherd was claiming a contingency fee of 37.5%, when Plaintiff executed a retainer agreement setting forth 33 1/3%; and (3) Feldman Shepherd believed they were entitled not only to 37.5% of the settlement with the defendants in this matter, but also 37.5% of an additional $600,000.00 under a policy of underinsured motorists coverage held by the Petersons. Sheila Peterson completely disagreed with all of these things, most critically, the alleged settlement and

6

release, and therefore immediately refused to execute the release. Tellingly, when Feldman Shepherd followed up via text message with the documents on May 31, 2023, Brook Peterson flatly responded "We need [to] talk." A copy of an affidavit from Brook Peterson is attached hereto as Exhibit I.

## II.    ISSUES BEFORE THE COURT

**First Issue:** Whether there is an enforceable settlement before the court.

**Short Answer:** No. Feldman Shepherd, as former counsel to Plaintiff, did not have Plaintiff's express authority to enter a full and final settlement.

**Second Issue:** If there is an enforceable settlement, is Feldman Shepherd entitled to a fee of 37.5% of $2,600,000.00?

**Short Answer:** No. Plaintiffs never agreed to a contingency fee of 37.5% and also never agreed, nor would have agreed, that Feldman Shepherd should recover from the Peterson's underinsured motorist policy.

## III.    ARGUMENT

a.    There is no enforceable settlement in this case because Feldman Shepherd did not obtain and ensure Plaintiff's express consent to full and final settlement, and under the circumstances Plaintiff did not acquiesce in the settlement.

"Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with *the principal's manifestations of consent to him*." Restatement (Second) of Agency § 7 (1958) (emphasis added). While authority may take several forms, in looking to Pennsylvania precedent, federal and state courts have "stated in no uncertain terms that an attorney must have express authority to settle a cause of action." *Covington v. Cont'l Gen. Tire, Inc.*, 381 F.3d 216, 219 (3d Cir. 2004) (citation and internal quotation omitted).

> The law in this jurisdiction is clear and well-settled that an attorney must have express authority in order to bind a client to a settlement agreement. The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited *knowingly*. As such, a client's attorney may not settle a case without the client's grant of express authority, and

7

> such express authority can only exist where the principal specifically grants the agent the authority to perform a certain task on the principal's behalf.
>
> As a result, if the existence of a settlement is in dispute because it is claimed that the attorney lacked authority to bind his client, the attorney's authority ... to bind [his] client by way of agreement or compromise is not inferred, but must be proven.

*King v. Driscoll*, 296 A.3d 1178, 1184 (Pa. Super. Ct. 2023) (citation and internal quotation omitted) (emphasis added). Where the existence of express authority to settle is in dispute, "that determination belongs to the trial court." *Id.* at 1185. Where, as here, the case stands to be reopened and there is a dispute concerning settlement, the trial court must hold a hearing. *See Garabedian v. Allstates Eng'g Co., Div. of Allstates Design & Dev. Co., Inc.*, 811 F.2d 802, 803-04 (3d Cir. 1987); *Brannam v. Reedy*, 906 A.2d 635, 638-641 (Pa.Cmwlth. 2006).

Express authority is more than apparent or implied authority. While apparent or implied authority may give attorneys some autonomy in making more routine judgments on behalf of their clients, the settlement of a dispute always requires the client's extension of express authority. *See Covington v. Cont'l Gen. Tire, Inc.*, 381 F.3d 216, 219, 220 (3d Cir. 2004) ("Although . . . the authority granted an attorney by virtue of his/her office is broad and includes the authority to bind his/her clients by admissions and acts in the course of suit or in the management of the regular course of litigation, . . . such apparent or implied authority does not extend to unauthorized acts which will result in the surrender of any substantial right of the client, or the imposition of new liabilities or burdens upon him."). Apparent authority only applies where, rather than communicating express authority to settle to their own counsel, the client communicates their attorney's authority to settle to the opposing counsel. *See id.* at 220 ("[I]n order for the doctrine of apparent authority to apply, the facts must show that the plaintiffs (principals) communicated directly with defense counsel, making representations that would lead defense

8

counsel to believe that the plaintiffs' attorney had authority to settle the case."). In any event, the ability of an attorney to settle must always proceed from the client's expressly cloaking her counsel with such authority.

In like manner to the above, absent fraud by former counsel, a settlement cannot be found merely because the defendant relied upon the perceived authority of former counsel in entering settlement, and where settlement has not be finalized. *See Brannam v. Reedy*, 906 A.2d 635, 639 (Pa.Cmwlth. 2006); *Reutzel v. Douglas*, 870 A.2d 787, 793 (Pa. 2005).[8] Ultimately, "[e]xpress authority exists [only] where the principal *deliberately and specifically grants authority* to the agent as to certain matters." *Walton v. Johnson*, 66 A.3d 782, 786 (Pa. Super. Ct. 2013) (emphasis added) (bracketed text added). *See Tiernan v. Devoe*, 923 F.2d 1024, 1033 (3d Cir. 1991) ("Express authority empowers an attorney to settle a client's claim; it does not arise merely from the fact of representation, but must be the result of explicit instructions regarding settlement.").[9]

In interpreting the extension of authority, or not, two interpretative principals may also control – acts and acquiescence. *See* Restatement (Second) of Agency § 42 (1958) ("If the authorization is ambiguous, the interpretation acted upon by the parties controls.") and *id*. at § 43 ("Acquiescence by the principal in conduct of an agent whose previously conferred authorization

---

[8] The case law appears to separate questions related to contract formation and enforcement from the question of express authority to enter the settlement in the first place. *See Baribault v. Zoning Hearing Bd. of Haverford*, 236 A.3d 112, 122 (Pa. Cmwlth. 2020) (separately discussing meeting of the minds and other principals of contract formation from express authority of counsel to settle). This approach is supported by the other case law cited above, which appears to hold the innocent opposing party as more of a third party to the dispute between former counsel and former client concerning authority to settle, absent a showing that former counsel committed fraud and or that former client acquiesced in the settlement for a significant period of time. *See Brannam, supra* and *Reutzel, supra*.

[9] The decision in *Tiernan, supra* was likely abrogated by *Reutzel, supra*, but only because *Tiernan* allowed for the injection of apparent authority in the settlement of cases, because *Reutzel* clarified that only express authority will do, that holding in *Tiernan* is not good law. The *Tiernan* court's pronouncement regarding express authority remains good law.

9

Case ID: 240501357

reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance.").

Plaintiff did not locate any case law specifically concerning a lack of express authority for settlement based upon Plaintiff's lack of understanding concerning the impact of a policy limits demand to an insurer. However, this fact alone makes certain things clear. First, Feldman Shepherd did not adequately explain the impact of a policy limits demand to Plaintiff. Second, if Feldman Shepherd did not make an adequate explanation of the impact of a policy limits demand, especially given the rights being lost, then there is no way that Plaintiff could have manifested to Feldman Shepherd the requisite expression of authority to settle this case fully and finally. Third, if Plaintiff, in relying on her former counsel, understood that a "policy limits demand" did not mean a full and final settlement with the defendants, then Plaintiff could not acquiesce in such settlement until the full impact was apparent. In this case, that is exactly what happened when Plaintiff received the release and, upon reviewing the same, she understood for the first time what was occurring, and voiced her disagreement.

> **b.** Even if a settlement exists, Feldman Shepherd is not entitled to a 37.5% fee and or is not entitled to take any fee from the proceeds of the Peterson's underinsured motorist policy, because the Peterson's did not agree to a 37.5% fee or to any fee to be taken from their underinsured motorist policy.

This Court has previously recognized jurisdiction to address contingent fee disputes. *See* ECF No. 51 (citing *Novinger v. E. I. Du Pont de Nemours & Co.*, 809 F.2d 212, 217 (3d Cir. 1987)). Here, there is simply a dispute of fact regarding what the contract signed by the Peterson's said at the time it was signed. First, the contract presented to the Peterson's clearly did not start out saying 37.5%. That was added. Second, that material alteration was not made by the Petersons. Third, that material alteration was not agreed to and not initialed by the Petersons. Fourth, the Petersons met with Feldman Shepherd in person, but were never supplied with a copy of their agreement. Fifth,

Case ID: 240501357

the agreement says nothing about the Petersons underinsured motorist coverage and given the magnitude of the loss suffered by the Petersons, they would never have agreed, nor did they agree, to include the significant sum of that coverage under the agreement with Feldman Shepherd. Finally, Feldman Shepherd is obviously the scrivener of this agreement.

The Petersons agree that they signed a contingency fee with Feldman Shepherd for the sum of 33 1/3% with regard to the proceeds of the wrongful death case, nothing more and nothing less.

## IV.    CONCLUSION

Plaintiff, Sheila K. Peterson, in her capacity as Administratrix of the Estate of Brandon C. Peterson, and individually, does hereby respectfully request that this Court:

    a.   schedule an evidentiary hearing upon the Motion for Settlement and, following that hearing, that this Court find that Feldman Shepherd did not have Plaintiff's express authority to settle, and as such, there is no settlement in this case; or

    b.   schedule an evidentiary hearing and, if the court should find that a settlement occurred, that the Court reduce the fee of Feldman Shepherd to 33 1/3% and further declare that Feldman Shepherd has no right to any of the proceeds, however or whenever obtained, of Plaintiff's UIM policy.

Respectfully submitted,

/s/ George C. Miller Jr.
George C. Miller Jr., Esquire
PA ID #316191

110 E Pittsburgh Street
Greensburg, PA 15601
Phone: (724) 838-8600
Fax:    (724) 838-8601
Email:  george@goldleaflaw.com

11

Case ID: 240501357

**VERIFICATION**

I, Brook Peterson, hereby verify that the statements made are true and correct to the best

of my knowledge, information, and belief.

I understand that false statements made herein are made subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.

Brook Peterson

Case ID: 240501357

## **VERIFICATION**

I, Sheila K. Peterson, verify that I am the Plaintiff in this action, and that the statements made are true and correct to the best of my knowledge, information, and belief.

I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

_____
Sheila K. Peterson

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Brief was served upon the following persons by electronic service using the CM/ECF system:

Brian L. Shepard, Esquire
James M. Girman, Esquire
Pion, Nerone, Girman, Winslow & Smith, P.C.
1500 One Gateway Center
420 Fort Duquesne Blvd
Pittsburgh, PA 15222
412-281-2288
Fax: 412-281-3388

*Counsel for Murrow's Transfer, Inc.*

Alan M. Feldman, Esquire
Daniel J. Mann, Esquire
Edward S. Goldis, Esquire
Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
215-567-8300
Fax: 215-567-8300

David H. Colvin, Esquire
DColvin@foxrothschild.com

Abraham C. Reich, Esquire,
AReich@foxrothschild.com
Fox Rothschild LLP

*Counsel for Feldman Shepherd*

By: /s/ George C. Miller Jr.
George C. Miller Jr., Esquire
PA ID #316191

**CONTINGENT FEE AGREEMENT**

1.    This Agreement is between FELDMAN, SHEPHERD, WOHLGELERNTER, TANNER, WEINSTOCK & DODIG LLP ("Feldman Shepherd")

AND

BROOK PETERSON & SHEILA PETERSON ("CLIENTS") for prosecution of a claim or claims arising from the wrongful death of Brandon Christopher Peterson occurring on December 22, 2020.

2.    Clients agree that as a fee for services under this Agreement, Feldman Shepherd shall receive 33-1/3% of the total amount received from the verdict or settlement of any claims. Feldman Shepherd may share its fee with referral counsel. Expenses of litigation incurred by Feldman Shepherd shall be reimbursed from the proceeds of recovery after the contingency fee has been calculated. Examples of litigation expenses include filing fees, depositions, expert witness fees, investigation services, copying and other costs associated with preparing Client's case. In the event no money is recovered, Client will not be responsible for any fees or costs.

3.    Client agrees to cooperate with Feldman Shepherd by providing all information known or available to Client that is relevant to the representation.

4.    It is agreed that this Agreement shall be interpreted according to the laws of the Commonwealth of Pennsylvania.

5.    Client acknowledges that he/she has read this Agreement and has received a duplicate copy of this Agreement.

DATE: _1-5-20_

DATE: _1-5-20_      BROOK PETERSON

DATE: _1/5/20_      SHEILA PETERSON

                     Attorney

COSTS OF LITIGATION WILL BE PAID AS FOLLOWS:

CLIENT: 62½ %

LAW FIRM: 37½ %

Case ID: 240501357

**FELDMAN**
**SHEPHERD**
**WOHLGELERNTER**
**TANNER**
**WEINSTOCK**
**DODIG      LLP**

Daniel J. Mann
Shareholder
*Telephone:* 215.567.8300
*Fax:* 215.567.8333
dmann@feldmanshepherd.com
Also Member NJ, TX Bar

March 10, 2023

<u>**VIA EMAIL AND REGULAR MAIL**</u>

Mr. and Mrs. Brook Peterson
2095 Kingview Road
Scottdale, PA  15683

    **RE:    Estate of Brandon Peterson**

Dear Sheila and Brook:

We just wanted to confirm in writing the discussions that we recently had regarding the available insurance coverage applicable to this case, the upcoming court required mediation, and issuing a demand for the available policy limits, which total $2 million.

As we mentioned, this case has been removed to Federal Court and assigned to Judge Christy Wiegand.  Judge Weigand requires all civil litigants to enter into a mediation process within sixty days of our initial conference with the Court, which has been scheduled for March 17, 2023.  As we previously discussed, we do not believe the amount of available insurance from the trucking company provides adequate coverage for this claim.  In advance of mediation, where we will be required to issue a demand for resolution of this case, the most effective way of potentially achieving a result in excess of the available insurance coverage is to make a "policy limits demand" and require that the policy limits be tendered within a relatively brief period of time.  The window of time within which they must be tendered must be "reasonable;" thus, at a minimum, we believe that the policy limits demand must remain open for at least a minimum of forty-five to sixty days.

As we discussed, if Hudson Insurance (the insurance carrier for Murrow's Transfer and Logan Denny) does not tender their policy limits, there is a possibility of recovering additional sums from the insurance company directly in the event the case went to trial and we achieved a verdict in excess of the available coverage.  But, as we discussed, there is always a chance that the carrier will end up tendering the policy limits in response to our demand.  If they choose to tender the policy limits if they are tendered within the window of time that we represent the policy limits demand to be available, we must agree to accept the policy limits to settle the case.

We also discussed with you the available options of what could occur if we chose not to make a policy limits demand.  If we just proceeded to go through the discovery phase and to trial without a policy limits demand, it is very likely that the Judge would essentially force us to accept the policy limits at a later point in time in the case.  Additionally, if we achieve a verdict in excess of the policy limits at trial, without ever making a policy limits demand and having it been rejected

March 10, 2023
Page 2

by the carrier, it is doubtful that Murrow's Transfer would have assets that would satisfy such a verdict and we would not have the opportunity to pursue a claim against the carrier.

Per your request, we enclose a copy of the policy limits demand letter that we intend to send to counsel for Murrow's and Mr. Denny. We appreciate your trust and faith in us, and believe, as we discussed, that this course of action is the most prudent one to follow given all of the facts and circumstances of this tragic case. Either we end up with a failure of the carrier to tender the policy limits, and essentially have the possibility of recovering a greater amount following trial, or we end up with the policy limits being tendered, and a savings to you of the rather significant costs of litigation (especially when trial in this matter, coupled with expert depositions, will likely run into the hundreds of thousands of dollars).

We will keep you apprised of any developments.

Very truly yours,

Daniel J. Mann

DJM/ch
Enclosure

FELDMAN
SHEPHERD
WOHLGELERNTER
TANNER
WEINSTOCK
DODIG          LLP

Case ID: 240501357

8:09         ..ll LTE 🔋

## New iMessage     Cancel

To: Atty Ciamboli |     

Dec 1, 2021 at 4:01 PM

Sheila – it's Ed Ciarimboli. We spoke briefly last January regarding the crash that tragically took your son's life. We r getting ready to file a very similar case. Did you ever pursue anything for your son? If so, would you share the name of the lawyer. I would like to reach out as I may have information helpful to him or vice versa for our clients. Thank you!

Hello... could you share the information with me

      iMessage     

Case ID: 240501357

8:09        ••• LTE 🔋

## New iMessage      Cancel

To: Atty Ciamboli          ⊕

I certainly could. What is your email? It's a excel spreadsheet with tons of information about Murrow's Transfer. Best of luck to you. Where is your case filed?

I don't have one yet

Sheilakpeterson@gmail.com

I would appreciate if I could look it over

No problem. Glad to help. If u do have a lawyer I can send to him/her

  iMessage 

Case ID: 240501357

8:10     .ıl LTE 🔋

## New iMessage    Cancel

To: Atty Ciamboli |

No problem. Sending info now and if u want me to copy your lawyer please let me know. Also if they or you have any questions about the data please reach out.

I just sent you the excel spreadsheet. Can u confirm that u got it and are able to open it. Take care.

> I did

> I will look it over

iMessage

Case ID: 240501357

8:10 LTE

## New iMessage · Cancel

To: Atty Ciamboli

Thank u

U r welcome. There r a number of difference tabs that all have significance both independently and together when analyzing the company as a whole. Any questions please let me know but this should be helpful for your lawyer in showing the systemic problems at the company prior to the crash involving your son.

Is your case with the same company

iMessage

Case ID: 240501357

8:10        .ooll LTE 🔋

## New iMessage     Cancel

To: Atty Ciamboli | 

> Is your case with the same company

They will likely be one of many defendants in our case.  We r waiting for some additional records from the Department of Transportation to confirm some key facts in our case.

> Multiple vehicle accident you have

Read

Yes.

  iMessage 

Case ID: 240501357

Case ID: 240501357

**8:10** .ıll LTE 🔋

## New iMessage       Cancel

To: Atty Ciamboli |       ⊕

Dec 6, 2021 at 11:47 AM

Shelia – good morning.  I am reaching out to see if u had any questions about the information that I sent to u. Also, we have obtained some additional information about Murrow from one of my experts. I am happy to share this with your team but if is confidential information that we have obtained. Please have your lawyer reach out to me so that he/she can execute a confidentiality agreement and I can send the info over.  Thanks and as always if u

iMessage

8:10      .ıl LTE 🔋

## New iMessage    Cancel

To: Atty Ciamboli    

as well which would make all the information protected by the attorney/client privilege. I'm sure this is a very hard time of year for you and your family and we will keep you in our thoughts and prayers.

Text Message

I appreciate your help... thank you for keeping me in your prayers

iMessage

No problem. Sending info now and if u want me to copy your lawyer

    iMessage   

Case ID: 240501357

8:11    .ıll LTE 🔋

## New iMessage          Cancel

To: Atty Ciamboli |          

Unfortunately, PA law doesn't allow me to give you advice since you are represented by another lawyer. I know those lawyers well and they are very good lawyers. I am currently litigating a case with them as co-counsel and they are doing a great job.



Ok

Delivered

     iMessage          🎤

Case ID: 240501357

**From:** Alan M. Feldman <afeldman@feldmanshepherd.com>
**Sent:** Monday, August 14, 2023 4:41 PM
**To:** Edward Ciarimboli <ejc@fclawpc.com>
**Subject:** RE: Estate of Paterson v. Murrow

Thanks for letting me know, Ed.

**From:** Edward Ciarimboli <ejc@fclawpc.com>
**Sent:** Monday, August 14, 2023 4:36 PM
**To:** Alan M. Feldman <afeldman@feldmanshepherd.com>; Edward Ciarimboli <ejc@fclawpc.com>
**Subject:** Estate of Paterson v. Murrow

Alan,
I hope that you are doing well. I received this from Ms. Paterson. If she reaches out again I will let you know.



**Ed Ciarimboli**
Fellerman & Ciarimboli
**ejc@fclawpc.com**

Sent from my iPad

Case ID: 240501357

# Cheryl Herling

**From:** Daniel J. Mann
**Sent:** Tuesday, August 8, 2023 7:44 PM
**To:** AMF Team
**Subject:** Fwd: Allan

CH psis

Sent from my PDA. Please pardon brevity and typographical errors.



**Daniel J. Mann**
Shareholder
Also Member NJ, TX Bar
*dmann@feldmanshepherd.com*
1845 Walnut Street - 21st Floor
Philadelphia, Pennsylvania 19103
www.feldmanshepherd.com
P. 215.567.8300 F. 215.567.8333

This electronic mail transmission contains confidential information intended only for the person(s) named. Any use, distribution, copying, or disclosure by another person is strictly prohibited.

Begin forwarded message:

**From:** S P <sheilakpeterson@yahoo.com>
**Date:** August 7, 2023 at 8:41:18 AM EDT
**To:** S P <sheilakpeterson@yahoo.com>, "Daniel J. Mann" <dmann@feldmanshepherd.com>
**Subject: Re: Allan**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Sent from Yahoo Mail for iPhone

On Sunday, August 6, 2023, 10:34 PM, S P <sheilakpeterson@yahoo.com> wrote:

So where to start, when I met you my life was in shambles I just had the most traumatic thing that could ever happen to any parents. The life of my child, was taken from me.
I met with you when I was still traumatized and wasn't able to make decisions as to any ordinary life activities.
I remember talking to you, initially on the phone stating you would do everything that you could to make the trucking company be held accountable for
Us to get justice for a Brandon. You went on and on telling me that Brandon was a person and that he deserves a fight. You told me you wasn't about the insurance money that a company carries but you

1

Case ID: 240501357

were seen that all of the things that Brandon should of been able to enjoy and life and to have would be compensated for. You said the livelihood that he would of made in his life you would be asking for. Remind you he was 18, far from the expected lifespan of a male. You told us you would make sure we were compensated for the years we were at a loss from not having the love and companionship of our child and his offspring.I was relieved that an attorney was going to fight for my family.

So we agreed to meet.We did. We thought we were in good hands.

Well months went by and the only contact I ever truly had from you or your firm was we need the phone, we need you to sign release form and we need you open an estate. Which I did. And I know I did these things probably not as fast as you wanted. Each item you wanted me to do was hurting me in my mental state more and more. Each thing I was burying my son over and over again. I did finally get all those things done for you. And then nothing was heard for months at a time. I remember always telling you I want the man who took my son's life to be charged and you told me this is how you need to do it. We need to win your case so that you could have that chance.

I believed you, why wouldn't I, after all you promised to do everything to get us justice or some type closure. I spoke to you or a part of your team I can say about 4-6 times after you received everything from me.

Wow, not a lot. I still had hope. You said you would be letting us show a video how our life has been devastated by the loss of our son, the loss of my other children brother. You said we would be able to give our testimony in court. We never went to court.

Why, didn't we go to court. You said it's not in our best interest. You could get us a settlement of 2 million that would be the best option. Of course I still was opposed to that. And just to state no talk up to this who point was ever stated about our insurance. And the few times I was on a call I always stated when do we contact State Farm again and you meaning who ever was on the call would brush me off by saying don't worry about that. Well the reason I stated that multiple times was I didn't need you taking a portion out of our insurance money that we had paid into for years.

By the way my initial phone call with you and the in person meeting with you you stated 8 figure settlement you would be getting us. Money was never want I was concern about in this at all. But I lost my son. You didn't lose your son and I don't believe that my attorneys should be profiting off of the loss of my son.

Do I feel that you should be getting an amount from our insurance company absolutely not. I never believed you were handling that. The contract that I finally receive only this month had edits made that I didn't even initial all modifications or alterations of a contract needs to be initial, and then when you spoke to me you said that the fee of 331/3 would not of been my fee because that wasn't the contract you normally use. What that's the contract you brought. I have no recollection of giving you a 4.167% increase in pay from the start. That's ludicrous. Also, my whole intent since the start was to press charges against the man, that destroyed my life and by signing the release not only am I giving you more fees than I believe we hired you for but also releasing him from any other consequences.

You also so you would have the company reimburse the fees of our burial services yet I never heard of that.

I didn't have this money 31 months ago , what I did have was my son.

So yes there are some issues we need to come to agreement. I hope you understand my views on this.

Sent from Yahoo Mail for iPhone

Case ID: 240501357

 

9:49 ◀

.ıll 5G 🔋

BP
DM

**2 People** ›

Mon, Apr 10 at 12:16 PM

Daniel J. Mann

Brook,
We heard from the defense attorney last Friday. The insurance carrier for Murrow's has decided to pay the full policy limits on the case, which as you know are $2 million. Additionally, last week the UIM carrier tendered its policy limits of $600,000. We wanted to text you first, in case you want-

   iMessage  

      

Case ID: 240501357

9:51 📶 5G 🔋



**2 People** ›

Tue, Apr 25 at 4:06 PM

Brook Peterson

Tomorrow at 4

Does that work

Daniel J. Mann

We have a mediation tomorrow in front of a retired Judge. It is supposed to go all day but we should have time to talk. It kids if depends on what is going on; we might need to speak quickly. But we really need to

iMessage

Case ID: 240501357

9:51

BP DM

2 People >

But we really need to make sure that you guys (Sheila) understands the process so let's try to talk at 4p. OK?

Kind of depends

Wed, Apr 26 at 3:52 PM

Brook Peterson

Can we make it 5

Daniel J. Mann

5p?  We will try to give you a call then.

iMessage

Case ID: 240501357



9:52                        5G

**2 People** ›

Wed, May 24 at 7:44 AM

Daniel J. Mann

Brook,
Just wanted to give you a heads up that later in the week or early next week, we are going to be sending you three things for Sheila to sign:

1. The release
2. The petition we will need to file with the court.
3. A statement of dis-

iMessage

  

      

Case ID: 240501357

9:53

.ıl 5G 🔋

BP
DM

**2 People** ›

3. A statement of dis-
tribution outlining all
of the costs/fees/etc.

Please don't hesitate
to reach out if you
have any questions
once you get the doc-
uments.
-Dan

DM

Wed, May 31 at 4:23 PM

Daniel J. Mann

Brook,
I'm about to email you
all of the documents

iMessage

Case ID: 240501357

9:53 ⏻

.ıl 5G 🔋

BP
DM

**2 People** >

📹

Wed, May 31 at 4:23 PM

Daniel J. Mann

Brook,
I'm about to email you
all of the documents
that I mentioned, in-
cluding a cover letter
with instructions.
Please give us a call if
you have any ques-
tions. Otherwise,
Sheila will need to
sign the release, and
both of you will need
to sign the statement
of distribution and the

  iMessage 🎤 

      

Case ID: 240501357

9:53

BP DM

2 People

of distribution and the
verification.
—Dan

**FILE_7596.pdf**
pdf PDF Document ·
207 KB

**FILE_6815.pdf**
pdf PDF Document · 88
KB

**SOD
Peterson.pdf**
pdf PDF Document ·
165 KB

**Plaintiff's
Petition for WD
+ SA.pdf**
pdf PDF Document ·
142 KB

iMessage

Case ID: 240501357

9:53

BP
DM

2 People

**Plaintiff's Petition for WD + SA.pdf**

pdf

PDF Document · 142 KB

**Verification Sheila and Brook.pdf**

pdf

PDF Document · 32 KB

DM

And, FYI, all of this is getting fed exed. It might be easier to sign and return the verification and Statement of Distribution with docusign. You will

iMessage

Case ID: 240501357

9:53 ⬆      .ıll 5G 🔋

BP
DM

**2 People** ›

And, FYI, all of this is getting fed exed. It might be easier to sign and return the verification and Statement of Distribution with docusign. You will need to take the release to a notary for signature.

Mon, Jun 5 at 12:05 PM

Brook Peterson

**We need talk**

Ok. Can Dan and I give

iMessage

Case ID: 240501357

## **Affidavit**

I, Brook Peterson, hereby verify that the statements made in this affidavit are true and correct to the best of my knowledge, information, and belief.

I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

1. When Feldman Shepherd would contact me, I always told Feldman Shepherd that my wife makes all decisions on the case, not me.

2. Feldman Shepherd understood and acknowledged that my wife makes all decisions.

3. Feldman Shepherd contacted both me and my wife minimal times.

4. Feldman Shepherd would call me and I would tell them that my wife wants to go to trial.

5. I was told the Judge is going to force us to make a demand, and this is a step we have to take to get to trial.

6. I believe that it is clear that Feldman Shepherd understands that my wife wants her day in court.

7. I was told that the steps we were taking were steps that are necessary to get to trial.

8. Neither my wife, nor I, ever gave any authority to Feldman Shepherd to settle the case.

Brook Peterson



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# M

Case ID: 240501357



# JAMES LAW

RYAN H. JAMES, ESQ

December 13, 2023

**Re:** ***Sheila Peterson, as Adminsitratrix of the Estate***
***of Brandon C. Peterson v. Murrow's Transfer, Inc., et al.***
**Docket No.: 2:23-cv-136-CCW (PAWD)**

WRITTEN REPORT BY RYAN H. JAMES, ESQUIRE
PURSUANT TO FED.R.CIV.P. 26(a)(2)(B)

## 1. Introduction.

The Court and the parties are familiar with the factual and procedural background of the case. I do not rehash that here. For my purposes, the relevant facts for this report follow.

On March 10, 2023, two years, two months, and five days after the Petersons signed a contingency-fee agreement with Feldman Shepherd pertaining to the wrongful death of their son, Brandon, Feldman Shepherd shareholder, Daniel J. Mann, Esquire, writes a confirmatory letter to the Petersons memorializing discussions "recently had" about (1) "available insurance coverage," (2) "the upcoming court required mediation," and (3) "issuing a demand for the available policy limits." This letter is a day after Attorney Mark A. Martini, counsel for the Petersons' insurer, State Farm, tenders $600,000 in UIM coverage.

The March 10 letter is sent to the Petersons via e-mail and regular mail. It purports to include another letter, dated the same day, addressed to defendants' counsel, James M. Girman, Esquire, which is said to be "the policy limits demand letter."

These letters follow 78 days after a Complaint is filed in the Allegheny County Court of Common Pleas; 42 days after removal of that suit to this Court; and 1 day after filing the Stipulation Selecting

Case ID: 240501357

ADR Process. Additionally, these letters post-date by 129 days an assets-evaluation report conducted by Orlowski and Associates, on a "rush basis," informing Feldman Shepherd that—

> *Based on available information we feel that if the subject concern [Murrow's Transfer, Inc.] has failed to maintain adequate insurance, they would have additional assets.*

The March 10 letter, in relevant part, communicates to the Petersons the following, which informs my opinion:

1) The Petersons "will be required to issue a demand for resolution."

2) The "most effective way of potentially achieving a result in excess of the available insurance coverage is to make a 'policy limits demand' and require that the policy limits be tendered within a relatively brief period of time."

3) "[T]here is always a chance that the carrier will end up tendering the policy limits in response to our demand. If they choose to tender the policy limits if they are tendered within the window of time that we represent the policy limits demand to be available, we must agree to accept the policy limits to settle the case."

4) "If we just proceeded to go through the discovery phase and to trial without a policy limits demand, it is very likely that the Judge would essentially force us to accept the policy limits at a later point in time in the case."

5) "Additionally, if we achieve a verdict in excess of the policy limits at trial, without ever making a policy limits demand and having it been rejected by the carrier, it is doubtful that Murrow's Transfer would have assets that would satisfy such a verdict and we would not have the opportunity to purse a claim against the carrier."

The question to be resolved by the Court as the factfinder, after assessing the credibility of the competing witnesses, is whether Sheila

Case ID: 240501357

Peterson made a decision to settle. This report does not tread into the Court's domain or express an opinion on *what events transpired* or whether Mrs. Peterson, in fact, decided to settle. What this report offers an opinion about, however, is whether Mrs. Peterson was possessed with "reasonably adequate" information to make an informed decision as to settlement and to negate any otherwise stated objective to proceed to trial.

Bearing the above material facts in mind, I now offer my opinion.

## 2. Statement of Opinions and Reasons for Them.

### A. Feldman Shepherd's letter of March 10, 2023, to Mr. and Mrs. Peterson, is a less-than-clear communication complicating the client's ability "to make informed decisions regarding the representation."

The Rules of Professional Conduct (RPC) instruct that lawyers are obligated to "abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued." RPC 1.2(a). Tied up in the lawyer's obligations to the client's objectives of representation, it is fundamental that "a lawyer shall abide by a client's decision whether to settle a matter." *Id.*

Communication is key in all of this. The sort of communication necessary is *not* a communication foreign to the client—be it linguistically or technically—but a communication "reasonably necessary to permit" the client to make "informed decisions." RPC 1.4(b).

The Comments to Rule 1.4 of the Rules of Professional Conduct elaborate on what that sort of communication looks like.

## Explaining Matters

[5] The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. Adequacy of communication depends in part on the kind of advice or assistance that is involved. For example, when there is time to explain a proposal made in a negotiation, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that are likely to result in significant expense or to injure or coerce others. On the other hand, a lawyer ordinarily will not be expected to describe trial or negotiation strategy in detail. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation. In certain circumstances, such as when a lawyer asks a client to consent to a representation affected by a conflict of interest, the client must give informed consent, as defined in Rule 1.0(e).

[6] Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers from diminished capacity. See Rule 1.14. When the client is an organization or group, it is often impossible or inappropriate to inform every one of its members about its legal affairs; ordinarily, the lawyer should address communications to the appropriate officials of the organization. See Rule 1.13. Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client.

RPC 1.4, Comments [5], [6].

Case ID: 240501357

Under Rule 1.4(b), the phrase "informed decisions" is not specially defined under the Rules of Professional Conduct like "informed consent." *See* RPC 1.0(e) (**"Informed consent"** denotes the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."). However, the two phrases share commonality with one another. Indeed, the Comments to the Rules of Professional Conduct intertwine the phrase "informed decisions" when elaborating upon the term of art, "informed consent."

## Informed Consent

[6] Many of the Rules of Professional Conduct require the lawyer to obtain the informed consent of a client or other person (e.g., a former client or, under certain circumstances, a prospective client) before accepting or continuing representation or pursuing a course of conduct. See, e.g., Rules 1.2(c), 1.6(a), 1.7(b), 1.8(a)(3), (b), (f) and (g), 1.9(a) and (b), 1.10 (d), 1.11(a)(2) and (d)(2)(i), 1.12(a) and 1.18(d)(1). The communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent. **The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make <u>an informed decision.</u> Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.** In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, **a lawyer**

Case ID: 240501357

**who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid.** In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent.

RPC 1.0, Comment [6] (emphasis added).

On the whole, for a client to provide either "informed consent" or to make an "informed decision," "a discussion of the client's . . . options and alternatives" is necessary. *See id.* And whether that discussion is "reasonably adequate," it must be considered whether the client "is experienced in legal matters generally and in making decisions of the type involved." *Id.*

With the Petersons being legally untrained and unaccustomed to the matters at hand, as I understand it, the letter of March 10, 2023, provided the false impression that their "options and alternatives" were really *none*—other than to make a "policy limits demand." I say that because of these excerpts of that letter:

In advance of mediation, **where we will be required** to issue a demand for resolution of this case, the most effective way of potentially achieving a result in excess of the available insurance coverage is to make a "policy limits demand."

\*　\*　\*

If we just proceeded to go through the discovery phase and to trial without a policy limits demand, it is very likely

*that* **the Judge would essentially force us to accept the policy limits at a later point in time in the case.**

\* \* \*

*[I]f we achieve a verdict in excess of the policy limits at trial, . . . it is doubtful that Murrow's Transfer would have assets that would satisfy such a verdict . . . .*

In the first instance, the Petersons are being told that they "will be required to issue a demand for resolution." They're told the most effective way of getting "a result in excess of the available insurance" is "to make a policy limits demand." Then, in the next instance, the Petersons are told that if they proceed "without a policy limits demand," then the authority figure presiding over the whole process—*i.e.* "the Judge"—will "essentially force" the acceptance of policy limits later. All of that is conveyed in a context where the Petersons are told that it's doubtful that Murrow's Transfer would have assets that would satisfy a verdict in excess of the policy limits demand.[1]

Apart from the portion of the letter stating what the Judge would "force" in terms of accepting policy limits being legally incorrect, because "a Plaintiff's right to jury trial is guaranteed by the Seventh Amendment . . . . [and] a judge may not coerce a settlement, or force a party to make an offer at a settlement conference," *see Griego v. Douglas*, 264 F.Supp.3d 1109, 1112 (D.N.M. 2017) (citations omitted), the impression given—even to the legally trained (including the undersigned)—is that there is really but *one option*: to make a policy limits demand.

This is not a clear communication discussing "options and alternatives" which empower laypersons, like Mrs. Peterson, with "reasonably adequate" information "to make informed decisions

---

[1] Feldman Shepherd's own assets-evaluation report of November 1, 2022, albeit rushed, signaled that Murrow's Transfer *"would have additional assets."* The Petersons seemingly were not apprised of that fact but were told otherwise—*i.e.,* that it's doubtful that Murrow's Transfer "would have assets that would satisfy such a verdict" (in excess of the policy limits).

regarding the representation." *See* RPC 1.0, Comment [6]; RPC 1.4(b). The communication, in my opinion, falls short of the sort of communication envisioned by Rule 1.4(b), leaving the distinct impression that a "policy limits demand" is just an inevitable part of the process. That failure of communication, of course, serves to undermine the allocation of authority inherent in the attorney-client relationship, whereby the client (principal) sets the objectives, and the lawyer (agent) abides accordingly.

The instant communication has the effect of obfuscating the Petersons', but specifically Mrs. Peterson's, "options and alternatives," and, insofar as it does, it runs afoul of Rule 1.4(b) and accordingly impacts Mrs. Peterson's ability "to make informed decisions regarding the representation." That, in turn, ultimately affects, in my opinion, the allocation of authority envisaged by Rule 1.2

### 3. Facts and Data Considered.

I have thoroughly reviewed the following docket entries, exhibits attached thereto, and other ancillary materials as noted:

- Docket Report, 2:23-cv-136-CCW (as of 12/7/23)

- ECF 1: Notice of Removal

- ECF 10: Answer and Affirmative Defenses

- ECF 14: Stipulation Re: ADR Process

- ECF 17: Order Referring Case to Mediation

- ECF 22: Notice of Settlement, 5/26/23

- ECF 24: Joint Status Report

- ECF 26: Joint Status Report

- ECF 28: Motion for Settlement, 8/11/23

- ECF 32: Motion for Extension of Time

- ECF 35: Br. in Support of Petition to Settle (Feldman Shepherd)

- ECF 38: Motion for Extension of Time

- ECF 40: Br. in Support of Petition to Settle (Murrow's Transfer)

- ECF 42: Br. in Opposition to Plaintiff's Motion to Compel

- ECF 47: Br. in Support of Motion for Extension

- ECF 48: Motion to File a Sur-Reply in Opposition to Motion to Compel

- ECF 49: Response to Motion to File a Sur-Reply

- ECF 52: Response to Motion for Settlement

- ECF 53: Br. in Opposition to Motion for Settlement

- ECF 55: Motion for Leave to File Reply Brief in Support of Motion for Settlement

- ECF 57: Reply Brief in Support of Motion for Settlement

- ECF 63: Correspondence of Fox Rothschild, 11/21/23

- ECF 66: Feldman Shepherd Witness List

- ECF 67: Plaintiff Witness List

- ECF 70: Motion to Extend Deadline

Case ID: 240501357

- Plaintiff's Confidential Position Letter to the Hon. Christy Criswell Wiegand, 3/14/23

- E-mail Thread between Atty. James M. Girman and Atty. Edward Goldis, 4/7/23 to 4/12/23, with Affidavit Re: Policy Limits

- E-mail from Sheila Peterson to Atty. Daniel J. Mann, 8/6/23

- Text Message Thread, beginning 3/6/23 to 7/14/23, between Atty. Daniel J. Mann and Mr. Brook Peterson

- Letter from Atty. Alan M. Feldman to Brook and Sheila Peterson, 7/25/23

- Revised Statement of Distribution, 7/27/23

## 4. Relevant Exhibits

I have considered the following documents relevant to this report, all of which are exhibits contained within the above docket entries except the Assets Evaluation:

- Contingent Fee Agreement, 1/5/20

- Assets Evaluation by Orlowski and Associates, 11/1/22

- Feldman Shepherd Letter to Atty. James M. Girman, 3/10/23

- Feldman Shepherd Letter to Mr. and Mrs. Brook Peterson, 3/10/23

## 5. Qualifications.

My curriculum vitae accompanies this report.

**6. Cases Qualified as Expert (past 4 years).**

None.

**7. Statement of Compensation for Study and Testimony.**

I have requested a retainer of $3,000.00 to be billed against at an hourly rate of $300/hour for my study relative to the case materials, legal research, and testimony to be provided in this case.

I hold the opinions recited herein to a reasonable degree of professional certainty.

Respectfully submitted.

_____
Ryan H. James (PA 313049)
JAMES LAW, LLC
1200 Lincoln Way
White Oak, Pennsylvania 15131
412-896-1349
412-896-1321 (Fax)
ryan@rhjameslaw.com

Case ID: 240501357

# RYAN HARRISON JAMES

1200 LINCOLN WAY, WHITE OAK, PENNSYLVANIA 15131
ryan@rhjameslaw.com | 412-977-1827

## PROFESSIONAL EXPERIENCE

**James Law, LLC,** *White Oak, Pennsylvania*                    July 2012-Present

### Owner/Trial & Appellate Lawyer

• Represent clients in state and federal courts, in both criminal and civil proceedings pending before trial and appellate tribunals.

*Representative matters include:*

- Sole or chief trial counsel in 24 jury and non-jury trials tried to verdict.  Sole or chief trial counsel in at least eight "significant cases," which are cases tried to verdict before a jury in matters where the highest graded offenses is punishable by a minimum of 10 years' imprisonment.

- Capital-qualified counsel in the Commonwealth of Pennsylvania.  Presently, capital counsel in the Court of Common Pleas of Washington County.

- Member of the Criminal Justice Act (CJA) Panel, PAWD, since 2019.  CJA counsel in over 45+ matters.  Tried two jury trials to verdict in the Western District of Pennsylvania: *USA v. Landfried*, 2021 (Ranjan, J.); *USA v. Peters*, 2022 (Schwab, J).

- Represented 1,000+ clients in 19 separate counties throughout the Commonwealth of Pennsylvania.

- Court-appointed counsel in approximately 80+ petitions for post-conviction relief, four of which resulting new trials.

- Appellate counsel in approximately 60 matters, involving the original and appellate jurisdictions of the Pennsylvania Supreme, Superior, and Commonwealth Courts, as well as the U.S. Supreme Court and the Third Circuit.

    *Representative cases:* **Commw. v. Hamilton**, 303 A.3d 823 (Pa. Super. 2023); **Commw. v. Trainer**, 287 A.3d 960 (Pa. Commw. 2022); **T.S. v. PSP**, 231 A.3d 103 (Pa. Commw. 2020) (en banc); **Interest of MYC**, 230

Case ID: 240501357

A.3d 500 (Pa. Super. 2020); **Commw. v. Green**, 203 A.3d 250 (Pa. Super. 2019)(en banc); **Commw. v. Durrett King**, 195 A.3d 255 (Pa. Super. 2018); **Commw. v. Luketic**, 162 A.3d 1149 (Pa. Super. 2017).

- Chief trial counsel in two Disciplinary hearings before hearing committees of the Disciplinary Board of the Supreme Court of Pennsylvania; and chief counsel in four Character & Fitness hearings before the Board of Law Examiners.

- Advise and consult with attorneys, judges, and law students on ethical issues involving the Rules of Professional Conduct, Rules of Disciplinary Enforcement, Disciplinary Board Rules and Procedures, and the Code of Judicial Conduct.

- Fmr. Solicitor for East McKeesport ZHB; Fmr. Solicitor for White Oak Borough.

- Responsible for day-to-day business operations, maintenance of 1,000+ client files, and supervision of staff.

**Law Offices of Patricia L. McGrail, LLC,** *White Oak, Pennsylvania*          Aug. 2011-July 2012

### Certified Legal Intern/Associate Attorney

- Represented and provided legal counsel to local municipalities, school boards, zoning boards, and private clients as part of the firm's practice areas in Municipal & School Law, Criminal Defense, and Civil Litigation.

**Michigan Supreme Court,** *Detroit, Michigan*          Jan. 2011-Apr. 2011

### Semester Clerk to the Fmr. Justice Diane M. Hathaway

- Assisted Justice Hathaway and her staff with research and writing needs on cases pending before the Supreme Court.

- Responsible for screening Applications for Leave to Appeal, providing analysis for Grant/Deny conferences, preparing bench memos for oral argument, and the general opinion-writing process.

## RECOGNITIONS & INVOLVEMENT

**Legal**
- Super Lawyers, Pennsylvania Rising Stars List Selectee, 2018-2024

Case ID: 240501357

- ACBA, Judiciary Committee Rating (Superior Court), 2019: *Recommended,* meaning that the candidate "possesses the legal ability, experience and temperament to excel as a judge" of said court.
- ACBA Judiciary Committee, 3-Yr. Term, 2023
- Local Rules Advisory Committee, U.S. District Court, Western District of Pennsylvania, 2023

**Community**
- Pittsburgh City Paper, Pittsburgh's Finest Profile Series, 2017
- Trib Total Media Readers' Choice Silver Award Winner (Mon-Yough)—Best Attorney, 2015
- The Daily News Readers' Choice Gold Award Winner—Best Attorney, 2014
- Pittsburgh's 50 Finest, Cystic Fibrosis Foundation (Western PA), 2013

**Law School**
- Ross Wilkins Graduating Class—Alumni Ass'n Distinguished Student Award
- Ross Wilkins Graduating Class—The President's Achievement Award
- Thomas M. Cooley Student Bar Association—Fitzgerald Student Award
- Thomas M. Cooley Law Review—John D. Voelker Award
- Thomas M. Cooley Grade Appeals Board—Earl Dayton Award
- Certificates of Merit: Adv. Mediation, Adv. Writing, Scholarly Writing, Contracts II

## BAR ADMISSIONS

Pennsylvania, 2012
Michigan, 2017
United States Supreme Court, 2021
United States Court of Appeals, Third Circuit, 2014
United States District Court, Western District of Pennsylvania, 2012
United States District Court, Eastern District of Michigan, 2022

## EDUCATION

**Thomas M. Cooley Law School,** *Lansing, Michigan*          Degree Conferred: Sept. 2011
Juris Doctor, *magna cum laude*
          Mng. Assoc. Ed., Law Review

**Allegheny College,** *Meadville, Pennsylvania*          Degree Conferred: May 2007
Bachelor of Arts (Poli. Sci./Phil.), *cum laude*

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# N

Case ID: 240501357

## <u>CONFIDENTIAL SETTLEMENT AND GENERAL RELEASE AGREEMENT</u>

This Confidential Settlement and General Release Agreement (the "**Agreement**") is hereby made and entered into by and among Sheila K. Peterson, individually and as Administratrix of the Estate of Brandon C. Peterson, deceased ("**Mrs. Peterson**"), Brook P. Peterson ("**Mr. Peterson**"), and Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP ("**Feldman Shepherd**"). Mrs. Peterson, Mr. Peterson and Feldman Shepherd are each a "**Party**" to this Agreement and are collectively referred to as the "**Parties**". The **Effective Date** of this Agreement shall be the latest of the calendar dates on the signature page(s) of this Agreement after the Agreement is signed by all Parties.

WHEREAS, Mrs. Peterson and Mr. Peterson are the surviving parents of Brandon C. Peterson;

WHEREAS, on December 22, 2020, Brandon C. Peterson was struck and killed by a tractor-trailer owned by Murrow's Transfer, Inc. and driven by Logan Denny;

WHEREAS, on or about January 5, 2021, Mrs. Peterson and Mr. Peterson signed a contingent fee agreement and retained Feldman Shepherd to represent them in connection with the death of Brandon C. Peterson;

WHEREAS, on or about January 18, 2022, the Register of Wills for Fayette County, Pennsylvania granted Letters of Administration to Mrs. Peterson to serve as the personal representative and administratrix of the Estate of Brandon C. Peterson;

WHEREAS, on or about December 22, 2022, Feldman Shepherd filed a complaint for wrongful death and other claims against defendants, Murrow's Transfer, Inc. and Logan Denny (collectively, "**Defendants**"), on behalf of Mrs. Peterson, individually and as the Administratrix of the Estate of Brandon C. Peterson, and Mr. Peterson (the "**Lawsuit**");

Case ID: 240501357

WHEREAS, Mr. Peterson, although not a named party in the Lawsuit, has a legal and financial interest in the outcome of the Lawsuit because he is the father of Brandon C. Peterson.

WHEREAS, in February and March 2023, Feldman Shepherd discussed with Mrs. Peterson and Mr. Peterson a proposal to send a policy limits demand letter to Defendants for the full amount of Defendants' available insurance coverage ($2,000,000.00);

WHEREAS, Feldman Shepherd was provided with an Affidavit of C.W. Dillion, President of Murrow's Transfer, Inc., that no other liability or excess coverage, beyond $2,000.000.00, was available.

WHEREAS, Mrs. Peterson, Mr. Peterson, and the Estate of Brandon C. Peterson do not by this Agreement, in any way, waive any rights or claims against Murrow's Transfer, Inc. or its insurers in the event that it is ever discovered that Murrow's Transfer, Inc. had a policy of insurance in effect on December 20, 2022 that would have or should have provided additional or excess coverage relating to the facts and circumstances of the death of Brandon C. Peterson over and above the $2,000,000.00 tendered by Defendants;

WHEREAS, following its discussions with Mrs. Peterson and Mr. Peterson, Feldman Shepherd reasonably believed that Mrs. Peterson and Mr. Peterson had authorized Feldman Shepherd to send a policy limits demand letter to Defendants;

WHEREAS, on or about March 10, 2023, Feldman Shepherd sent a policy limits demand letter to Defendants;

WHEREAS, in a letter dated March 9, 2023, State Farm tendered the policy limits of $600,000.00 to Feldman Shepherd in connection with Mrs. Peterson's and Mr. Peterson's underinsured motorist insurance policy;

Case ID: 240501357

WHEREAS, on April 5, 2023, Defendants accepted the demand and agreed to tender the policy limits of Defendants' available insurance coverage in the amount of $2,000,000.00, which settled the Lawsuit;

WHEREAS, on or about August 11, 2023, Feldman Shepherd filed with the Court a petition to approve the settlement of the Lawsuit;

WHEREAS, on or about August 20, 2023, Mrs. Peterson and Mr. Peterson terminated their attorney-client relationship with Feldman Shepherd;

WHEREAS, on or about August 21, 2023, Mrs. Peterson filed an affidavit in the Lawsuit stating that she did not expressly authorize Feldman Shepherd to send a policy limits demand letter or to settle the case;

WHEREAS, Feldman Shepherd disagreed with Mrs. Peterson's claim that she did not expressly authorize Feldman Shepherd to send a policy limits demand letter or to settle the case;

WHEREAS, following the termination of Feldman Shepherd, Mrs. Peterson and Mr. Peterson, through counsel, alleged that Feldman Shepherd committed legal malpractice during Feldman Shepherd's representation of Mrs. Peterson and Mr. Peterson in the Lawsuit;

WHEREAS, Feldman Shepherd denied – and denies – any and all allegations of legal malpractice asserted by Mrs. Peterson and Mr. Peterson;

WHEREAS, an evidentiary hearing was scheduled for February 1-2, 2024 before the Hon. Christy C. Wiegand, U.S.D.J. in the United States District Court for the Western District of Pennsylvania for the purpose of determining whether Mrs. Peterson expressly authorized Feldman Shepherd to send a policy limits demand letter to Defendants and the resulting settlement of the Lawsuit;

155650866.1

Case ID: 240501357

WHEREAS, Mrs. Peterson and Mr. Peterson, through counsel, represented to Feldman Shepherd and the Court that they intended to introduce testimony and evidence at the evidentiary hearing regarding Feldman Shepherd's alleged legal malpractice;

WHEREAS, on January 26, 2024, the Court issued an Order denying Feldman Shepherd's motions *in limine* and allowing Mrs. Peterson to introduce testimony and evidence at the evidentiary hearing regarding Feldman Shepherd's alleged legal malpractice;

WHEREAS, Mrs. Peterson and Mr. Peterson, through counsel, represented to Feldman Shepherd that they intended to file a legal malpractice action against Feldman Shepherd regardless of the outcome of the evidentiary hearing; and

WHEREAS, the Parties desire to fully and finally settle and dispose of all claims and disputes between them according to the terms of this Agreement, including any past, present or future claims for legal malpractice against Feldman Shepherd arising from its representation of Mrs. Peterson and Mr. Peterson in the Lawsuit.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the Parties set forth in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, and intending to be legally bound, the Parties agree as follows:

1.   **<u>Recitals</u>**

The foregoing recitals are confirmed by the Parties as true and correct, are intended to be covenants of the Parties to this Agreement, are a material part of this Agreement and are binding on the Parties.

155650866.1

Case ID: 240501357

2.    <u>**Settlement of Lawsuit**</u>

Mrs. Peterson and Mr. Peterson represent and warrant that they have agreed to accept the total sum of $2,600,000.00 in full and final settlement of the Lawsuit. Mrs. Peterson and Mr. Peterson covenant that they will sign a release of Defendants in the Lawsuit and any other required documents necessary to complete the full and final settlement of the Lawsuit pursuant to the terms and allocation set forth in the motion for Court approval attached to this Agreement as Exhibit 1, provided that any such release shall not be drafted or construed to release Defendants from any criminal liability associated with the facts and circumstances surrounding the death of Brandon C. Peterson. Consistent with the Court's Order, dated January 30, 2024, on or before February 29, 2024, Mrs. Peterson and Mr. Peterson shall file a renewed motion for Court approval of the settlement of the Lawsuit, which motion shall be filed in substantially the same form as the motion for Court approval attached to this Agreement as Exhibit 1.

3.    <u>**Settlement of Malpractice Claims**</u>

In full and final resolution of all disputes between Mrs. Peterson and Mr. Peterson, on the one hand, and Feldman Shepherd, on the other hand, including all actual or potential claims, contentions and defenses that were asserted in the Lawsuit, or could have been asserted in the Lawsuit, by any Party against any other Party, or that Mrs. Peterson and Mr. Peterson could assert against Feldman Shepherd in a future legal malpractice action, Feldman Shepherd has agreed to pay to Mrs. Peterson and Mr. Peterson – and Mrs. Peterson and Mr. Peterson have agreed to accept – the total sum of $565,326.15 (the "**Settlement Payment**"). The Settlement Payment shall be paid by Feldman Shepherd by wire transfer to Goldleaf Law, PLLC's IOLTA account (pursuant to wire instructions to be provided separately) to be held in trust for Mrs. Peterson and Mr. Peterson

Case ID: 240501357

no later than five (5) business days after the date on which the Court enters an Order approving the settlement of the Lawsuit.

### 4.    Representation by Feldman Shepherd and Acknowledgement by Mrs. Peterson and Mr. Peterson

Feldman Shepherd represents and warrants that, to the best of its information, knowledge and belief, all costs and expenses incurred in connection with its representation of Mrs. Peterson and Mr. Peterson in the Lawsuit have been paid.

Mrs. Peterson and Mr. Peterson, and their attorneys, acknowledge and agree that any and all Medicare, Medicaid, Social Security, DHS, ambulance, hospital, disability, medical insurance coverage subrogation claims and/or any and all other types of liens, taxes, and/or interest that are claimed and/or could be claimed by any person and/or entity, will be fully paid, satisfied and released from the gross settlement proceeds paid to Mrs. Peterson and Mr. Peterson by Defendants in the underlying Lawsuit and that any such payments shall not increase or otherwise change the amount of the Settlement Payment.

### 5.    No Admission of Liability

Each Party expressly denies any liability or wrongdoing of any kind or nature, and nothing in this Agreement constitutes an admission by any Party regarding any potential claim, defense or allegation that was asserted or could have been asserted by any other Party. The Parties agree that neither the existence of this Agreement nor the terms of this Agreement shall be used in any manner by a Party in a future action or proceeding as evidence of the rights, duties, or obligations of any Party, except for the purpose of enforcing the terms of this Agreement.

155650866.1

Case ID: 240501357

6. **Mutual Releases**

6(a). **Mrs. Peterson's and Mr. Peterson's General Release of Feldman Shepherd**

Other than for a breach of this Agreement, Mrs. Peterson and Mr. Peterson, on behalf of themselves, and together with their respective current and former representatives, administrators, heirs, executors, trustees, spouses, predecessors, successors, parents, subsidiaries, affiliates, joint venturers, agents, licensors, licenses, attorneys, insurers, consultants, independent contractors, third-party beneficiaries, partners, employees, officers, directors, members, managers, shareholders, transferees and assigns (collectively, the **"Peterson Releasors"**), hereby release and forever discharge Feldman Shepherd, together with its respective current and former representatives, partners, shareholders, predecessors, successors, parents, subsidiaries, affiliates, joint venturers, agents, licensors, licenses, attorneys, insurers, consultants, independent contractors, third-party beneficiaries, employees, officers, directors, members, managers, transferees and assigns (collectively, the **"Feldman Shepherd Releasees"**), of and from any and all claims, actions, causes of action, appeals, suits, liabilities, obligations, debts, collateral, dues, rents, costs, services, expenses, attorneys' fees, accounts, covenants, contracts, controversies, warranties, contributions, promises, representations, credits, income, profits, damages, judgments, taxes, counterclaims, appeals and demands whatsoever of any nature or kind, in law, equity or otherwise, whether known or unknown, asserted or unasserted, matured or unmatured, direct or indirect, which the Peterson Releasors ever had, now have, or hereafter can, shall, or may have against the Feldman Shepherd Releasees for, upon, or by reason of any matter, cause, or thing from the beginning of time through and including the Effective Date including, but not limited to, all actual or potential claims, contentions and defenses that were asserted in the Lawsuit, or could have been asserted in the Lawsuit, by Mrs. Peterson and Mr. Peterson against Feldman Shepherd,

Case ID: 240501357

Feldman Shepherd's representation of Mrs. Peterson and Mr. Peterson, and any and all claims that have been asserted or could be asserted by Mrs. Peterson and Mr. Peterson for legal malpractice against Feldman Shepherd.

      6(b).  **Feldman Shepherd's General Release of Mrs. Peterson and Mr. Peterson**

      Other than for a breach of this Agreement, Feldman Shepherd, on behalf of itself, and together with its respective current and former representatives, partners, shareholders, predecessors, successors, parents, subsidiaries, affiliates, joint venturers, agents, licensors, licenses, attorneys, insurers, consultants, independent contractors, third-party beneficiaries, employees, officers, directors, members, managers, transferees and assigns (collectively, the **"Feldman Shepherd Releasors"**), hereby releases and forever discharges Mrs. Peterson and Mr. Peterson, together with their respective current and former representatives, administrators, heirs, executors, trustees, spouses, predecessors, successors, parents, subsidiaries, affiliates, joint venturers, agents, licensors, licenses, attorneys, insurers, consultants, independent contractors, third-party beneficiaries, partners, employees, officers, directors, members, managers, shareholders, transferees and assigns (collectively, the **"Peterson Releasees"**), of and from any and all claims, actions, causes of action, appeals, suits, liabilities, obligations, debts, collateral, dues, rents, costs, services, expenses, attorneys' fees, accounts, covenants, contracts, controversies, warranties, contributions, promises, representations, credits, income, profits, damages, judgments, taxes, counterclaims, appeals and demands whatsoever of any nature or kind, in law, equity or otherwise, whether known or unknown, asserted or unasserted, matured or unmatured, direct or indirect, which the Feldman Shepherd Releasors ever had, now have, or hereafter can, shall, or may have against the Peterson Releasees for, upon, or by reason of any matter, cause, or thing from the beginning of time through and including the Effective Date.

### 6(c).   **Third-Party Beneficiaries**

The third parties being released in this Section 6 are expressly agreed to be third-party beneficiaries of this Agreement.

### 6(d).   **Release Acknowledgement**

The Parties acknowledge and understand that they may hereafter discover facts different from or in addition to those which they now know or believe to be true with respect to the present and future claims, disputes and causes of action released in this Section 6.  The Parties agree that the releases in this Section 6 shall be and remain in effect, notwithstanding the discovery or existence of any such different or additional facts.

### 6(e).   **Waiver of Statutory Provisions**

The Parties acknowledge, understand and assume the risk that, after the signing of this Agreement, they may suffer material injury, loss, damage, costs, attorneys' fees, or expenses that are related to the released claims, disputes and causes of action or that are unknown and unanticipated at the time of this Agreement.  The Parties expressly waive any statutory provision or common law rule that provides that a release does not extend to claims that the releasing party does not know or expect to exist at the time of signing the release agreement which, if known by the releasing party, would have materially affected the terms of the settlement.

### 7.   **Representations**

Notwithstanding the releases in Section 6 of this Agreement, each Party hereby represents and warrants that she/he/it has no knowledge of any other claims, actions, causes of action, appeals, suits, liabilities, obligations, debts, collateral, dues, rents, costs, services, expenses, attorneys' fees, accounts, covenants, contracts, controversies, warranties, contributions, promises, representations,

155650866.1

Case ID: 240501357

credits, income, profits, damages, judgments, taxes, counterclaims, appeals and demands whatsoever of any nature or kind against any other Party.

8.      **Non-Disparagement**

Each Party agrees not to disparage or slander any other Party.  No Party shall make or publish, or instigate, assist, participate or otherwise cause any other person or entity to make or publish, any negative, critical, or denigrating oral, written or electronic statement(s) concerning any other Party and/or any other Party's services and/or any other Party's partners, shareholders, employees, attorneys, agents, representatives, successors or assigns including, but not limited to, any statement that would libel, slander, disparage, criticize or expose to hatred, contempt, or ridicule any other Party and/or any other Party's services and/or any other Party's partners, shareholders, employees, lawyers, agents, representatives, attorneys, successors or assigns.

Any breach of Section 8 of this Agreement shall be deemed a material breach of the Agreement, subjecting the breaching party to money damages, including, but not limited to damages relating to potential reputational harm. The Parties acknowledge and agree that any Party alleging a breach of the obligations in Section 8 of this Agreement shall be entitled to temporary, preliminary and/or permanent injunctive relief, and will agree to the entry of an immediate order if such relief is sought.

9.      **Confidentiality**

The terms of this Agreement and the negotiations leading up to this Agreement shall remain strictly confidential.  The Parties shall not disclose the terms of this Agreement to any person or entity except as specifically provided in this Section 9 of the Agreement.

The terms of this Agreement may only be disclosed by the Parties to the Court and to the Parties' respective shareholders, attorneys, accountants, insurers and tax advisors.  The Parties

10 of 16

Case ID: 240501357

shall advise their respective shareholders, attorneys, accountants and tax advisors about this confidentiality provision in advance of any disclosure of the terms of this Agreement. This Section 9 of the Agreement shall not apply to any disclosure required by law, any court of competent jurisdiction, or any disclosure in a legal proceeding to enforce the rights or obligations of any Party to this Agreement. This Section 9 of the Agreement shall not apply to any disclosure in any legal proceeding between any Party and any insurer(s).

If the Parties, or their respective representatives, are asked about the dispute between the Parties, then the Parties or their respective representatives shall respond that "the Parties resolved their dispute" or "the parties reached a confidential settlement."

In the event that Mrs. Peterson and/or Mr. Peterson receives a court order or subpoena that requires testimony and/or the production of information or documents that relate to the negotiation, terms and/or provisions contained in this Agreement, then Mrs. Peterson and/or Mr. Peterson, as applicable, shall, no later than five (5) business days following receipt of such court order or subpoena, provide written notice to Feldman Shepherd, along with a copy of any such court order or subpoena, by overnight delivery and electronic mail to the following representatives of Feldman Shepherd, or any substitute representative(s) that Feldman Shepherd may designate from time to time:

> Notice to Feldman Shepherd:
>
> Alan M. Feldman, Esquire
> Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP
> 1845 Walnut Street, 21st Floor
> Philadelphia, PA 19103
> afeldman@feldmanshepherd.com
>
> and

Case ID: 240501357

David H. Colvin, Esquire
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
dcolvin@foxrothschild.com

In the event that Feldman Shepherd receives a court order or subpoena that requires testimony and/or the production of information or documents that relate to the negotiation, terms and/or provisions contained in this Agreement, then Feldman Shepherd shall, no later than five (5) business days following receipt of such court order or subpoena, provide written notice to Mrs. Peterson and Mr. Peterson, along with a copy of any such court order or subpoena, by overnight delivery and electronic mail to the following representatives of Mrs. Peterson and Mr. Peterson, or any substitute representative(s) that Feldman Shepherd may designate from time to time:

Notice to Mrs. Peterson and Mr. Peterson:

Sheila and Brook Peterson
2095 Kingview Road
Scottdale, PA 15683
sheilakpeterson@yahoo.com
brookp7378@icloud.com

and

Richard C. Thiele, Esquire
Goldleaf Law, PLLC
110 E. Pittsburgh Street
Greensburg, PA 15601
richard@goldleaflaw.com

10. **Prior Third-Party Communications By Mrs. Peterson**

No later than ten (10) days after the Effective Date, Mrs. Peterson shall affirmatively withdraw in writing any and all complaints regarding Feldman Shepherd and/or any of its attorneys that she made to any federal, state or local government agency and to any other organization(s).

12 of 16

155650866.1

Mrs. Peterson's counsel shall provide Feldman Shepherd's counsel with a copy of each written communication from Mrs. Peterson no later than fifteen (15) days after the Effective Date.

11.   **Parties to Bear Own Fees and Costs**

Each Party shall bear its own attorneys' fees and costs incurred in connection with this Agreement.

12.   **No Assignment**

Each Party represents and warrants that it owns all right, title, and interest in every claim that she/he/it purports to release in this Agreement and that she/he/it has not sold, assigned, transferred, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of those claims.

13.   **Severability**

If any provision of this Agreement is declared by a court of competent jurisdiction to be invalid for any reason, such invalidity shall not affect the remaining provisions of this Agreement, which shall be fully severable and given full force and effect.  The Parties agree to literally observe the requirement that a court of competent jurisdiction must declare a provision to be invalid before any such provision shall be severed from the remaining provisions in this Agreement.

14.   **Entire Agreement**

This Agreement constitutes the entire understanding and/or agreement between the Parties with respect to the subject matter of this Agreement and, as such, supersedes any prior understandings, agreements, representations, warranties, promises, or covenants by or among the Parties, whether written or oral.  The Parties may modify and/or amend this Agreement only by a separate written agreement signed by the Parties.

155650866.1

Case ID: 240501357

15. **Governing Law**

This Agreement shall be interpreted and construed in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania, without reference to conflicts of law principles.

16. **Jurisdiction and Venue**

Each Party irrevocably submits to the exclusive jurisdiction of the Court of Common Pleas of Philadelphia County, Pennsylvania with respect to all disputes, actions and proceedings arising under or in connection with this Agreement. Each Party hereby irrevocably and unconditionally submits to the personal jurisdiction and venue of the Court of Common Pleas of Philadelphia County, Pennsylvania. The Parties agree that none of them will institute or seek to institute any legal action arising out of this Agreement in any forum other than the Court of Common Pleas of Philadelphia County, Pennsylvania. The prevailing party in any litigation or judicial proceeding between the Parties relating to this Agreement shall be entitled to an award of that Party's reasonable legal fees and costs.

17. **Mistake**

By entering and making this Agreement, the Parties assume the risk of any mistake of fact or law, and any such mistake(s) shall not be grounds for seeking rescission or otherwise attacking the validity of this Agreement. This Agreement is final and binding on the Parties regardless of any mistake of fact or law.

18. **No Waiver**

Any failure by any Party to enforce any of the terms and/or conditions of this Agreement shall not constitute a waiver of such Party's right(s) to assert or enforce any of the terms and/or conditions of this Agreement, including any term or condition that such Party failed to enforce.

155650866.1

Case ID: 240501357

19. **Authority**

Each person signing this Agreement represents and warrants that he or she is authorized to sign this Agreement on behalf of the Party for whom he or she signs.

20. **Further Acts**

The Parties agree to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out this Agreement.

21. **Representation by Counsel**

The Parties hereby represent and warrant that, in voluntarily entering into this Agreement, they have been represented by counsel of their choosing and have relied upon their own judgment. Each Party also represents and warrants that she/he/it has not been influenced by any representations or statements not contained in this Agreement made by or on behalf of any other Party. The Parties also represent and warrant that they have, either personally or through their attorneys, fully investigated, to their full satisfaction, all facts concerning the claims and disputes between them, and that they are fully satisfied with the terms and consequences of this Agreement. The Parties also represent and warrant that their respective counsel has explained to them the terms of this Agreement and the consequences of entering into this Agreement. The Parties further represent and warrant that they understand the terms of this Agreement and the consequences of entering into this Agreement.

22. **No Rule of Strict Construction**

This Agreement shall be construed as jointly drafted and shall not be construed against any Party on the ground that the Party drafted this Agreement.

155650866.1

Case ID: 240501357

23.   **Counterparts**

This Agreement may be signed in one or more counterparts, each of which, when signed, shall be deemed to be an original and all of which taken together shall constitute one Agreement. Electronic or facsimile signatures shall be treated as original signatures.

24.   **Successors and Assigns**

The Parties agree that this Agreement shall be binding upon any successors and assigns of any Party.

IN WITNESS WHEREOF, the Parties have signed this Agreement on the date(s) written below and the Parties agree to be legally bound by the terms and conditions of this Agreement.

ACKNOWLEDGED AND AGREED:

Sheila K. Peterson, individually and
as Administratrix of the Estate of
Brandon C. Peterson

Dated: 2/26/24

ACKNOWLEDGED AND AGREED:

Brook P. Peterson

Dated: 2-29-24

ACKNOWLEDGED AND AGREED:

Feldman Shepherd Wohlgelernter
Tanner Weinstock Dodig LLP

By: ALAN M. FELDMAN

Title: PARTNER

Date 3/7/24

16 of 16

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# O

**FELDMAN**
**SHEPHERD**
**WOHLGELERNTER**
**TANNER**
**WEINSTOCK**
**DODIG        LLP**

Alan M. Feldman
Co-Managing Shareholder
Telephone: 215.567.8300
Direct Fax: 215-599-1291
afeldman@feldmanshepherd.com
Certified Civil Trial Advocate,
National Board of Trial Advocacy

October 3, 2023

**VIA EMAIL – CONFIDENTIAL**
**COMMUNICATION**

       **RE:     Estate of Brandon Peterson, deceased v. Murrow's Transfer, Inc., et al.**

To Whom it May Concern:

We write to advise of a potential claim pursuant to the terms of our professional liability policy.

On January 5, 2021, our firm was retained by Sheila and Brook Peterson pursuant to a written contingent fee agreement to represent them in an action arising from the death of their son, Brandon Peterson, on December 22, 2020.  On that date, Brandon Peterson was struck by a tractor trailer while standing on the shoulder of a roadway next to his pick-up truck which had become disabled.

After litigating the case for more than two years, in March of 2023, and following a series of discussions with the clients, both Sheila (the formally appointed Administrator of Brandon Peterson's Estate) and Brook Peterson authorized us to demand the insurance policy limits of $2 million from the trucking company defendants to settle the case. Thereafter, we wrote to the clients on March 10, 2023, confirming that they had authorized us to demand the $2 million policy limits to settle the case. The letter was sent by email and first-class mail and also enclosed the demand letter sent to defense counsel. Neither Sheila nor Brook Peterson contacted us to object to or challenge the content of either letter.

Shortly thereafter, counsel for the defendants notified us that, in response to our settlement demand, the full amount of the $2 million policy limits was being tendered, resulting in a settlement of the case against the trucking defendants.  Separately, in March of 2023, the $600,000 policy limits of Brandon Peterson's underinsured motorist coverage were tendered. Accordingly, by March of this year we had resolved both the third-party trucking case and the UIM claim for 100% of the available insurance coverage.

In July of 2023, the Petersons, for the first time, disputed our entitlement to a fee for recovery of UIM insurance benefits. There was no dispute concerning the settlement with the third-party trucking company raised at that time.  After we advised the clients of our position that we were entitled, under the terms of our fee agreement, to a fee on the recovery of the UIM proceeds, in August or September, the Petersons then also disputed our entitlement to the full contingent fee of 37.5% of the net amount of the third-party recovery from the trucking

October 3, 2023
Page 2

defendants, as provided in the Contingent Fee Agreement.  On August 20, 2023, Sheila Peterson sent an email to us, abruptly discharging our firm as counsel.  The following day, new counsel for Sheila Peterson entered their appearance and submitted an Affidavit from Ms. Peterson in which she contended, for the first time, that she had not authorized a settlement with the trucking defendants. Sheila Peterson also now apparently disputes receipt of our letter to her and Brook Peterson of March 10, 2023 confirming that they had authorized us to settle the case, even though it was sent by email and first-class mail.

The issue of whether the case has been settled with the Defendants and/or whether our firm had authority from the plaintiff to settle the case is now before the Honorable Christy Criswell Wiegand of the United States District Court for the Western District of Pennsylvania, Civil Action 2:23-CV-00136-CCW. Presently before the Court is our Petition for Approval of the Settlement, which was filed before we became aware that Ms. Peterson was disputing our authority to settle the case.  Judge Weigand has ordered us to provide our entire case file to new counsel for plaintiff, which we expect will be accomplished in the next week.  We await further instructions from Judge Weigand as to how the matter will proceed thereafter.

We believe the evidence supports our position that Sheila Peterson and her husband Brook Peterson expressly authorized us to settle the third-party claim for the policy limit of $2 million.  We further believe that the contingent fee agreement providing for a 37.5% net fee was and is valid. However, because plaintiff is now contending that authority to settle was not given, and is suggesting at least the possibility of a "professional malpractice action" in the future (see Plaintiff's Motion for Extension of Time and Other Relief filed on September 7, 2023), we are providing this notice of a potential claim in the event that the Court determines that the settlement was not authorized by our former client(s).

Very truly yours,

Alan M. Feldman

AMF/tp
Enclosure
cc:





Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# P

**Louis Bove**

| | |
|---|---|
| **From:** | Adorno, Jaclyn <Jaclyn.Adorno@awac.com> |
| **Sent:** | Thursday, December 21, 2023 4:18 PM |
| **To:** | Alan M. Feldman |
| **Cc:** | charles.caruso@assuredpartners.com; michelle.coleman@assuredpartners.com |
| **Subject:** | Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP/Sheila and Brook Peterson/AW Ref 2023024408 |
| **Attachments:** | Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP-Sheila and Brook Peterson-NOPC 12.21.2023-AW Ref 2023024408.pdf |

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Afternoon Attorney Feldman,

Attached please find Allied World's coverage position treating this matter as a Notice of Potential Claim under your Policy.  We are aware the Firm has retained Fox Rothschild as counsel and there is an evidentiary hearing scheduled for February 2024.  While this does not arise to a Claim under your Policy based on the information known at this time, we agree to reduce the Fox Rothschild legal fees (from the date of tender and going forward) from your SIR in the event this matter turns into a covered Claim.  Please let me know how the evidentiary hearing in February goes and let me know if you need anything else in the interim.  Have a nice holiday and a happy new year.

Sincerely,
Jaclyn

Jaclyn L. Adorno, Esq.
AVP, North American Claims Group
**Allied World** Insurance Company
**Allied World** Specialty Insurance Company
1690 New Britain Avenue, Suite 101
Farmington, CT 06032
T: 860.284.1542
E: jaclyn.adorno@awac.com
W: www.awac.com

---

The information contained in this e-mail and any attachments hereto is confidential. If you are not the intended recipient, you must not use or disseminate any of this information. If you have received this e-mail in error, please immediately notify the sender by reply e-mail and permanently delete the original e-mail (and any attachments hereto) and any copies or printouts thereof. Although this e-mail and any attachments hereto are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Allied World Assurance Company Holdings, Ltd or its subsidiaries or affiliates, either jointly or severally, for any loss or damage arising in any way from its use.

Case ID: 240501357



Jaclyn Adorno, Esq.
AVP, NA Claims Group

V  (860)284-1542
F  (860)284-1301
E  Jaclyn.Adorno@awac.com

**VIA E-MAIL AND VIA CERTIFIED MAIL**

December 21, 2023

Alan M. Feldman
Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
afeldman@feldmanshepherd.com

Re:      Insured:               Feldman Shepherd Wohlgelernter Tanner Weinstock &
                                Dodig LLP
          Insurer:              Allied World Insurance Company
          Policy No.:           0310-8385
          Policy Period:        07/24/2023 to 07/24/2024
          Limit:                $5,000,000
          Retention:            $50,000
          Subject:              Sheila and Brook Peterson
          Ref. No.:             2023024408

Dear Attorney Feldman:

I am writing on behalf of Allied World Insurance Company in connection with the above referenced matter. As a member of the Allied World group of insurance companies, the **Insurer** named in the caption above will be referred to in this letter as "Allied World." The purpose of this letter is to provide our initial coverage evaluation under the Lawyers Professional Liability Policy that Allied World issued to Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP ("Firm" or "**Insured**") for the Policy Period of July 24, 2023 to July 24, 2024 (the "Policy").  As set forth below, we are treating this matter as Notice of a Potential **Claim**.

Your name has been provided as the contact for the Firm in connection with this matter. If you are not the appropriate person to whom we should be communicating, please provide us with the name and contact information of the appropriate representative.

To assist you in understanding this letter, we recommend that you review the Policy together with this letter, which does not modify any terms and conditions of the Policy.

**ALLIED WORLD** INSURANCE COMPANY                    1690 New Britain Avenue    T.  860 284 1300        E.  info@awac.com
                                                    Suite 101                  F.  860 284 1301        www.awac.com
                                                    Farmington, CT 06032
                                                    U.S.A.

Case ID: 240501357

December 21, 2023
Page 2 of 6

Please note that the words that appear in **bold** print within this correspondence are defined in the Policy.

**<u>SUMMARY OF FACTS:</u>**

On October 3, 2023, the Firm reported this matter to Allied World and advised:

> We write to advise of a potential claim pursuant to the terms of our professional liability policy.
>
> On January 5, 2021, our firm was retained by Sheila and Brook Peterson pursuant to a written contingent fee agreement to represent them in an action arising from the death of their son, Brandon Peterson, on December 22, 2020.  On that date, Brandon Peterson was struck by a tractor trailer while standing on the shoulder of a roadway next to his pick-up truck which had become disabled.
>
> After litigating the case for more than two years, in March of 2023, and following a series of discussions with the clients, both Sheila (the formally appointed Administrator of Brandon Peterson's Estate) and Brook Peterson authorized us to demand the insurance policy limits of $2 million from the trucking company defendants to settle the case. Thereafter, we wrote to the clients on March 10, 2023, confirming that they had authorized us to demand the $2 million policy limits to settle the case. The letter was sent by email and first-class mail and also enclosed the demand letter sent to defense counsel. Neither Sheila nor Brook Peterson contacted us to object to or challenge the content of either letter.
>
> Shortly thereafter, counsel for the defendants notified us that, in response to our settlement demand, the full amount of the $2 million policy limits was being tendered, resulting in a settlement of the case against the trucking defendants. Separately, in March of 2023, the $600,000 policy limits of Brandon Peterson's underinsured motorist coverage were tendered. Accordingly, by March of this year we had resolved both the third-party trucking case and the UIM claim for 100% of the available insurance coverage.
>
> In July of 2023, the Petersons, for the first time, disputed our entitlement to a fee for recovery of UIM insurance benefits. There was no dispute concerning the settlement with the third-party trucking company raised at that time.  After we advised the clients of our position that we were entitled, under the terms of our fee agreement, to a fee on the recovery of the UIM proceeds, in August or September, the Petersons then also disputed our entitlement to the full contingent fee of 37.5% of the net amount of the third-party recovery from the trucking defendants, as provided in the Contingent Fee Agreement.  On August 20, 2023, Sheila Peterson sent an email to us, abruptly discharging our firm as counsel.  The following day, new counsel for Sheila Peterson entered their appearance and submitted an Affidavit from Ms. Peterson in which she contended, for the first time, that she had not authorized a settlement

December 21, 2023
Page 3 of 6

with the trucking defendants. Sheila Peterson also now apparently disputes receipt of our letter to her and Brook Peterson of March 10, 2023 confirming that they had authorized us to settle the case, even though it was sent by email and first-class mail.

The issue of whether the case has been settled with the Defendants and/or whether our firm had authority from the plaintiff to settle the case is now before the Honorable Christy Criswell Wiegand of the United States District Court for the Western District of Pennsylvania, Civil Action 2:23-CV-00136-CCW. Presently before the Court is our Petition for Approval of the Settlement, which was filed before we became aware that Ms. Peterson was disputing our authority to settle the case. Judge Weigand has ordered us to provide our entire case file to new counsel for plaintiff, which we expect will be accomplished in the next week.  We await further instructions from Judge Weigand as to how the matter will proceed thereafter.

We believe the evidence supports our position that Sheila Peterson and her husband Brook Peterson expressly authorized us to settle the third-party claim for the policy limit of $2 million.  We further believe that the contingent fee agreement providing for a 37.5% net fee was and is valid. However, because plaintiff is now contending that authority to settle was not given, and is suggesting at least the possibility of a "professional malpractice action" in the future (see Plaintiff's Motion for Extension of Time and Other Relief filed on September 7, 2023), we are providing this notice of a potential claim in the event that the Court determines that the settlement was not authorized by our former client(s).

## SUMMARY OF COVERAGE

The Policy provides a $5,000,000 maximum Limit of Liability per **Claim** and a $5,000,000 maximum aggregate Limit of Liability for all **Claims** subject to a $50,000 Retention per **Claim**.

Insuring Agreement I. of the Policy provides in pertinent part that Allied World:

> ... will pay on behalf of an **Insured**, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** first made during the **Policy Period** or any applicable Extended Reporting Period and reported in accordance with the terms of this Policy, for a **Wrongful Act**.

It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:

1.      during the **Policy Period**; or

Case ID: 240501357

December 21, 2023
Page 4 of 6

2.    on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

    (a)    the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**;

    (b)    prior to the date listed in Item 8. of the Declarations, no **Insured** had any basis: (1) to believe that any Insured had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and (c) there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

Policy Section III.C. defines **Claim** to mean:

1. any written notice or demand for monetary relief or **Legal Services**;

2. any civil proceeding in a court of law;

3. any administrative proceeding, other than a **Disciplinary Proceeding**; or

4. a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for any **Wrongful Act**.

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

Pursuant to Policy Section III.JJ., a **Wrongful Act** means, in pertinent part, "a **Legal Services Wrongful Act"**. Pursuant to Policy Section III.Q., **Legal Services Wrongful Act** means "an actual or alleged act, error or omission by an **Insured**, solely in the performance of or failure to perform **Legal Services**."

**Legal Services**, as per Policy Section III.P., includes those services performed on behalf of the **Named Insured** for others by an **Insured** as a licensed lawyer in good standing.

December 21, 2023
Page 5 of 6

Policy Section III.N. defines **Insured** to mean:

1.      the **Named Insured**;

1.      any **Predecessor Firm**;

3.      any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

4.      any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

5.      any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in the performance of or failure to perform Legal Services on behalf of the **Named Insured** or **Predecessor Firm**;

6.      any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

7.      any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and

8.      the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

Based on the foregoing, it does not appear as though a **Claim** has been made at this time. As such, Allied World will treat this matter as a Notice of a Potential **Claim** that may give rise to a **Claim** as per Policy Section V.E.3, which provides:

If, during the **Policy Period**, the **Insured** first becomes aware of a **Wrongful Act** which may reasonably be expected to be the basis of a **Claim** against an **Insured**,

Case ID: 240501357

December 21, 2023
Page 6 of 6

and the **Insured**, as soon as practicable, but in no event later than the termination of the **Policy Period**, gives the **Insurer** written notice of the **Wrongful Act** including a description of the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then the **Insurer** will treat any subsequently resulting **Claim** as if it had first been made during the **Policy Period**.

Any such **Claim** that is subsequently made against an **Insured** in connection with the above referenced facts and promptly reported to us shall be deemed to have been made and reported at the time notice was given.

Allied World's position with respect to this matter is based on the information provided to date, and is subject to further evaluation as additional information becomes available. Allied World respectfully reserves all of its rights and defenses under the Policy and available at law, including the right to assert additional Policy terms and provisions which may become applicable as new information is learned.

Please keep us informed of any and all developments in this matter.  Please ensure that we receive a copy of all significant correspondences and pleadings, should there be any. If you have any questions regarding the foregoing, please do not hesitate to contact me.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jaclyn Adorno, Esq.

Cc:      charles.caruso@assuredpartners.com
         michelle.coleman@assuredpartners.com



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 10:40 am
E. SMITH

# EXHIBIT Q

**Louis Bove**

| | |
|---|---|
| **From:** | Adorno, Jaclyn <Jaclyn.Adorno@awac.com> |
| **Sent:** | Wednesday, January 17, 2024 8:53 AM |
| **To:** | Colvin, David H. |
| **Cc:** | Alan M. Feldman; Reich, Abraham C. |
| **Subject:** | [EXT] RE: Confidential Settlement/Mediation Discussion - AW 2023024408 |

Good Morning David,

I do not have any objection to your response to the Peterson's attorney.  Your prior email referenced a statement that the Petersons will be filing a malpractice claim regardless of the current settlement/fee dispute.  I do agree that if the mediation is not successful, we at least will have insight into what is coming.  If mediation can be successful, the goal would be a global resolution.

We should speak soon about this matter as well.  Let me know if you have time this afternoon (after 1 pm) or Thursday/Friday (my days are currently pretty open).

Thanks,
Jaclyn

Jaclyn L. Adorno, Esq.
AVP, North American Claims Group
**Allied World** Insurance Company
**Allied World** Specialty Insurance Company
1690 New Britain Avenue, Suite 101
Farmington, CT 06032
T: 860.284.1542
E: jaclyn.adorno@awac.com
W: www.awac.com

**From:** Colvin, David H. <DColvin@foxrothschild.com>
**Sent:** Tuesday, January 16, 2024 4:26 PM
**To:** Adorno, Jaclyn <Jaclyn.Adorno@awac.com>
**Cc:** Alan M. Feldman <afeldman@feldmanshepherd.com>; Reich, Abraham C. <AReich@foxrothschild.com>
**Subject:** Fwd: Confidential Settlement/Mediation Discussion

**CAUTION:** External Email

Jaclyn,

The Petersons' counsel have confirmed they have authority to go to mediation.  Below is my proposed response - are you ok with this?  Need to keep this moving forward given the tight deadlines.  Thanks.

Richard and George:

Thank you for your email.  Provided that (i) you represent to us in writing that the Petersons are prepared to be reasonable and mediate in good faith, and (ii) the Court's order referring the parties to mediation states that "at least

Case ID: 240501357

one week before the mediation date the Petersons will make a written demand to Feldman Shepherd," you may advise the court that Feldman Shepherd consents to the motion. Assuming the above is acceptable, please send us a draft of the motion to review and approve. Thanks.

DC

**David H. Colvin**
Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile
(215) 299-2150 - fax
**DColvin@FoxRothschild.com**
**www.foxrothschild.com**



---

**From:** George Miller <george@goldleaflaw.com>
**Sent:** Tuesday, January 16, 2024 3:15:04 PM
**To:** Colvin, David H. <DColvin@foxrothschild.com>; Reich, Abraham C. <AReich@foxrothschild.com>
**Cc:** Richard Thiele <richard@goldleaflaw.com>
**Subject:** [EXT] Confidential Settlement/Mediation Discussion

Dear David and Abraham:

This will confirm our authority to move for mediation in this matter. Please advise if we may prepare a joint or uncontested motion to continue the pending hearing and request that the matter be referred to mediation. If you agree, we are happy to get a draft to you for review by tomorrow morning.

Thanks,
George



**George C. Miller Jr., Esquire**
Attorney at Goldleaf Law, PLLC

**O :** 724-838-8600
**M :** 724-858-0452
**E :** george@goldleaflaw.com
**W :** www.goldleaflaw.com
**A :** 110 E Pittsburgh Street
        Greensburg, PA 15601

Case ID: 240501357

**DISCLAIMER:** This email is for the intended recipient only and may contain confidential information. If you are not the intended recipient and/or have received this email in error, please advise the sender and delete this message, including any attachments, immediately. Any unauthorized or improper disclosure, copying, distribution or use of the contents of this email and any attached documents is prohibited.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

---

The information contained in this e-mail and any attachments hereto is confidential. If you are not the intended recipient, you must not use or disseminate any of this information. If you have received this e-mail in error, please immediately notify the sender by reply e-mail and permanently delete the original e-mail (and any attachments hereto) and any copies or printouts thereof. Although this e-mail and any attachments hereto are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Allied World Assurance Company Holdings, Ltd or its subsidiaries or affiliates, either jointly or severally, for any loss or damage arising in any way from its use.

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:40 am
E. SMITH

# EXHIBIT R

**Louis Bove**

| | |
|---|---|
| **From:** | Colvin, David H. |
| **Sent:** | Saturday, January 20, 2024 3:36 PM |
| **To:** | Adorno, Jaclyn |
| **Cc:** | Alan M. Feldman; Reich, Abraham C. |
| **Subject:** | Peterson / Feldman Shepherd - AW Ref. No. 2023024408 (Privileged) |

<u>Privileged</u>

Hi Jaclyn,

My apologies for writing to you on a Saturday.  The Petersons just demanded $1,653,168.00 to resolve all issues, including the alleged malpractice claim.

Per my call with the Petersons' counsel, here is how they got to that number:

1. They started by taking an amount roughly in the middle of $4,500,000 to $7,000,000, which is the range of economic loss that Feldman Shepherd identified in its mediation statement provided to the Court on March 14, 2023.  The number they start with is $5,250,000.
2. They then subtracted the insurance proceeds recovered of $2,600,000.
3. They then subtracted Feldman Shepherd's out of pocket costs of $70,000.
4. They then subtracted another $100,000 in expected costs to take the case to trial.
5. They then multiplied the result by 66.66%.
   = Demand of $1,653,168.

The Petersons' demand does not appear to take into account any risk of (i) losing the malpractice action, (ii) the time and costs associated with litigating a malpractice action, (iii) the lack of Defendants' assets -- beyond the insurance coverage already tendered – in the underlying case, and (iv) collectability issues in the underlying case.

Please let me know when you can discuss.  Thanks.

DC

**David H. Colvin**
Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile
(215) 299-2150 - fax
DColvin@FoxRothschild.com
www.foxrothschild.com

Case ID: 240501357



Case ID: 240501357



# EXHIBIT S

**Louis Bove**

| | |
|---|---|
| **From:** | Colvin, David H. |
| **Sent:** | Wednesday, January 24, 2024 7:20 PM |
| **To:** | Adorno, Jaclyn |
| **Cc:** | Alan M. Feldman |
| **Subject:** | FW: Peterson (Rule 408 - Not Admissible) |

Privileged

Jaclyn,

Per your email today and Alan Feldman's authority, please see below.  I will keep you posted.

Thank you.

DC

**David H. Colvin**
Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile
(215) 299-2150 - fax
**DColvin@FoxRothschild.com**
**www.foxrothschild.com**



---

**From:** Colvin, David H.
**Sent:** January 24, 2024 7:19 PM
**To:** Richard Thiele <richard@goldleaflaw.com>; George Miller <george@goldleaflaw.com>
**Cc:** Reich, Abraham C. <AReich@foxrothschild.com>
**Subject:** Peterson (Rule 408 - Not Admissible)

Rule 408
Not Admissible

Richard,

Case ID: 240501357

I write to propose a resolution to the current dispute that would obviate any risk to the Petersons and Feldman Shepherd of an adverse ruling by Judge Wiegand at the evidentiary hearing.  Please consider it.  The proposal is as follows:

1.  Plaintiff Sheila Peterson will withdraw her objection to the settlement of the civil case with the Defendants without waiver of her right to contend in a malpractice action that she did not authorize or consent to the settlement, along with whatever other allegations or claims she intends to raise in any such action.

2.  Feldman Shepherd would preserve and maintain all of its arguments that Sheila Peterson (and Brook Peterson) did, in fact, authorize the sending of the policy limits demand letter and the resulting settlement and/or ratified Feldman Shepherd's authority by not objecting in a timely manner to the demand letter or the settlement, as well as all defenses to any claim for malpractice.

3.  Feldman Shepherd will receive a fee of 37.5% on the $2MM recovered from Defendants' insurance carrier.

4.  Feldman Shepherd will agree to reduce its fee on the UIM recovery of $600,000 from 37.5% to 22.5%.

Please discuss this proposal with your clients and get back to me as soon as possible.  Thank you.

DC

**David H. Colvin**
Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile
(215) 299-2150 - fax
**DColvin@FoxRothschild.com**
**www.foxrothschild.com**



Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# T

**Louis Bove**

---

| | |
|---|---|
| **From:** | Adorno, Jaclyn <Jaclyn.Adorno@awac.com> |
| **Sent:** | Monday, January 29, 2024 11:02 AM |
| **To:** | Colvin, David H.; Alan M. Feldman |
| **Cc:** | Reich, Abraham C.; Cereijo, Kim |
| **Subject:** | [EXT] RE: 408 Offer of Settlement; Expires 1/29/24 @ 11:00 a.m. |

Dear Alan and David:

I'm writing to follow up on our telephone conversation this morning regarding this matter.

As explained during our call, at this juncture, Allied World is prepared to contribute $50,000 toward the proposed global resolution of this dispute.  In addition, Allied World will pay all reasonable and necessary defense costs that the Firm has incurred in the defense of this matter, in excess of the Policy's $50,000 Retention.

Allied World defers to the Firm and its counsel as to whether to move forward with this resolution.  In the event that the matter does not resolve, and the claimant proceeds with the pursuit of a legal malpractice claim, Allied World will continue to provide the Firm with a defense, subject to a reservation of rights.

Please keep me posted as to the status of any further settlement discussions and any other material developments in this matter.   Allied World continues to reserve all rights under the Policy and applicable law.

Sincerely,
Jaclyn

Jaclyn L. Adorno, Esq.
AVP, North American Claims Group
**Allied World** Insurance Company
**Allied World** Specialty Insurance Company
1690 New Britain Avenue, Suite 101
Farmington, CT 06032
T: 860.284.1542
E: jaclyn.adorno@awac.com
W: www.awac.com

---

**From:** Adorno, Jaclyn <Jaclyn.Adorno@awac.com>
**Sent:** Monday, January 29, 2024 10:00 AM
**To:** Colvin, David H. <DColvin@foxrothschild.com>
**Cc:** Alan M. Feldman <afeldman@feldmanshepherd.com>; Reich, Abraham C. <AReich@foxrothschild.com>
**Subject:** RE: 408 Offer of Settlement; Expires 1/29/24 @ 11:00 a.m.

Good Morning,

I received your emails/VM this morning and have been actively working on this to try to meet this 11 am deadline.  Sending a teams invite for 10 am.

-Jaclyn

Jaclyn L. Adorno, Esq.
AVP, North American Claims Group

Case ID: 240501357



# EXHIBIT U

**Louis Bove**

| | |
|---|---|
| **From:** | Adorno, Jaclyn <Jaclyn.Adorno@awac.com> |
| **Sent:** | Monday, January 29, 2024 3:57 PM |
| **To:** | Alan M. Feldman |
| **Cc:** | areich@foxrothschild.com; DColvin@foxrothschild.com; Cereijo, Kim |
| **Subject:** | RE: Peterson - Privileged |

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Alan,

I refer you to Policy Section V.H., which provides in part, ... No **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**."

Please be advised that Allied World does not consent to a settlement on the terms proposed below, which would allocate the "bulk of the settlement" amount towards the legal malpractice claim. As conveyed to you earlier today during our call and via email, Allied World is prepared to contribute $50,000 toward the proposed global resolution of this dispute.

Allied World reserves all rights under the Policy and applicable law.

Sincerely,
Jaclyn

Jaclyn L. Adorno, Esq.
AVP, North American Claims Group
**Allied World** Insurance Company
**Allied World** Specialty Insurance Company
1690 New Britain Avenue, Suite 101
Farmington, CT 06032
T: 860.284.1542
E: jaclyn.adorno@awac.com
W: www.awac.com

---

**From:** Alan M. Feldman <afeldman@feldmanshepherd.com>
**Sent:** Monday, January 29, 2024 2:58 PM
**To:** Adorno, Jaclyn <Jaclyn.Adorno@awac.com>
**Cc:** DColvin@foxrothschild.com; areich@foxrothschild.com
**Subject:** Peterson - Privileged

**CAUTION: External Email**

---

See the email below we have just received from counsel for the Petersons. They apportion the settlement amount differently than I had, attributing almost all of it to the legal malpractice claim. Whether their allocation or mine (or something in between) is correct, it is clear that most of the settlement amount is for resolving claims of legal malpractice.

Case ID: 240501357

I have not had any response to my email sent at 11:20 AM. Since then, we have had another unfavorable ruling from the Court, and we are increasingly concerned that the Court's decisions at the evidentiary hearing this week will effectively find us responsible for legal malpractice. We have an opportunity to settle all claims against us for about $500K. As I explained in my email earlier today, the fee reduction portion of the claim is, at most, for $130K and perhaps much less. The balance of at least $370K, and in the view of the Petersons virtually all of the settlement amount, is clearly and unequivocally for asserted claims of legal malpractice. Allied World's offer to contribute only $50K to resolve the legal malpractice claims is unreasonable and inconsistent with your obligations to my firm under the insurance contract.

Your refusal to cover all or even most of the legal malpractice claims against us puts my firm in a difficult position. Because of our concern about the outcome of the hearing scheduled for this Thursday and Friday, and Allied World's refusal to participate with a fair contribution to the proposed settlement, please be advised of our intention to go forward with a settlement of all claims for the amount of $500K, which will initially be funded by my firm. The settlement agreement will reflect a fair and equitable allocation of this amount between our modest fee reduction and the bulk of the settlement, which is plainly for resolution of the legal malpractice claims. We will thereafter seek reimbursement from Allied World of the full amount of our payment to resolve the legal malpractice claims.

I am available to discuss. Keep in mind the Peterson's offer to settle expires at 4 PM today and we will proceed as outlined above absent further communication from you.



**Alan M. Feldman**
Co-Managing Shareholder
afeldman@feldmanshepherd.com
1845 Walnut Street - 21st Floor
Philadelphia, Pennsylvania 19103
www.feldmanshepherd.com
P. 215.567.8300 F. Direct 215-599-1291

This electronic mail transmission contains confidential information intended only for the person(s) named. Any use, distribution, copying, or disclosure by another person is strictly prohibited.

**From:** Colvin, David H. <DColvin@foxrothschild.com>
**Sent:** Monday, January 29, 2024 2:40 PM
**To:** Alan M. Feldman <afeldman@feldmanshepherd.com>
**Subject:** FW: More Time

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**David H. Colvin**
Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile

Case ID: 240501357

(215) 299-2150 - fax
**DColvin@FoxRothschild.com**
**www.foxrothschild.com**



---

**From:** Richard Thiele <richard@goldleaflaw.com>
**Sent:** January 29, 2024 2:29 PM
**To:** Colvin, David H. <DColvin@foxrothschild.com>
**Cc:** George Miller <george@goldleaflaw.com>
**Subject:** [EXT] Re: More Time

Dear David,

Your client has asserted a claim for a 37.5% attorney's fee in the amount of $950,712.70. In compromise of her present and future clams, Mrs. Peterson has offered to pay Feldman Shepherd the sum of $450,152.69.

The remainder sum of Feldman Shepherd's claimed fee shall be payable to Mrs. Peterson. The amount is $500,560.01, together with the remainder of all sums due pursuant to settlement of the underlying action. To be clear, we feel the sum attributable to Feldman Shepherd's malpractice far exceeds the $500,560.01 payable to Mrs. Peterson, however, in the context of this confidential settlement effort, we believe the following allocation applies:

Sum attributable to fee dispute: $20,873.35 (37.5% - 33.33% = 4.17% of $500,560.01)

Sum attributable to malpractice claim: $479,686.66 ($500,560.01 - $20,873.35).

Please call with any questions.

Case ID: 240501357



**Richard C. Thiele, Esquire**
Attorney at Goldleaf Law, PLLC

O : 724-838-8600
M : 724-972-2892
E : richard@goldleaflaw.com
W : www.goldleaflaw.com
A : 110 E Pittsburgh Street
    Greensburg, PA 15601

**From:** Richard Thiele <richard@goldleaflaw.com>
**Sent:** Monday, January 29, 2024 11:03 AM
**To:** Colvin, David H. <DColvin@foxrothschild.com>
**Cc:** George Miller <george@goldleaflaw.com>; Reich, Abraham C. <AReich@foxrothschild.com>
**Subject:** Re: More Time

David,

In our discussions, you have indicated that Feldman Shepherd has approved of the sum demanded for settlement, you have further indicated, and i take your email to mean, that you need additional time to obtain final approval from the carrier.  Based on that understanding, please get back to us at or before 4:00PM.

Thank you.

Richard



**Richard C. Thiele, Esquire**
Attorney at Goldleaf Law, PLLC

O : 724-838-8600
M : 724-972-2892
E : richard@goldleaflaw.com
W : www.goldleaflaw.com
A : 110 E Pittsburgh Street
    Greensburg, PA 15601

**From:** Colvin, David H. <DColvin@foxrothschild.com>
**Sent:** Monday, January 29, 2024 9:45 AM
**To:** Richard Thiele <richard@goldleaflaw.com>
**Cc:** George Miller <george@goldleaflaw.com>; Reich, Abraham C. <AReich@foxrothschild.com>
**Subject:** More Time

Richard,

I'm doing everything I can to get this done but I need more time.  Can you please extend the deadline to later today?  4 pm?

**David H. Colvin**

Partner
**Fox Rothschild LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2139 - direct
(610) 716-6389 - mobile

Case ID: 240501357

(215) 299-2150 - fax
**DColvin@FoxRothschild.com**
**www.foxrothschild.com**



This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

The information contained in this e-mail and any attachments hereto is confidential. If you are not the intended recipient, you must not use or disseminate any of this information. If you have received this e-mail in error, please immediately notify the sender by reply e-mail and permanently delete the original e-mail (and any attachments hereto) and any copies or printouts thereof. Although this e-mail and any attachments hereto are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Allied World Assurance Company Holdings, Ltd or its subsidiaries or affiliates, either jointly or severally, for any loss or damage arising in any way from its use.

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:40 am
E. SMITH

# EXHIBIT
# V

**From:** Alan M. Feldman
**Sent:** Monday, February 5, 2024 4:06 PM
**To:** Adorno, Jaclyn <Jaclyn.Adorno@awac.com>
**Cc:** DColvin@foxrothschild.com; areich@foxrothschild.com
**Subject:** Peterson - Privileged

This email will summarize our video meeting on February 1, 2024, concerning the legal malpractice claims that have been asserted against our firm by our former clients, Sheila and Brook Peterson. AWAC's coverage counsel, Kim Cereijo of the Wiley firm, also participated in the meeting at your invitation.

The meeting was requested by me to try to understand AWAC's position with respect to coverage of the malpractice claims. As you know, our counsel, Dave Colvin, had written to you on January 27th and 28th to recommend a settlement based upon our concerns about the evidentiary hearing that was supposed to take place on February 1st and 2nd. In an earlier video meeting with you, Kim, Dave Colvin and me, you had said we were free to enter into the proposed settlement for $500K, but that AWAC was only prepared to contribute $50K, and any balance would have to come from us.

Over the succeeding days, I asked repeatedly why AWAC was only willing to contribute $50K, but never received an answer. At our video meeting on February 1st, I raised that and other issues with you and Kim. I will not recount every word that was spoken, but here is what occurred:

- I asked if AWAC was now objecting to our entering into a settlement. While Kim referred to AWAC's objection to what she termed a "unilateral" settlement, she seemed to have forgotten that AWAC had already told us, over and over, that they had no objection to our entering into a settlement if we paid for it.
- I asked if there now was an objection to the proposed settlement, what the nature of the objection was. There was no answer.
- I asked if AWAC had an objection to the amount of the settlement. There was no answer.
- I asked if AWAC was denying coverage for this claim. There was no answer, although Kim repeated AWAC's willingness to contribute $50K.
- I asked how the $50K was arrived at and why AWAC was not providing coverage for the balance of this legal malpractice settlement. There was no answer.
- Kim (who did all the talking for your side, although she did not say very much) referred several times to the "fee dispute" we had with the Petersons. I asked how she concluded that this was a "fee dispute" rather than a reduction in our fee based upon claims of legal malpractice. No one answered.
- I asked why AWAC was not covering this claim (after acknowledging that a claim had been made against us for legal malpractice). Again, no answer.
- I renewed our earlier proposal to equally share responsibility for the $500K (i.e., $250K from AWAC and $250K from us.) Kim said we would receive AWAC's response in writing, but otherwise just repeated the offer to contribute $50K.
- I asked Kim if she wanted to see the settlement agreement we were negotiating with the Petersons since AWAC apparently no longer had any interest in covering and negotiating this claim. After a pause, Kim said I could send it to both of you if I wished to. Since I do not want to burden you with paperwork that you have no interest in, please be advised that I stand ready, upon request, to send you the current form of the settlement agreement for your input and suggestions.
- You agreed to continue to pay our counsel's legal fees at least up to our $50K deductible, but only at a much-reduced rate  that you had never discussed with Dave Colvin or me.

I have not received the written statement of AWAC's position that was promised in our video meeting. While I still hope you will explain your decisions instead of refusing to even discuss with us your inconsistent and prejudicial handling of this claim, AWAC's unexplained determination not to cover more than $50K of this claim leaves us no choice but to protect ourselves from our insurance carrier's bad faith conduct.

Case ID: 240501357

I am available to speak with you, Kim or any other AWAC representative if you have any questions.



**Alan M. Feldman**
Co-Managing Shareholder
afeldman@feldmanshepherd.com
1845 Walnut Street - 21st Floor
Philadelphia, Pennsylvania 19103
www.feldmanshepherd.com
P. 215.567.8300 F. Direct 215-599-1291

This electronic mail transmission contains confidential information intended only for the person(s) named.  Any use, distribution, copying, or disclosure by another person is strictly prohibited.

Case ID: 240501357



Filed and Attested by the
Office of Judicial Records
10 MAY 2024 11:20 am
E. SMITH

# EXHIBIT
# W



Jaclyn L. Adorno, Esq.
AVP, North American Claims
Group

T 860-284-1524
E jaclyn.adorno@awac.com

January 31, 2024

**<u>VIA EMAIL</u>**

Alan M. Feldman
Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
afeldman@feldmanshepherd.com

Re:   Insured:         Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP
      Insurer:         Allied World Insurance Company
      Policy No.:      0310-8385
      Policy Period:   07/24/2023 to 07/24/2024
      Limit:           $5,000,000
      Retention:       $50,000
      Subject:         Sheila and Brook Peterson (the "Peterson Matter")
      Ref. No.:        2023024408

Dear Attorney Feldman:

As a member of the Allied World group of insurance companies, the **Insurer** named in the caption above will be referred to as "Allied World" in this letter. Please note that the words that appear in bold print within this correspondence are defined in the Policy. The purpose of this letter is to address certain issues in connection with the defense of the Peterson Matter under *LPL Assure* Lawyers Professional Liability policy number 0310-8385 issued to Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP (the "Firm") for the **Policy Period** of July 24, 2023 to July 24, 2024 (the "Policy"). The Policy has a Limit of Liability of $5,000,000 per **Claim** and in the aggregate, subject to a Retention of $50,000 per **Claim**. This letter does not address any issues pertaining to the Firm's unilateral settlement of the Peterson Matter. Allied World continues to reserve all rights in that regard.

As previously explained, Allied World has accepted the Peterson Matter as a **Claim**, and agreed to provide a defense to the Firm, subject to a complete reservation of rights. The Policy provides that, "[t]he **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy. The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**. However, the **Insurer** shall not select defense counsel without the consent of the **Named Insured**, such consent not to be unreasonably withheld." Policy, Section V.C.1, as modified by Endorsement No. 2. The Policy obligates the **Insured** to "cooperate with the **Insurer**, including providing all information requested

**ALLIED WORLD** INSURANCE COMPANY          1690 New Britain Avenue   T. 860 284 1300      E. info@awac.com
                                          Suite 101                 F. 860 284 1301      www.awac.com
                                          Farmington, CT 06032
                                          U.S.A.

Case ID: 240501357

by the **Insurer** regarding any **Claim**, and cooperating fully with the **Insurer** in the defense, investigation and settlement of any **Claim**." *Id.*, Section V.H.  In addition, "[n]o **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**." *Id.*

The Firm first notified Allied World of the Peterson Matter on October 3, 2023, describing the matter as a "potential claim."  At that point, the Firm had already retained David Colvin and Abraham Reich at Fox Rothschild LLP to represent the Firm's interests in this matter.  Based on the information presented, Allied World concluded that no **Claim** had been made at that time, however, Allied World agreed that, to the extent that the matter evolved into a **Claim** under the Policy, Allied World would agree to apply toward the Policy's Retention reasonable fees and costs that the Firm incurred with Fox Rothschild from the date of notice onward.  I further indicated that Allied World would need to reach an agreement with respect to Fox Rothschild's hourly rates and requested that the Firm provide rate information.

In January 2024, based on developments in connection with the Peterson Matter, Allied World agreed to treat this matter as a **Claim** under the Policy.  Allied World again requested rate information for Fox Rothschild and also requested copies of all invoices so that Allied World could track satisfaction of the Policy's Retention.

Allied World first received information regarding Fox Rothschild's rates on January 26, 2024.  Allied World now understands that Fox Rothschild's proposed rates for this matter are $860-$1,160 for partners, $450 for associates, and $325 for paralegals.  Respectfully, Allied World does not view these rates as reasonable.  These rates vastly exceed what Allied World typically pays counsel for the defense of similar cases in the relevant jurisdiction.  At the high end, typical defense counsel rates in the jurisdiction are $260 for partners, $230 for associates, and $115 for paralegals.  The proposed rates are also materially greater than the rates that Fox Rothschild itself charged for similar cases when acting as panel counsel representing Allied World's insureds in other matters.

Although Allied World cannot consent to Fox Rothschild's retention at the proposed rates, Allied World will agree to pay the rates that Fox Rothschild previously charged as panel counsel for Allied World when defending similar matters – *i.e.,* $350 for partners, $215 for associates, and $110 for paralegals (the "Agreed Rates").  Relatedly, Allied World will agree to credit toward the satisfaction of the Policy's Retention fees that the Firm paid to Fox Rothschild in the Peterson Matter beginning on October 3, 2023 - the date of notice to Allied World - but only at the Agreed Rates.

To date, Allied World has received only one defense invoice from Fox Rothschild in this matter, which pertains to its work in December 2023.  Please promptly provide copies of all defense invoices for Allied World's review so that it may determine satisfaction of the Policy's Retention and calculate any amounts owed in excess of the Retention.

Case ID: 240501357

January 31, 2024
Page 3 of 3

Allied World's position with respect to this matter is based on the information provided to date and is subject to further evaluation as additional information becomes available. Allied World respectfully reserves all of its rights and defenses under the Policy and available at law, including the right to assert additional Policy terms and provisions. If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jaclyn L. Adorno, Esq.

cc:      charles.caruso@assuredpartners.com
         michelle.coleman@assuredpartners.com



# EXHIBIT X

Case ID: 240501357

Kimberly Cereijo
202.719.7326
kcereijo@wiley.law

Joseph W. Gross
202.719.3320
jgross@wiley.law



Wiley Rein LLP
2050 M St NW
Washington, DC 20036
Tel: 202.719.7000

**wiley.law**

February 14, 2024

**VIA E-MAIL ONLY**

Louis A. Bove, Esq.
Bodell Bove LLC
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
lbove@bodellbove.com

Re:  Insured:    Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP
     Insurer:     Allied World Insurance Company
     Policy No.:  0310-8385
     Subject:     Sheila and Brook Peterson
     Claim No.:   2023024408

Dear Mr. Bove:

This firm represents Allied World Insurance Company ("Allied World") in connection with the above-referenced matter.  Please direct all future correspondence to our attention.  We are sending this letter to you based on our understanding that you represent Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP (the "Firm") in connection with issues of insurance coverage for this matter.  To the extent that this understanding is incorrect, please notify us promptly so that we may forward this letter to the appropriate party.

Allied World issued *LPL Assure* Lawyers Professional Liability Policy number 0310-8385 to the Firm for the **Policy Period** of July 24, 2023 to July 24, 2024 (the "Policy").  As potentially applicable here, the Policy has a Limit of Liability of $5,000,000 per **Claim** and in the aggregate, subject to a Retention of $50,000 per **Claim**.

Please note that, other than headings, terms in bold are defined under the Policy.

In October 2023, the Firm provided notice to Allied World of what it described as a "potential claim" by Sheila and Brook Peterson (the "Petersons"), and Allied World agreed to accept the matter as a notice of circumstances under the Policy.  In January 2024, based on further developments and at the Firm's request, Allied World agreed to treat the matter as a **Claim** under the Policy.  Allied World confirmed that it would provide the Firm with a defense for the **Claim**, subject to a reservation of rights.

Shortly thereafter, the Firm informed Allied World that it wished to settle its dispute with the Petersons on an expedited basis.  On January 29, 2024, the Firm presented proposed settlement terms to Allied World and requested that Allied World consent to the settlement that same day.

Case ID: 240501357

Louis A. Bove, Esq.
February 14, 2024
Page 2

Allied World did not consent to the terms of the settlement as proposed.  Allied World understands that, notwithstanding Allied World's lack of consent, the Firm settled with the Petersons on January 29, 2024.  The Firm is now demanding that Allied World reimburse the Firm in connection with the settlement.

For the reasons discussed in detail below, Allied World has no obligation to pay any amounts in connection with the settlement, which the Firm entered into unilaterally and which encompasses terms that are not reasonable under any objective analysis of the circumstances presented.  Allied World also disputes the Firm's allegations that Allied World has acted in bad faith, which are refuted by the factual record.

We invite you to contact us to the extent that you have questions following your review of this letter.

## <u>BACKGROUND</u>

The Firm represented the Petersons in connection with a wrongful death action against a trucking company arising from the death of their son, Brandon Peterson (the "Wrongful Death Action").  Brandon was killed when he was struck by a truck while standing on the side of the roadway attending to his disabled vehicle.  According to the Firm, when retaining the Firm, the Petersons agreed to pay the Firm a contingent fee of 37.5% of the net amount of any third-party recovery, which, according to the Firm, included both recovery from the trucking company and under Brandon Peterson's Uninsured/Underinsured Motorist ("UIM") coverage.

Allied World understands that, in March 2023, the Firm made a demand on the trucking company to settle the Wrongful Death Action for $2,000,000, which was the full limit of liability of the trucking company's insurance.  The trucking company accepted the demand.  According to the Firm, it also secured for the Petersons $600,000 in UIM benefits under Brandon Peterson's automobile policy, for a total recovery of $2,600,000.

In July 2023, while in the process of finalizing the settlement, the Petersons disputed issues with the Firm's fee.  As the Firm described in an October 3, 2023 letter to Allied World:

> In July of 2023, the Petersons, for the first time, disputed our entitlement to a fee for recovery of UIM insurance benefits. There was no dispute concerning the settlement with the third-party trucking company raised at that time.  After we advised the clients of our position that we were entitled, under the terms of our fee agreement, to a fee on the recovery of the UIM proceeds, in August or September, the Petersons then also disputed our entitlement to the full contingent fee of 37.5% of the net amount of the third-party recovery from the trucking defendants, as provided in the Contingent Fee Agreement.

October 3, 2023 Letter at 1.

The Petersons terminated the Firm's representation of them on August 20, 2023.  On August 22, 2023, the Firm moved for approval of the settlement with the trucking company (the "Motion to Enforce").  The Firm confirmed in the Motion to Enforce that there was a fee dispute with the Petersons and that the Petersons had discharged the Firm.  Motion to Enforce at 4-5.

wiley.law

Louis A. Bove, Esq.
February 14, 2024
Page 3

In response to the Motion to Enforce, the Petersons, through new counsel, submitted an Affidavit from Ms. Peterson in which she testified that she had not authorized a settlement with the trucking company.  The Petersons opposed the Motion to Enforce but simultaneously argued that, if the Motion to Enforce were granted, the Firm should not be entitled to its claimed contingency fee.

The Firm first notified Allied World of circumstances regarding its representation of the Petersons by letter of October 3, 2023, describing the matter as a "potential claim."  In describing the dispute, the Firm stated:

> We believe the evidence supports our position that Sheila Peterson and her husband Brook Peterson expressly authorized us to settle the third-party claim for the policy limit of $2 million.  We further believe that the contingent fee agreement providing for a 37.5% net fee was and is valid. However, because plaintiff is now contending that authority to settle was not given, and is suggesting at least the possibility of a "professional malpractice action" in the future (see Plaintiff's Motion for Extension of Time and Other Relief filed on September 7, 2023), we are providing this notice of a potential claim in the event that the Court determines that the settlement was not authorized by our former client(s).

*Id.*

By letter dated December 21, 2023, Allied World advised that, based on the information the Firm had provided, no **Claim** had been made as defined under the Policy, but Allied World would accept the matter as notice of circumstances that might lead to a **Claim** pursuant to Policy Section V.E.3.  Allied World also agreed that, to the extent the matter evolved into a **Claim** under the Policy, Allied World would apply toward the Policy's Retention reasonable fees and costs that the Firm incurred in the matter from the date of notice onward.

Notwithstanding that the Firm itself had characterized the matter as a "potential claim" in its October 3, 2023 letter to Allied World, the Firm contested Allied World's position that no **Claim** had been made, and it provided various documents in support of its position.  In January 2024, based on the additional information provided, and in light of the Firm's request, Allied World agreed to treat the matter as a **Claim** under the Policy.  Allied World confirmed its position to the Firm during a telephone call on January 16, 2024.  During that call, Allied World specifically advised the Firm that the Policy does not afford coverage for fee disputes and confirmed that any reduction of the Firm's fees would not qualify as covered **Damages** under the Policy.

The court in the Wrongful Death Action set an evidentiary hearing on the Motion to Enforce for February 1, 2024.  On January 16, 2024, the Firm filed a motion in limine seeking to limit the scope of testimony at the evidentiary hearing to the following issues: "(i) did Feldman Shepherd receive Mrs. Peterson's express authority to send the policy limits demand letter to defendants; (ii) did Mrs. Peterson ratify Feldman Shepherd's authority to send the policy limits demand letter by not objecting to the letter or the settlement in a timely manner; and (iii) if the answer to (i) or (ii) is yes, are the Petersons contractually obligated to pay a fee equal to 37.5% of the net settlement proceeds to Feldman Shepherd pursuant to the signed contingent fee agreement." The Firm argued that "[t]he evidentiary hearing is not an opportunity for Mrs. Peterson to test-drive an alleged malpractice claim against Feldman Shepherd or to introduce evidence that Feldman Shepherd did not adhere to the applicable standard of care."  The Firm made a second motion in limine to exclude testimony by the Petersons' expert on similar grounds.

wiley.law

Louis A. Bove, Esq.
February 14, 2024
Page 4

On or around January 20, 2024, the Petersons demanded $1,653,168 in connection with a global resolution of all issues, which the Firm rejected.

On January 24, 2024, the Firm proposed a settlement structure to the Petersons whereby the Firm would accept a reduced contingent fee on the UIM recovery, the Petersons would drop their objections to the Motion to Enforce, and the Petersons would preserve a potential malpractice claim against the Firm. The Petersons rejected the Firm's offer on January 26, 2024. Later that evening (a Friday), the Petersons offered to pay the Firm a reduced fee of $164,766.14 in exchange for a global resolution, including with respect to any future potential legal malpractice claims.

On January 27, 2024 (Saturday), the Firm's defense counsel emailed Allied World regarding the Petersons' offer, confirming that it was not acceptable to the Firm. Counsel explained that the Firm was contemplating a response as follows:

> Feldman Shepherd would like to make a one-time, take it or leave it, offer to pay $500,000 to the Petersons to resolve the settlement dispute and the malpractice claim. Feldman Shepherd would like Allied to contribute 50% of the settlement payment to resolve the malpractice claim. In other words, Feldman Shepherd would agree to compromise its fee by $250,000 and Allied would agree to compromise the malpractice claim for $250,000.

That night, the Petersons extended a new settlement proposal. In an email to Allied World on January 28, 2024 (Sunday), defense counsel described the offer as follows:

> Feldman Shepherd's fee for settling the case for $2.6MM is $950,712. The Petersons are offering to compromise the settlement dispute AND the malpractice action by offering to pay Feldman Shepherd a total of $450,152.69. The Petersons' proposal results in a reduction of Feldman Shepherd's fee by approximately $500,000 in exchange for settling the current dispute AND the future malpractice action.

The email further stated:

> In order to reach a resolution that is fair and reasonable, Feldman Shepherd is proposing to allocate $250,000 of the $500,000 reduction as a compromise of the [fee] dispute (for which Allied has said there is no coverage) and to allocate $250,000 of the $500,000 as a compromise of the malpractice action (for which there is coverage).

The Petersons' offer purported to expire on Monday, January 29, 2024 at 11am, and the Firm requested a response from Allied World as soon as possible. Defense counsel for the Firm sent follow-up emails and left a voicemail over the course of the weekend. The Firm also had its insurance broker contact Allied World on the morning of January 29, 2024. Allied World received these communications at the opening of business on Monday morning, January 29, 2024, and immediately reached out to the Firm and its defense counsel to schedule a call for 10:00 a.m.

Louis A. Bove, Esq.
February 14, 2024
Page 5

During the telephone conference on January 29, 2024, Allied World advised that it was not a in a position to agree to contribute $250,000 to settle a "future" malpractice action but that it would contribute $50,000 toward a global resolution of the Peterson Matter based on a "cost of defense" consideration regarding any future legal malpractice claim.  Allied World noted that it deferred to the Firm and its counsel as to whether to proceed with the contemplated settlement and further stated that, if the Firm wanted to settle the uncovered fee dispute and carve out from the release a future malpractice claim, Allied World did not object and it would continue to provide the Firm with a vigorous defense in any such future claim.

Meanwhile, the Firm requested more time to consider the Petersons' offer.  The Petersons agreed to keep their offer open until 4pm that same day, stating that "In our discussions, [the Firm's defense counsel has] indicated that Feldman Shepherd has approved of the sum demanded for settlement, [the Firm's defense counsel has] further indicated, and i take your email to mean, that [the Firm's defense counsel] need[s] additional time to obtain final approval from the carrier."

Later that day, the Firm forwarded Allied World an email from the Petersons stating that, with respect to the $500,000 compromise amount, they now apportioned $20,873.35 to the fee dispute and $479,686.66 towards the "malpractice claim."  The Firm forwarded the Petersons' email to Allied World and asserted that it was "evidence" that the "bulk of the settlement" was attributable to the legal malpractice claim.

Allied World responded shortly thereafter, reiterating that its consent to settle was required under the Policy and that, based on the available information, it could not consent to the settlement.

On January 30, 2024, the Firm's defense counsel advised Allied World that the Firm had settled the Peterson Matter.  The Firm then emailed Allied World asking if it might be possible to "work this out."  Allied World agreed to discuss the matter further, and a call was set for January 31, 2024. Shortly before the call, the Firm emailed Allied World accusing it of acting in bad faith.  After receiving that email, Allied World asked to reschedule the call so that a representative of this firm could attend.

Allied World and the undersigned participated in call with Alan Feldman, of the Firm, on February 1, 2024.  At the outset of the call, Allied World's representatives explained that it would be providing to the Firm a detailed written explanation of its position and that it did not believe that it would be productive for the parties to argue about the issues during the call.  Allied World conveyed that it had invited the call to find out if the Firm had a proposal for how the parties could "work this out" as suggested in the Firm's email of January 30, 2024.  It became clear early on during the call that the Firm did not intend to propose a resolution but was intent on arguing about Allied World's position.

Mr. Feldman's statements during the call grossly mischaracterized facts and events.  Inexplicably, Mr. Feldman asserted that there had never been any fee dispute with the Petersons.  Rather, he claimed that the dispute had always been about the Firm's malpractice.  Moreover, despite the Firm's prior characterizations of the malpractice allegations as baseless and unsupported by any evidence, Mr. Feldman stated that the Firm had significant exposure in connection with a malpractice claim by the Petersons.

Mr. Feldman also argued that Allied World had "denied coverage" for the malpractice claim, and that it had refused to explain why. Mr. Feldman further stated that the Firm had consulted with

Louis A. Bove, Esq.
February 14, 2024
Page 6

coverage counsel and had been informed that it would win "100%" of the time in litigation against Allied World.  Following these and similar comments, Allied World concluded that further discussion would not be productive.  Allied World ultimately ended the call, reiterating that it would be providing a detailed written statement conveying its position and asking Mr. Feldman to confirm if coverage counsel was formally retained so that this firm could communicate with the Firm's counsel directly.

On February 5, 2024, the Firm followed up via email making more unsupported allegations and mischaracterizing the discussion during the parties' February 1, 2024 telephone call.  In response, Allied World disputed the Firm's recitation of events and again reiterated that it would be providing a written explanation of its position.

<u>**COVERAGE ANALYSIS**</u>

I.      <u>**The Policy does not afford coverage for fee disputes.**</u>

Subject to its terms and conditions, the Policy's Insuring Agreement provides:

> The **Insurer** will pay on behalf of an **Insured**, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** first made during the **Policy Period** or any applicable Extended Reporting Period and reported in accordance with the terms of this Policy, for a **Wrongful Act**.

> It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:

> 1. during the **Policy Period**; or

> 2. on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

>> (a) the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**;

>> (b) prior to the date listed in Item 8. of the Declarations, no **Insured** had any basis:  (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

>> (c) there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

> The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

wiley.law

Louis A. Bove, Esq.
February 14, 2024
Page 7

Policy, Section I.  In the event of a covered **Claim**, the Policy provides that Allied World has the right and duty to defend.  *See id.*, Section V.C.1, as modified by Endorsement No. 2.

Based on Ms. Peterson's accusations that the Firm did not obtain her consent to settle with the trucking company in the Wrongful Death Action, Allied World agreed to treat the matter as a **Claim** alleging **Wrongful Acts** by the **Named Insured**, and agreed to provide a defense to the Firm, subject to a complete reservation of rights.

As Allied World has informed the Firm, the Policy does not afford coverage for fee disputes.  The Policy provides specified coverage for **Damages** and **Claim Expenses** because of **Claims** alleging a **Legal Services Wrongful Act**.  *See id.*, Sections I, III.J.  A **Legal Services Wrongful Act** is defined as an "actual or alleged act, error or omission by an **Insured**, *solely in the performance of or failure to perform **Legal Services**,*" which, in turn, means "those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer in good standing… but *only where such services were performed in the ordinary course of an **Insured's** activities as a lawyer*."  *Id.*, Sections III.Q, III.P (emphasis added).  Fee setting and billing are administrative functions inherent in any profession and are not solely in the Firm's performance of **Legal Services**.

Additionally, the Policy defines **Damages**, in part, as "the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest." *Id.*, Section III.G, as modified by Endorsement No. 4.  However, the Policy provides that **Damages** do not include, among other things: "the return or restitution of legal fees, costs and expenses, *no matter how claimed'* or "amounts deemed uninsurable by law."  *Id.*  Thus, Allied World has no obligation to pay amounts in connection with any return or reduction of the Firm's fees, "no matter how claimed."

Notwithstanding Mr. Feldman's assertion during the February 1, 2024 call that this matter was never about a fee dispute, the record clearly reflects the opposite.  Indeed, in its original notice letter to Allied World, the Firm described the matter as primarily a fee dispute.  The Firm stated that "because plaintiff is now contending that authority to settle was not given, and is suggesting at least the *possibility* of a 'professional malpractice action' *in the future* … we are providing this notice of a potential claim in the event that the Court determines that the settlement was not authorized by our former client(s)."  October 3, 2023 Letter at 2 (emphasis added). The Firm's Motion to Enforce likewise did not mention any issues beyond the fee dispute.

In fact, the record reflects that, until the point of the Firm's unilateral settlement with the Petersons, the parties' dispute centered on the Firm's entitlement to fees.  More specifically, at issue was whether the Firm was entitled to a 37.5% contingency fee calculated based on the total recovery from the trucking company and the UIM coverage.  The Petersons argued that the Firm was not entitled to collect any contingency fee from the UIM coverage recovery and further contended that they had never agreed to a 37.5% fee recovery on the settlement with the trucking company.

Pursuant to its express terms, the Policy does not cover fee disputes involving the return or reduction of the Firm's fees "no matter how claimed."

Louis A. Bove, Esq.
February 14, 2024
Page 8

**II.     The Firm unilaterally settled with the Petersons on unreasonable terms and without Allied World's consent, and the Policy therefore does not provide coverage.**

The Policy affords Allied World with both the right and the duty to defend, which includes making decisions regarding settlement.  To that end, the Policy provides that "[n]o **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**." *Id.*, Section V.H.  By email of January 29, 2024, Allied World reminded the Firm of this Policy provision and informed the Firm that it did not consent to the Firm's proposed settlement with the Petersons which would allocate the "bulk" of the settlement to resolving allegations of legal malpractice and de minimus amounts to the fee dispute.  Allied World understands that the Firm proceeded with the settlement notwithstanding Allied World's lack of consent.

"Pennsylvania law requires that a settlement entered without the insurers' knowledge or consent must be reasonable and in good faith and non-collusive."  *Dietz & Watson, Inc. v. Liberty Mut. Ins. Co.*, No. CIV.A. 14-4082, 2015 WL 356949, at *9 (E.D. Pa. Jan. 28, 2015).  Where, as here, an insurance company defends an insured subject to a reservation of rights, the policy requires the insurer's consent to any settlement, and the insured settles without consent, the insurer can only be held liable if the settlement is fair and reasonable in light of the totality of the circumstances. *Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 131 A.3d 445, 463 (Pa. 2015).

As an initial matter, the circumstances surrounding the Firm's demand on Allied World to settle were not reasonable.  Allied World learned of the Firm's proposed settlement on the morning of January 29, 2024 and the Firm demanded a response by 4pm that same day.

That issue aside, the Firm's self-serving allocation of the bulk of the settlement to resolving a future legal malpractice claim was neither fair nor reasonable under the circumstances.  As explained above, at the time of the settlement, the Firm's dispute with the Petersons centered on the Firm's entitlement to fees.  Although the Petersons had made generalized statements that they had not consented to the settlement with the trucking company and they had opposed the Motion to Enforce on that basis, the legal malpractice allegations were undeveloped, as were the Firm's defenses to such allegations.  Notably, prior to pressuring Allied World to settle on January 29, 2024, the Firm itself had taken the position that there was no validity to any such allegations. The information that the Firm provided to Allied World supports this position, as it reflects that the Petersons did not voice objections to the settlement at the time of the agreement and only later asserted a lack of consent after the fee dispute with the Firm could not be resolved.  In addition, the record reflects that the Firm had a potentially strong causation defense to any legal malpractice claim centering on the Petersons' alleged failure to consent to the settlement.  More specifically, the record reflects that the Firm's investigation had revealed that the trucking company did not have collectible assets beyond its insurance coverage.  As such, the Petersons could not have collected more than the trucking company's policy limits even if the matter had not settled and the Petersons had gone on to secure a larger judgment against the company at trial. The legal malpractice claim may also have been rendered moot if the court concluded that the Petersons had not consented to the settlement and had refused to enforce the settlement on that basis.

Louis A. Bove, Esq.
February 14, 2024
Page 9

In short, under these circumstances, it was neither fair nor reasonable for the Firm (or the Petersons) to allocate the "bulk" of the settlement to a future legal malpractice claim that was undeveloped and which appeared to be highly defensible. Putting aside the allocation, the amount of the settlement purportedly attributed to the malpractice claim was excessive and unreasonable on its face, considering not only the Firm's position that it in fact had the Petersons' consent to the settlement but also that the settlement required payment of the trucking company's full insurance limit of liability. Correspondingly, it was entirely reasonable for Allied World to refuse to consent to a settlement on these terms, and Allied World was well within its rights under the Policy to forego settling and to proceed with defending any future legal malpractice claim.

Allied World further points out that the purported allocation of the settlement is unreasonable on its face because it provides for the Firm's recovery of all but approximately $20,000 of its $950,000 contingent fee under circumstances where (1) the Firm was fired before the contingent event (*i.e.,* the settlement) was confirmed; and (2) the Firm asserts that it faced significant exposure for committing legal malpractice in connection with the representation. Put differently, as the Firm describes the facts, the amount of its fee is grossly excessive and unreasonable.

Pennsylvania law supports Allied World's position. Where, as here, the client terminates the attorney-client relationship before the happening of the contingency (*i.e.*, a recovery), the terminated firm is not entitled to the previously-agreed-upon contingent fee percentage. *See In re Thorpe*, 755 F. App'x 177, 180 (3d Cir. 2018) ("Because the contingency did not occur during his representation of the Thorpes, Mirarchi is not entitled to collect the fee."); *Kelly v. Vennare*, No. 2069 WDA 2014, 2016 WL 1062819, at *1 (Pa. Super. Ct. Mar. 16, 2016) ("Precedent establishes that an attorney cannot recovery on a contractual basis when discharged by a client"). Rather, "a discharged contingency fee lawyer is entitled to just compensation and this is had through quantum meruit." *Angino & Rovner v. Jeffrey R. Lessin & Assocs.*, 131 A.3d 502, 509 (Pa. Super. 2016). "Determining the appropriate attorney's fee award on a quantum meruit basis… requires an exacting analysis, in which courts consider various factors, including: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; ... the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question." *Kang Haggerty LLC v. Hayes*, No. CV 17-1295, 2023 WL 1862288, at *6 (E.D. Pa. Feb. 9, 2023) (internal citations and quotations omitted).

It follows that, where a law firm is accused of malpractice, and the law firm has asserted that it faces significant exposure on such claim, it would not be "just" for the law firm to receive all but $20,000 of its nearly $1,000,000 contingent fee. Yet that is exactly the result contemplated by the Firm's settlement with the Petersons. Under any objective analysis, the settlement is not reasonable.

Louis A. Bove, Esq.
February 14, 2024
Page 10

## **CONCLUSION**

For the reasons discussed above, Allied World has no obligation to pay any amounts in connection with the Firm's unilateral settlement with the Petersons, which was unreasonable on its face and which the Firm entered into without Allied World's consent, as is required under the Policy.  Allied World reserves all rights under the Policy, applicable law, and in equity.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Kimberly Cereijo
Joseph W. Gross

cc:     Jaclyn Adorno / Allied World (jaclyn.adorno@awac.com)

# COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____ 1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

_____ 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

_____     a. Uniform Commercial Code transactions;

_____     b. Purchases or sales of business or the assets of businesses;

_____     c. Sales of goods or services by or to business enterprises;

_____     d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

_____     e. Surety bonds;

_____     f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

_____     g. Franchisor/franchisee relationships.

_____ 3. Actions relating to trade secret or non-compete agreements;

_____ 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____ 5. Actions relating to intellectual property disputes;

_____ 6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____ 7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____ 8. Actions relating to corporate trust affairs;

__X__ 9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____ 10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

EFS #2405023208                                                                 \\zdraddm 5/07